WR-84,320-01

**Application for Writ of Habeas Corpus
From Smith County**

Ex Parte: KIMBERLY CARGILL
(Name of Applicant)

241st District Court Judicial District Court

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 06 2016

Abel Acosta, Clerk

TRIAL COURT WRIT NO. 241-1510-10-A

CLERK'S SUMMARY SHEET
VOLUME 1

**Applicant's Name :** KIMBERLY CARGILL
(As reflected on the Judgment)

**Offense:** CAPITAL MURDER BY TERROR THREAT/OTHER FELONY
(As reflected on the Judgment)

**Cause No:** 241-1510-10
(As reflected on Judgment)

**Plea:** Not Guilty
(As reflected on Judgment)

**Sentence:** DEATH PENALTY/ Texas Department of Criminal Justice
(As described on the Judgment)

**Trial Date:** 05/31/2012
(Date upon which sentence was imposed)

**Judge's Name:** Jack Skeen, Jr.
(Judge presiding at trial)

**Appeal No:** AP-76,819
(If applicable)

**Citation to Opinion:** S.W.3d
(If applicable)

**Hearing Held:** No
(Pertaining to the application for writ)

**Findings and Conclusions Filed:**
**05/20/16**

**Recommendation:** Denied
(Trial court's recommendation regarding application)

**Judge's Name:** Jack Skeen, Jr.
(Judge presiding over habeas proceedings)



Smith County Courthouse
100 N. Broadway, Room 204
Tyler, Texas 75702

# Lois Rogers
## Smith County District Clerk

(903) 590-1660
Fax (903) 590-1661

In the 241st District Court of Smith County,

Texas, the Honorable, JACK SKEEN, JR. Judge

Presiding, the following proceedings were held and the following

Instruments and other papers were filed in this cause, to wit:

Trial Court Cause No.  241-1510-10-A

STATE OF TEXAS, Appellant

vs.

KIMBERLY CARGILL, Appellee



TABLE OF CONTENTS

KIMBERLY CARGILL

TRIAL COURT CAUSE NO. 241-1510-10

WRIT NO. 241-1510-10-A

INDEX

| Document Title | File Date | Page |
|---|---|---|
| **VOLUME I** | | |
| 1. Application for Writ of Habeas Corpus | 08/19/14 | 1-193 |
| **VOLUME II** | | |
| 2. Exhibits 1-38 To Initial Application | 08/19/14 | 194-474 |
| **VOLUME III** | | |
| 3. Indictment | 09/22/11 | 475-476 |
| 4. Judgment | 06/01/12 | 477-481 |
| 5. Motion to Seal Exhibits | 08/19/16 | 482-485 |
| 6. Letter from Brad Levenson | 08/25/14 | 486-489 |
| 7. State's Preliminary Answer | 09/12/14 | 490-494 |
| 8. Response to State's Preliminary Answer | 09/19/14 | 495-501 |
| 9. Memorandum Order | 09/26/14 | 502-503 |
| 10. Order-Request to Seal Exhibits | 09/26/14 | 504 |
| 11. Request for Live Status Conference | 09/30/14 | 505-507 |
| 12. Affidavit of Douglas Parks | 12/29/14 | 508-510 |
| 13. Motion for Extension of Time to File Affidavit | 01/08/15 | 511-512 |
| 14. Order-Motion for Extension of Time to File Affidavit | 01/08/15 | 513 |
| 15. Second Motion for Extension of Time to File Affidavit | 03/09/15 | 514-516 |
| 16. Order-Motion for Extension of Time | 03/09/15 | 517 |
| 17. Third Motion for Extension of Time to File Affidavit | 05/06/15 | 518-519 |

| | | |
|---|---|---|
| **18.** Order-Motion for Extension of Time | 05/08/15 | 520 |
| **19.** Affidavit of J. Brett Harrison | 05/22/15 | 521-551 |
| **20.** Affidavit of Jeff Haas | 05/22/15 | 552-569 |
| **21.** Motion to Order Live Evidentiary Hearing | 06/10/15 | 570-578 |
| **22.** State's Response to Motion to Evidentiary Hearing | 06/16/15 | 579-593 |

**VOLUME IV**

| | | |
|---|---|---|
| **23.** State's Supplemental Answer | 07/31/15 | 594-918 |

**VOLUME V**

| | | |
|---|---|---|
| **24.** Order | 08/19/15 | 919 |
| **25.** Motion for Extension of Time to File Proposed FFCL | 09/09/15 | 920-925 |
| **26.** Order-Motion for Extension of Time | 09/09/15 | 926-927 |
| **27.** Response to State's Supplemental Answer | 11/30/15 | 928-939 |
| **28.** Objection to Court Making Findings of Fact | 11/30/15 | 940-1079 |
| **29.** Order from Court of Criminal Appeals | 12/16/15 | 1080-1082 |
| **30.** Order Denying Motion for Live Evidentiary Hearing | 05/20/16 | 1083 |
| **31.** Findings of Fact | 05/23/16 | 1084-1156 |
| **32.** Docket Sheet | | 1157-1164 |

FILED
LOIS ROGERS
DISTRICT CLERK

2011 AUG 19 PM 1: 42

SMITH COUNTY TEXAS

BY_____
DEPUTY

## IN THE 241ST JUDICIAL DISTRICT COURT

## SMITH COUNTY, TEXAS

|  |  |  |
|---|---|---|
| **EX PARTE** | ) | Trial Cause No. |
| **Kimberly Cargill** | ) | 241-1510-10 |
| **APPLICANT** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS
## (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(Email: Brad.Levenson@ocw.texas.gov)
JANET GILGER-VANDERZANDEN
(No. 24079978)
(Email: Janet.Gilger-VanderZanden@ocw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(Email: Derek.VerHagen@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave., Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

1

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................ii

TABLE OF AUTHORITIES.................................................................................ix

PROCEDURAL HISTORY .................................................................................2

    A.    Trial Court Proceedings...................................................................2

    B.    State Appellate Proceedings ...........................................................3

    C.    State Habeas Proceedings ...............................................................3

STATEMENT OF FACTS.....................................................................................4

    A.    Guilt Phase Presentation by the State.............................................4

    B.    Guilt Phase Presentation by the Defense.......................................8

    C.    Guilt Phase Rebuttal by the State .................................................11

    D.    Punishment Phase Presentation by the State ...............................11

    E.    Punishment Phase Presentation by the Defense ..........................13

    F.    Punishment Phase Rebuttal by the State .....................................13

STANDARD OF CARE .......................................................................................14

    A.    Ineffective Assistance of Trial Counsel .....................................14

    B.    Ineffective Assistance of Appellate Counsel..............................18

    C.    Scope of the Waiver of Attorney-Client Privilege .....................19

ARGUMENT .......................................................................................................22

CLAIM ONE TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT CHERRY WALKER DIED OF SUDDEN UNEXPECTED DEATH IN EPILESPY RATHER THAN HOMICIDAL VIOLENCE ..........................................................................................................22

    A.    SUDEP Evidence Presented during the Guilt/Innocence Phase of Trial    ..................................................................................................22

B. SUDEP Expert...........................................................................26

    1. Explanation of SUDEP..............................................................27

    2. Walker's Medical History Reveals Multiple Risk Factors for SUDEP ..............................................................................................28

    3. The Circumstances of Walker's Death are Indicative of SUDEP 33

    4. The Autopsy of Cherry Walker is Consistent with SUDEP.........34

    5. Walker's Death Is Likely to Have Been a SUDEP Death............36

C. Ineffective Assistance of Trial Counsel ...........................................37

    1. Trial Counsel's Failure to Call an Expert like Dr. Samden Lhatoo Constituted Deficient Performance..............................................39

    2. Trial Counsel's Failure Prejudiced Cargill...............................41

CLAIM TWO TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO VICTIM IMPACT EVIDENCE PRESENTED DURING THE GUILT/INNOCENCE PHASE OF TRIAL ..........................................................44

A. Trial Counsel Has a Duty to Preserve Error by Making Proper Objections ...............................................................................................44

B. Victim Impact Evidence is Inadmissible during the Guilt/Innocence Phase of Trial.................................................................45

C. Trial Counsel Failed to Object to the Victim Impact Testimony of Walker's Stepmother as Irrelevant.............................................................46

D. Trial Counsel Failed to Object to the Irrelevant Testimony Offered by Joseph Mayo.........................................................................................48

E. Cargill was Prejudiced by Trial Counsel's Failure to Object to Irrelevant Testimony and Preserve Error for Appeal..................................50

CLAIM THREE TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER LAY TESTIMONY BY BRENDA WHITAKER DURING THE GUILT/INNOCENCE PHASE OF TRIAL............................................51

A. Trial Counsel Has a Duty to Preserve Error by Making Proper Objections ...............................................................................................51

iii

3

     1.  Limitation on Lay Witness Opinions ........................................52

     2.  Counsel May Not Engage in Argumentative Questioning...........53

    B.     Trial Counsel Failed to Object to the Improper Lay Opinion Elicited from Brenda Whitaker.................................................................54

    C.     Cargill was Prejudiced by Trial Counsel's Failure to Object to the Improper Lay Testimony of Brenda Whitaker..........................................57

CLAIM FOUR   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILURE TO REQUEST A CHANGE OF VENUE DUE TO INFLAMMATORY PRE-TRIAL PUBLICITY..................................................................................................58

    A.     The Media Coverage of Cargill's Arrest and Trial Was Extensive and Inflammatory ..............................................................................59

    B.     Cargill Was Prejudiced by Trial Counsel's Failure to Move for a Change of Venue ..................................................................................65

    C.     Conclusion ...................................................................................69

CLAIM FIVE   CARGILL RECEIVED INEFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL REGARDING THE IMPROPER AND PREJUDICIAL ADMISSION OF AN AUTOPSY PHOTOGRAPH.....................69

    A.     Appellate Counsel Performed Ineffectively When Failing to Appeal Trial Counsel's Overruled Objection to the Admission of the Autopsy Photograph During the Testimony of Cherry Walker's Hairdresser.................70

    B.     The Autopsy Photo Used by the State During the Testimony of Walker's Hairdresser Was Far More Prejudicial Than Probative and Thus Inadmissible.......................................................................................71

    C.     Conclusion ...................................................................................73

CLAIM SIX   THE STATE COMMITTED MISCONDUCT WHEN IT ENGAGED IN IMPROPER ARGUMENT THROUGHOUT CARGILL'S TRIAL, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GREAT MAJORITY OF THESE IMPROPRIETIES..................................74

    A.     Relevant Legal Standards ............................................................75

    B.     The State's Misconduct ................................................................77

iv

4

1. Prosecution Testifying to Facts and Assertions Not in Evidence 77

2. Disparaging Remarks ...................................................................... 83

3. Religious Imagery ........................................................................ 85

4. Sidebar Comments and Other Expressions of Personal Opinion. 87

5. Misrepresentation of the State's Role .......................................... 88

6. Improper Challenging of an Expert's Qualifications .................... 89

7. Sympathetic References to the Victim .......................................... 91

8. Diminishing the Magnitude of the Jury's Responsibility ............ 92

C.   Conclusion ................................................................................ 94

CLAIM SEVEN TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
PRESENT MITIGATING LAY WITNESS TESTIMONY AT THE
PUNISHMENT PHASE OF CARGILL'S CAPITAL TRIAL ............................. 95

A.   Trial Counsel Failed to Present a Comprehensive Picture of
Cargill's Life History During the Punishment Phase of Her Capital Trial ........ 96

B.   Cargill Suffered From Trauma During Childhood, Adolescence,
and Early Adulthood ...................................................................... 99

1.   Kimberly Is Born Into a Chaotic and Unstable Family
Environment ................................................................................ 99

2.   Kimberly's Childhood and Adolescence are Wrought with
Dysfunction and Feelings of Abandonment ................................ 101

3.   Kimberly's First Divorce Takes a Significant Toll on Her
Emotional Health ........................................................................ 105

C.   Despite Assertions to the Contrary, There Was a Positive and
Compassionate Side to Kimberly Cargill .................................... 107

D.   Trial Counsel Presented an Expert Who Testified That Cargill
Suffered From Borderline Personality Disorder Without Independent
Corroboration of Environmental Factors ..................................... 110

      E.     Trial Counsel's Failure Prejudiced Cargill................................. 114

CLAIM EIGHT TRIAL COUNSEL WERE INNEFFECTIVE FOR FAILING TO REBUT THE STATE'S CASE IN AGGRAVATION DURING THE PUNISHMENT PHASE OF TRIAL............................................................................ 115

      A.     Trial Counsel Has a Duty to Rebut the Prosecution's Case in Favor of the Death Penalty ................................................................................ 115

      B.     Trial Counsel Failed to Rebut the Aggravating Testimony of Several State Witnesses During the Punishment Phase of Trial....................... 116

           1. Trial Counsel Failed to Rebut Mike West's Account of the Custody Battle Relating to Their Son, David .................................................. 117

           2. Sonja West Incident................................................................ 122

           3. Injury to a Child Charge Pertaining to Zach Robinson ................ 127

      C.     Cargill was Prejudiced by Trial Counsel's Failure to Rebut the State's Case in Aggravation ............................................................................ 131

CLAIM NINE TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO IMPEACH FORREST GARNER WITH THE TRUE NATURE OF HOW HIS CRIMINAL CONVICTIONS WERE VACATED ................................................ 132

      A.     Forrest Garner's Testimony at the Punishment Phase of Cargill's Trial Was Detrimental and Highly Prejudicial ........................................... 134

      B.     Trial Counsel Failed to Impeach Garner with Information Regarding How His Criminal Convictions for Assault Were Vacated............. 136

      C.     Trial Counsel's Failure to Impeach Forrest Garner Prejudiced Cargill ............................................................................................................ 139

      D.     Conclusion ............................................................................ 140

CLAIM TEN TRIAL COUNSEL WERE INNEFFECTIVE FOR FAILING TO OBJECT TO HEARSAY STATEMENTS OFFERED BY JILL LOWE ............. 141

      A.     Trial Counsel Has a Duty to Preserve Error by Making Proper Objections ....................................................................................................... 141

      B.     Trial Counsel Failed to Object to Multiple Hearsay Statements Offered by Jill Lowe .................................................................................... 142

vi

6

1. Hearsay Testimony Regarding Luke Garner............................... 143

2. Hearsay Testimony Regarding Zach Robinson......................... 143

C. Cargill was Prejudiced by Trial Counsel's Failure to Object to the Hearsay Statements ................................................................................ 145

CLAIM ELEVEN CARGILL'S DEATH SENTENCE WAS ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL ISSUE.......................... 146

A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the Class of Death-Eligible Defendants ........................................ 148

CLAIM TWELVE CARGILL'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE........................................................................ 151

A. The Cargill Jury was Initially Unable to Agree on the First Special Issue ............................................................................................................ 153

B. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances ................................................................................................................... 154

C. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence.................................................. 155

D. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations ................................................................................... 156

E. Conclusion ........................................................................................ 158

CLAIM THIRTEEN CARGILL'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 158

A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily ..................................................................................... 159

B. Texas's Death Penalty Scheme Is Unconstitutional...................... 161

vii

7

       1.   Geography ................................................................................... 162

       2.   Race ........................................................................................... 165

     C.   Conclusion ................................................................................... 168

CLAIM FOURTEEN    CARGILL'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING ................................................................................. 168

     A.   The Texas Statute and Cargill's Jury Instructions ....................... 169

     B.   Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence.... ............................................................................................... 170

     C.   Conclusion ................................................................................... 172

CLAIM FIFTEEN   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESERVE THE RECORD FOR APPEAL ............................................... 173

     A.   Given the Importance of Preserving Issues for Appeal and the Clear Mandate of the ABA Guidelines to Do So, Failure to Preserve the Trial Record Constitutes Ineffective Assistance of Counsel ....................... 174

     B.   Even if Failure to Preserve the Trial Record Will Not Always Automatically Satisfy the Deficient Performance Prong of *Strickland*, the Deficient Conduct of Cargll's Counsel in This Case Warrants a Finding of Deficient Performance ...................................................................... 176

     C.   This Inquiry Must Take Into Account the Inherent Difficulties of Establishing Prejudice When a "Substantial and Crucial Portion" of the Transcript is Missing .................................................................................. 177

PRAYER FOR RELIEF ............................................................................................... 178

# TABLE OF AUTHORITIES

**Federal**

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003)...............................................20

*Bobby v. Van Hook*, 558 U.S. 4 (2009)...................................................................15

*Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388 (2011).......................................15

*Evitts v. Lucey*, 469 U.S. 387 (1985)..............................................................18, 73

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011)...............................15, 17

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687 (C.D. Cal. 1988).................................................................................................20

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001)...........................................20

*Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967)......................................20

*Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876 (E.D. Pa. 1976).....................20

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005)......................................................16

*Padilla v. Kentucky*, 559 U.S. 356 (2010)..............................................................15

*Payne v. Tennessee*, 501 U.S. 808 (1991)........................................................45, 48

*Porter v. McCollum*, 558 U.S. 30 (2009)............................................14, 15, 17, 18

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008).................................18, 69, 70

*Rompilla v. Beard*, 545 U.S. 374 (2005).........................................................15, 16

*Smith v. Robbins*, 528 U.S. 259 (2000)..........................................................18, 69

*Strickland v. Washington*, 466 U.S. 668 (1984).............................................passim

*United States v. Basham*, 2012 WL 1130657 (D.S.C. Apr. 4, 2012) (unpublished) ...................................................................................................................................20

*United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009)..................................19, 20

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006).......................................................14

*Wiggins v. Smith*, 539 U.S. 510 (2003).........................................................passim

*Williams v. Taylor*, 529 U.S. 362 (2000).....................................................18, 114

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)............................................................168

**State**

*Alabama v. Lewis*, 36 So. 3d 72 (Ala. Crim. App. 2008)........................................20

*Amis v. State*, 910 S.W.2d 511 (Tex. App.—Tyler 1995, pet. ref'd)...............85, 94

*Borjan v. State*, 787 S.W.2d 53 (Tex. Crim. App. 1990).......................................75

*Brown v. State*, 270 S.W.3d 564 (Tex. Crim. App. 2008).....................................76

*Campbell v. State*, 610 S.W.2d 754 (Tex. Crim. App. 1980).................................76

*Cannon v. State*, 668 S.W.2d 401 (Tex. Crim. App. 1984)...................................76

*Cazares v. State*, 488 S.W.2d 110 (Tex. Crim. App. 1972)...................................87

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010)......................................38

*Cortez v. State*, 683 S.W.2d 419 (Tex. Crim. App. 1984).....................................75

*Crawford v. State*, 412 S.W.2d 57 (Tex. Crim. App. 1967)...................................87

*Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010).......................................53

*Del Carmen Hernandez v. State*, 273 S.W.3d 685 (Tex. Crim. App. 2008)............... 142

*Dickinson v. State*, 685 S.W.2d 320 (Tex. Crim. App. 1984)............................. 75

*Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) ........................... 89, 93

*Drew v. State*, 76 S.W.3d 436 (Tex. App.—Houston [14th Dist.] 2002) ............... 72

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) ............................ 149

*Dunklin v. State*, 194 S.W.3d 14 (Tex. App.—Tyler 2006)............................. 72

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012)............................. 14

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) ..................... 16, 17, 18

*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012) ....................... passim

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006)........................... 17

*Ex parte Martinez*, 330 S.W.3d 891 (Tex. Crim. App. 2011)....................... passim

*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)...................... 18, 69, 70

*Fairow v. State*, 943 S.W.2d 895 (Tex. Crim. App. 1997).............................. 52

*Ford v. State*, 919 S.W.2d 107 (Tex. Crim. App. 1996)............................. 45, 48

*Gaddis v. State*, 753 S.W.2d 396 (Tex. Crim. App. 1988) ............................ 84

*Gaffney v. State*, 937 S.W.2d 540 (Tex. App.—Texarkana 1996)...................... 83

*Granviel v. State*, 552 S.W.2d 107 (Tex. Crim. App. 1976)......................... 149

*Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999)............................... 76

*Henley v. State*, 576 S.W.2d 66 (Tex. Crim. App. 1978)............................. 59

*Hooks v. State*, 44 S.W.3d 607 (Tex. App.—Texarkana 2001)......................... 72

*Howard v. State*, 239 S.W.3d 359 (Tex. App.—San Antonio 2007).................... 175

*In re Dean*, 711 A.2d 257 (N.H. 1998)................................................. 21

*Jackson v. State*, 726 S.W.2d 217 (Tex. App.—Dallas 1987, pet. ref'd) ............... 85

*Joseph v. State*, 3 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 1999)................ 19

*Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975)......................... 149, 159

*Kendrick v. State*, 942 S.W.2d 120 (Tex. App.—Beaumont 1997) ...................... 72

*Kreyssig v. State*, 935 S.W.2d 886 (Tex. App.—Texarkana 1996) ..................... 72

*Maryland Am. Gen. Ins. v. Blackmon*, 639 S.W.2d 455 (Tex. 1982) ................... 19

*Mathews v. State*, 635 S.W.2d 532 (Tex. Crim. App. 1982)........................... 174

*Medina v. State*, 2004 WL 764444, *6 (Tex. App.—Texarkana 2004)................... 175

*Meza v State*, 206 S.W.3d 684 (Tex. Crim. App. 2006)................................ 18

*Miller-El v. State*, 782 S.W.2d 892 (Tex. Crim. App. 1990) ...................... 46, 48

*Moosavi v. State*, 711 S.W.2d 53 (Tex. Crim. App. 1986) ........................... 174

*Mosely v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) ......................... 46, 48

*Oakley v. State*, 68 S.W.2d 204 (Tex. Crim. App. 1934)............................. 85

*Pardee v. State*, 2012 WL 3516485 (Tex. App.—Texarkana 2012, pet. denied).. 53,
............................................................................................. 57

*Richardson v. State*, 257 S.W.2d 308 (Tex. Crim. App. 1953) ....................... 75

*Rougeau v. State*, 738 S.W.2d 651 (Tex. Crim. App. 1987)........................... 89

*Salazar v. State*, 38 S.W.3d 141 (Tex. Crim. App. 2001)............................. 59

x

*Stein v. State*, 492 S.W.2d 548 (Tex. Crim. App. 1973) ............................................ 83
*Summers v. State*, 182 S.W.2d 720 (Tex. Crim. App. 1944) ...................................... 94
*Tanguma v. State*, 47 S.W.3d 663 (Tex. App.—Corpus Christi 2001) ................... 174
*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) .............................. passim
*Waldrip v. Head*, 532 S.E.2d 380 (Ga. 2000) ...................................................... 21
*West v. Solito*, 563 S.W.2d 240 (Tex. 1978) ........................................................ 19

**Statutes**

Tex. Code Crim. Proc. Art. 37.071 § 2(b)(1) ...................................................... 147
Tex. Code Crim. Proc. Art. 37.071 § 2(b)-(e) .................................................... 149
Tex. Code Crim. Proc. art. 37.071, § 2(a)(1) ...................................................... 152
Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)-(2), (e)(1) .................................... 151
Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1) .......................................... 169
Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2) .......................................... 152
Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) ............................................... 169, 172
Tex. Code Crim. Proc. art. 37.071, § 2(g) .......................................................... 152
Tex. Code Crim. Proc., § 2(a)(1) ...................................................................... 152
Tex. Crim. Pro. art. 37.071 § 2(h) .................................................................... 174
Tex. R. Evid. 401 ............................................................................................ 71
Tex. R. Evid. 403 ............................................................................................ 71
TEX. R. EVID. 503 ............................................................................................ 19
Tex. R. Evid. 611(a) ........................................................................................ 53
Tex. R. Evid. 702 ............................................................................................ 55
Tex. R. Evid. 801(a)(2) .................................................................................. 145
Texas Rule of Evidence 404(b) ...................................................................... 144

**Other Authorities**

ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at viii, xxxix (September 2013) ........................................ 147
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ................ 16, 17, 21
*ABA Standards for Criminal Justice* (3d ed. 1993) ...................................... passim
ABA *Standards for Criminal Justice: Prosecution Function* (3d ed. 1993) (Standard 3-5.2(a) ...................................................................................... 76
ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456 (2010) ........................................................................................................ 21

Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/adam_gershowitz/5 (2009) ..................................................................... 163

Christina Studebaker & Steven Penrod, *Pretrial Publicity: The Media, the Law, and Common Sense*, 3 Psychol.Pub.Pol'y & L. 428 (1997) ..................... 65, 68

Christopher Slobogin, *Capital Punishment and Dangerousness*, in MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119 (Robert F. Schopp et al. eds., 2009) .................................................................. 149

David Baldus, et al., *Race and Proportionality Since McCleskey v. Kemp (1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007) .................................................................. 165

Ellen Brickman, et. al., *How Juror Internet Use Has Changed the American Jury Trial*, 1 Journal of Court Innovation 287 (2008)...................................... 68

Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* 5-6 (June 24, 2009)....................................... 167

Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009)......................................... 165

Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345 (1998)......................................................................... 163

Jennifer L. Eberhardt, et al., *Looking Deathworthy*, 17 PSYCH. SCI. 383 (2006). 167

Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010)............................ 163

Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305 (2009)........................................................................................ 163

Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012 ................... 150

Michael Catalano, Making and Preserving the Record – Objections, 6 Am. Jur. Trials 605 (1967)........................................................................... 174

Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845 (1989-1990)............... 150

N. Kerr, *Severity of Prescribed Penalty and Mock Jurors' Verdicts*, 36 J. PERSONALITY & SOC. PSYCH. 1431 (1978)............................................. 167

N.J. Death Penalty Study Comm., *New Jersey Death Penalty Commission Report* 43 (2007) ...................................................................................... 164

Norbert L. Kerr et al., *On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study*, 40 AM. U. L. REV. 665 (1991)............................................................................................. 67

12

Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131 (2012) ............................................... 166

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008) ........................................................................................... 166

Shari Diamond & Neil Vidmar, *Jury Room Ruminations on Forbidden Topics*, 87 Va.L.Rev. 1857 (2001) ....................................................................................... 68

Shari Diamond, *Beyond Fantasy and Nightmare: A Portrait of the Jury*, 54 Buff.L.Rev. 717 (2006) ........................................................................................ 68

State Bar of Texas, Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ...................................................................................................... 16, 21

Steven Goode, et al., *Texas Practice Series: Courtroom Handbook on Texas Evidence* § 611 cmt. 12 (2012) .............................................................................. 53

Tex. Dep't Crim. Just., *Offenders on Death Row* ...................................................... 162

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51 (2003) ............................................................................................................ 156

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

Cherry Walker died from Sudden Unexpected Death in Epilepsy ("SUDEP"). However, the jury sitting in judgment of Kimberly Dianne Cargill ("Cargill") never heard specific evidence regarding SUDEP and how Walker was at particular risk for it. As a result, Cargill was wrongfully convicted of capital murder and sentenced to death.

SUDEP is a very real cause of death which takes thousands of lives each year. It is the subject of extensive study and clinical research. Yet instead of presenting an expert to the jury to explain what SUDEP is and why it was the likely cause of Walker's death, trial counsel accepted the testimony of the State's general neurologist, who did not fully understand SUDEP and its implications, and asserted that Walker did not die from the condition. This failure allowed the State to unremittingly insist that Cargill's testimony that Walker died following a seizure was implausible, ridiculous, and patently false.

Had the jury been presented evidence that Walker was, in fact, a victim of SUDEP, Cargill would not have been convicted of capital murder and would not find herself today languishing on death row. This Court must reverse Cargill's capital conviction, or, at the very least, hold an evidentiary hearing in order for evidence to be presented on Walker's actual cause of death.

i

# I.

## PROCEDURAL HISTORY

Cargill is confined under a sentence of death pursuant to the judgment of the 241st District Court, Smith County, Texas, case number 241-1510-10, which was rendered and entered on June 1, 2012. (5 CR at 982-86; 69 RR at 132.)[1]

### A. Trial Court Proceedings

On July 30, 2010, Honorable Jack Skeen Jr., of the 241st District Court, signed a Certificate of Magistrate charging Cargill with the offense of capital murder. (CR at 14.) Also on July 30, 2010, the court appointed Jeff Haas and Brett Harrison to represent Cargill on the charge with an un-indicted cause number. (CR at 1-2.)

On October 21, 2010, a grand jury indictment was filed charging Cargill with the capital murder of Cherry Walker by means unknown, committed during the offense of retaliation. (CR at 6-7.) On June 16, 2011, Cargill was arraigned and entered a plea of not guilty. (2 RR at 4-8.) On July 6, 2011, Smith County District Attorney Matt Bingham filed the State's Election to Seek the Death Penalty. (CR at 36.) On February 29, 2012, the court denied Cargill's Motion to Quash and Exception to the Form of Indictment. (7 RR at 44-46.)

Voir dire commenced on March 22, 2012, and concluded on April 25, 2012. (9 RR at 25-40 RR at 15.) The guilt/innocence phase of Cargill's trial began on May 7, 2012. After the reading of the indictment, Cargill pled not guilty. The State gave its opening statement and the defense reserved the right to make an opening statement. (42 RR at 53-104.) The State began its case-in-chief the same day. (42 RR at 109.)

---

[1] All references to "CR" are to the Clerk's Record filed on June 18, 2012. All references to "RR" are to the Reporter's Record filed on December 15, 2012.

2

The State rested its case on May 15, 2012. (51 RR at 136.) On May 16, 2012, the defense gave an opening statement and presented its case. (53 RR at 8-54 RR at 162.) On May 17, 2012, the defense rested and the State called two witnesses in rebuttal. (55 RR at 7-53.) On May 18, 2012, the jury received the charge of the court and both sides presented closing arguments. (56 RR at 9-135.) The case was submitted to the jury for guilt/innocence determination on May 18, 2012, and the jury returned a verdict of guilt the same day. (56 RR at 137-42.)

The State began its punishment case on May 21, 2012, and concluded on May 25, 2012, after five days of testimony. The defense case began on May 29, 2012, and concluded the next day. The State presented witnesses in rebuttal and rested their case on May 30, 2012. (58 RR at 14-69 RR at 4.) Jury deliberations commenced on May 31, 2012, and the jury returned the verdict answering "Yes" to special issue one and "No" to special issue two. (69 RR 114-25.) Cargill was subsequently sentenced to death. (69 RR at 132-35.)

## B. State Appellate Proceedings

On May 31, 2012, the court appointed Douglas Parks to represent Cargill for purposes of the direct appeal. (CR at 987, 991.) On December 2, 2013, Cargill filed her opening appellate brief, *Kimberly Cargill v. The State of Texas*, with cause number AP-76,819 in the Texas Court of Criminal Appeals ("CCA"). The State filed its response on April 7, 2014. On May 9, 2014, oral argument was waived by Mr. Parks. A decision by the CCA is currently pending.

## C. State Habeas Proceedings

On June 16, 2012, this court appointed the Office of Capital Writs to represent Cargill in her post-conviction habeas litigation, pursuant to Code of Criminal Procedure Article 11.071. (CR at 992.) This Application follows.

3

## II.

## STATEMENT OF FACTS

### A. Guilt Phase Presentation by the State

The State's guilt phase case-in-chief consisted of testimony from forty-five witnesses presented to advance the theory that Kimberly Cargill killed Cherry Walker on June 18, 2010, in order to prevent Walker from testifying at a child custody hearing involving Cargill's son Luke.

The State asserted that Cherry Walker was intellectually disabled and visited daily by a caretaker named Paula Wheeler. Despite her limitations, and the fact that she suffered from a seizure disorder, Walker babysat several children including Cargill's son Luke. (42 RR at 113; 44 RR at 33-40, 120-25; 50 RR at 24-25, 113-14.) In March 2010, Cargill's son Zach was removed from her custody due to allegations of physical abuse. Based on the allegations regarding Zach, in early June 2010 Cargill's youngest son Luke was also removed from Cargill's care. (49 RR at 104.) With support from Luke's father Forrest Garner, Cargill's mother Rachel Wilson sought custody of Luke. A hearing was set on June 23, 2010, for a determination of Luke's custody. (49 RR at 104-09.) Cargill was distraught at the prospect of losing custody of her fourth child, and asked friends and acquaintances to write letters to the court and/or testify on her behalf. (43 RR at 170-72; 50 RR at 143-60.)

#### June 18, 2010

On Friday, June 18, 2010, Cargill worked over twelve-hours as a licensed vocational nurse at a hospital in Athens, Texas. She started her shift at 6:45 a.m. and ended it at 7:30 p.m. Despite it being against hospital policy, throughout that day Cargill made multiple phone calls and sent text messages to various people, including Walker. (43 RR at 119-29; 43 RR at 201-02; 46 RR at 88-97; 49 RR at 119-25; 50 RR at 115-16.) Cargill was emotional and upset that morning and also

4

made irate phone calls to the clinic manager at Luke's pediatrician's office. (43 RR at 30-33.)

Around 10:00 a.m., Walker was served with a subpoena to testify at the June 23 custody hearing. (43 RR at 40-46.) Walker called Cargill who told Walker she did not have to testify at the hearing and offered to hide Walker until the hearing passed. Cargill told Walker that she (Cargill) would lose her child if the court learned she had a mentally retarded babysitter. (44 RR at 53-58.) Wheeler was with Walker at the time she received the subpoena and spoke twice with Cargill on the phone. Cargill also told Wheeler that Walker did not have to go to court and other people just wanted to confuse Walker and make her look bad or incompetent on the stand. (44 RR at 56-61.)

Walker and Wheeler discussed the subpoena with a supervisor from the community program where Walker received services. (44 RR at 62-63.) Cargill called a friend and expressed how upset she was that Walker was subpoenaed to testify at the custody hearing. (43 RR at 135-36.)

Walker went to the beauty parlor to have her hair done around noon. (43 RR at 107.) After her return home, Walker talked several times to both Wheeler and Wheeler's supervisor and expressed her nervousness and unease at receiving the subpoena. (44 RR at 65-66; 45 RR at 28-29.) At about 8:00 p.m., Walker spoke to Wheeler and said Cargill was coming over to take Walker to dinner. Walker also said that Cargill offered to pay her a lot of money to clean Cargill's house. Walker had already eaten and did not want to go to dinner, but agreed to go with Cargill anyway. (44 RR at 66-68.)

The hospital where Cargill worked called Cargill several times that evening to ask if a medication had been given to a patient, but Cargill did not answer. Cargill finally returned the hospital's call in the early morning hours of Saturday, June 19. (43 RR at 62-71.)

5

## June 19 and June 20, 2010

Around 7:30 a.m. on June 19, Cargill spoke to a neighbor and said she was going to get her car washed. (43 RR at 167.) Early that afternoon, Cargill went to the Whitehouse Police Department and asked how busy they had been that day. Cargill also asked if there was any news about her dog that had been missing for months. (49 RR at 92-93.) Later that night Cargill was seen at the drive-thru of a Burger King and her car appeared to be unusually clean. (43 RR at 213-15.)

That same day, a body was found by a passerby on the side of a rural road in Smith County. (45 RR at 60-68.) The body was face down and a fire had been started with an incendiary liquid. (45 RR at 124, 137.) A Dairy Fresh coffee creamer container was found between the legs of the body. (47 RR at 37.) An autopsy was performed the next day. (51 RR at 39.) There was no discernable cause of death and no apparent fatal injury. The manner of death was determined to be homicidal violence through means unknown. The determination of homicide was based on petechial hemorrhage in the eye and collateral information, including the location where the body was found and the presence of thermal burns. (51 RR 34-89, 102.) There were no defensive wounds, no ligature marks or bruises to the neck, and no injury to the windpipe. (51 RR at 95.)

On Sunday, June 20, Walker's step-mother became concerned because Walker did not attend church. Walker's family called Walker several times and checked her home, finding it messier than usual. (49 RR at 142-43.) Similarly, Wheeler called Walker several times over the weekend but did not get an answer. (44 RR at 69-70.) That evening, Walker's step-mother saw a televised news story that a body matching the description of Walker had been found and called the number provided. (50 RR at 9.) Walker's step-mother told authorities that she had gone to Walker's apartment that day expecting to find that Walker suffered a seizure. (50 RR at 20-24.)

6

19

## The Days Following Walker's Death

On June 22, 2010, Cargill was stopped by police for failure to come to a complete stop at a stop sign. (49 RR at 38.) Pursuant to a search warrant, Cargill's car was searched and impounded. (49 RR at 78.) The car was processed by crime scene technicians and a single black hair was recovered from the passenger side headrest. (48 RR at 66.) The hair was submitted for mitochondrial testing. Walker could not be excluded as the contributor of the hair. (49 RR at 10-20.) Additionally, the coffee creamer container found with Walker's body on the rural road was submitted for DNA testing. The DNA profile obtained was from a mixture of two different individuals. Walker was excluded as a contributor to the mixture. Cargill could not be excluded as a contributor to the DNA on the creamer container. The likelihood that someone who was not Cargill would have the same DNA profile was 1 in 227,000.[2] (48 RR at 155-63.)

Walker's body was conclusively identified by her dental records on June 23. (46 RR at 23-29.) The medical examiner reviewed Walker's medical history and records (which included a documented history of seizures) and opined that Walker's death was due to homicidal violence. (51 RR at 127-29.) The same day, Cargill's house was searched and investigators removed a variety of items. (47 RR at 64-96.)

Cargill was ultimately arrested on the injury to a child warrant. After her arrest, Cargill called a friend from jail and asked her to collect personal effects and mementos from Cargill's house. Cargill also asked her friend to change her email and social media account passwords, and addresses on her bank and other

---

[2] Cargill voluntarily submitted to a buccal swab test on June 28, 2010. (48 RR at 106.)

7

accounts. (50 RR at 218-20.) Cargill's friend was ultimately charged with a felony charge of tampering with evidence. (50 RR at 133.)

## B. Guilt Phase Presentation by the Defense

Cargill testified in her own defense. Cargill testified that Walker babysat somewhat regularly for her son Luke and she was the one who provided CPS with Walker's name and contact information. (53 RR at 15-20.) Cargill acknowledged that she knew Walker was subpoenaed to testify at the June 23 hearing because Walker called her immediately after receiving the subpoena. Cargill told Walker she did not have to testify and she would take Walker to dinner so they could discuss the matter. Cargill also told Walker that she would talk to her attorney and "fix it" so that Walker did not have to testify. (53 RR at 21-22.) Cargill did not dispute the number of calls she made on June 18. She was attempting to get information that her attorney needed for the upcoming hearing. (53 RR at 23-26.)

Cargill finished her work shift at approximately 7:30 p.m., arriving at Walker's apartment at approximately 8:30 p.m.[3] Cargill picked up Walker and they drove to Cargill's home in Whitehouse, arriving around 8:45 p.m. Cargill wanted to stop by her house because she thought her friend William Selmon might be there mowing the lawn. Cargill wanted Selmon to testify at the June 23 hearing and believed he would have a harder time telling her "no" if she asked him in person. Cargill pulled into her driveway, leaving Walker in the car, and went inside the house to use the restroom and plug her cellular phone into a charger. Walker did not get out of the car. (53 RR at 27-36.) Leaving her phone at home in order to charge it, Cargill drove Walker to Posados Café in Tyler, stopping along

---

[3] Cargill got a warning ticket at about 8:00 p.m. for speeding as she drove through Chandler, which was on the way from the hospital to Walker's apartment. (53 RR at 30; 45 RR at 40-54.)

8

the way for Cargill to get gas and cash for dinner.[4] The two women ate dinner together and Cargill proceeded to drive Walker home. (53 RR at 36-39.) While in the car, Walker asked Cargill to drive her to a local bar and became agitated when Cargill refused. (53 RR at 135-36.)

While stopped at a red light in a left-hand only turn lane, Walker began to have a seizure. Traffic was on-coming so Cargill had to wait in order to turn. As she was seizing, Walker repeatedly struck her head on the glass of the passenger side window. Based on her medical training, Cargill knew the most important thing to do during a seizure was to protect the head of the person having the seizure. (53 RR at 41-42.)

Cargill drove the few blocks to Walker's apartment complex, stopped the car and exited the driver's side door, and ran to open the passenger door. Walker fell to the ground, striking her head. The seizure stopped within a few seconds of Walker hitting the ground. Cargill could not call 911 because her phone was still at home in the charger. Cargill yelled for help and attempted to help Walker by performing CPR and mouth to mouth resuscitation. There was no one else at or around the apartment complex. (53 RR at 42-47.)

Cargill pulled Walker back into the passenger side of the car in order to drive her to the hospital which was a few blocks away. As she was driving to the hospital Cargill realized Walker had been unresponsive for over ten minutes and was clearly dead. Cargill panicked, and under the mistaken impression that Walker striking her head on the ground might have caused her death, did not take Walker to the hospital. Instead, Cargill drove around in a panic for approximately forty-five minutes and ended up out on a rural road. Cargill pulled Walker's body

---

[4] Cargill's representation that she stopped for cash was corroborated by bank records that showed she withdrew $35 from her account at 9:16 p.m. on the night of June 18. (47 RR at 14-15.)

9

out of her car onto the ground. Cargill used lighter fluid to burn Walker's shirt because she knew her DNA in the form of tears, sweat, and saliva, would be present on Walker's clothes. (53 RR at 48-52.)

Cargill admitted to washing her car on June 19 in order to destroy any evidence. She also confessed to going to the Whitehouse police station, also on June 19, to attempt to get information about Walker potentially being found. Cargill adamantly denied killing Walker. (53 RR at 53-55.)

During cross-examination, Cargill testified at great length regarding the events of June 18 and after. (See 53 RR at 55-54 RR at 85.) Additionally, Cargill testified regarding prior bad acts she allegedly committed including putting her hands around her mother's throat (54 RR at 36-39); biting her son Jamie (54 RR at 39-43); and pushing and choking her son Zach.[5] (54 RR at 43-47.)

The defense also presented the following: the detective who searched Walker's apartment found pills designated for June 18 in Walker's pill organizer (54 RR at 86-91); a case worker from the Andrews Center testified that she knew Walker was babysitting and was doing so without problems (54 RR at 108-18); and Cargill's neighbor verified that Cargill's dog did in fact go missing and she saw signs up in the neighborhood about the dog.[6] (54 RR at 145-48.)

---

[5] These prior bad acts were admitted in error. (See Appellant's Opening Brief, Point of Error No. 5.)

[6] Cargill had a roll of duct tape in the back of her SUV at the time it was searched. (47 RR at 85.) There was no evidence presented that the duct tape was used in any way the night of Walker's death or had any connection whatsoever to the instant case. However, the State alleged that the duct tape must have been in Cargill's car for a nefarious reason. (43 RR at 290-91.) Cargill explained during cross-examination that she had duct tape in her car because several months prior she had hung up signs around the neighborhood regarding her missing dog. (54 RR at 66.)

10

## C. Guilt Phase Rebuttal by the State

The State presented two witnesses in rebuttal. First, Walker's former neurologist, Dr. Richard Ulrich, testified that while Walker had a seizure disorder, it was well controlled by medication and the toxicology screening done at the autopsy demonstrated that Walker had a therapeutic level of medication in her system at the time of her death. Dr. Ulrich testified that there was no indication Walker had recently suffered a seizure, despite self-reports to the contrary to her current neurologist. Dr. Ulrich had never seen a patient die from a seizure. (54 RR at 11-18.) On cross-examination, Dr. Ulrich testified that while he had heard of Sudden Unexpected Death in Epilepsy ("SUDEP"), it is exceedingly rare and even more rarely does it occur absent an underlying health issue. (54 RR at 20-24.)

Paula Wheeler was re-called and testified regarding the phone calls between Walker and Cargill on June 18, and reiterated that Walker was upset and nervous about the subpoena and did not want to go out to eat with Cargill. (54 RR at 38-46.)

## D. Punishment Phase Presentation by the State

At the punishment phase, the State presented a wide variety of witnesses who testified to a multitude of bad acts allegedly committed by Cargill. This included neighbors who found Cargill to be difficult, aggressive, and verbally abusive to her children (58 RR at 111-46; 62 RR at 61-70); teachers who witnessed Cargill's aggressive and irrational behavior to both them and Cargill's children (58 RR at 245-56; 59 RR at 19-32, 43-50; 62 RR at 108-17, 126-30); a former friend of Cargill's who experienced Cargill's manipulative and volatile behavior (62 RR at 72-106); former in-laws who Cargill allegedly assaulted during emotional altercations (59 RR at 53-58; 60 RR at 32-47, 50-57); and Cargill's sister who frequently saw Cargill be unpredictable and irrationally angry. (58 RR at 212-37.)

11

The State also presented Cargill's mother, Rachel Wilson, who testified that Cargill had a good life growing up and the support of her family. Wilson further testified to Cargill's volatile behavior and the fact that she was easily provoked. Wilson was allegedly assaulted by Cargill in 1994. Wilson also testified as to the circumstances surrounding her assuming custody of Cargill's son in June 2010. (58 RR at 149-210.)

The State presented Cargill's three ex-husbands and one ex-boyfriend. They recounted their alleged mistreatment at the hands of Cargill and various incidents of violence, emotional abuse, and volatility. (59 RR at 76-112; 60 RR at 101-42; 61 RR at 51-91; 63 RR at 65-127.) Three of Cargill's four children also testified regarding alleged incidents of physical and emotional abuse they suffered by Cargill. (60 RR at 10-30,157-93; 61 RR at 7-33, 107-51.) Cargill's former in-laws testified to alleged bad acts committed by Cargill against both them and their son. (61 RR at 7-64.)

The State presented a psychological report from 1993 where the evaluator diagnosed Cargill with a maladaptive personality with narcissistic and histrionic features. (58 RR at 40.) Also testifying were jailers and deputies from Smith County jail who had negative experiences with Cargill (63 RR at 224-03, 233-40, 244-49, 252-59; 64 RR at 7-12, 18-33, 45-58, 64-79, 85-90, 93-99), and two correctional officers who testified regarding classification and the difference between death row and life in general population with a life without parole sentence.[7] (63 RR at 166-204, 261-77.)

---

[7] The officers provided inconsistent information regarding classification policy and procedures. (*See* Appellant's Opening Brief, Point of Error Nos. 7 and 8.)

12

## E. Punishment Phase Presentation by the Defense

The defense presented the dry cleaner and law firm runner who handled the clothes Cargill wore at trial to address the allegation she had contraband in the form of a straight pin in her cell (65 RR at 18-19, 23-25), as well as four correctional officers from Smith County jail who testified that Cargill was not a problem inmate. (66 RR at 94-97, 102-04, 112-16; 68 RR at 9-11.) Additionally, an inmate housed with Cargill testified that Cargill was kind to her and Cargill was treated poorly by the other inmates. (68 RR 21-16.)

Additionally, the defense presented two expert witnesses. Dr. Antoinette McGarrahan, a forensic psychologist, testified that she interviewed Cargill and administered to her a battery of neuropsychological tests. Ultimately, Dr. McGarrahan diagnosed Cargill with borderline personality disorder with narcissistic and antisocial personality traits. Dr. McGarrahan indicated that the available literature suggests that personality disorders develop as a result of environment. Dr. McGarrahan acknowledged that there is no cure for personality disorders but medication such as mood stabilizers can help to control the symptoms. (65 RR at 27-56.) Dr. Jonathan Lipman, a neuropharmacologist, testified that Cargill had taken prednisone, a corticosteroid at different times in her life, and at the time of the alleged crime had abruptly discontinued the psychiatric drugs Klonopin and Celexa. Dr. Lipman testified to the effect that these drugs can have on a person, considering a number of different variables.[8] (66 RR at 6-44.)

## F. Punishment Phase Rebuttal by the State

In rebuttal, the State presented Dr. Timothy Proctor, a forensic psychologist, who agreed with Dr. McGarrahan's diagnosis of borderline personality disorder. Dr. Proctor did not agree with Dr. McGarrahan's assessment that Cargill exhibited

---

[8] The trial court erroneously limited the scope of Dr. Lipman's testimony. (*See* Appellant's Opening Brief, Point of Error No. 9.)

13

traits of narcissistic personality disorder but believed Cargill's diagnosis to include narcissistic personality disorder full-scale. Dr. Proctor also believed Cargill exhibited every criteria of antisocial personality disorder but acknowledged there was no indication the behavior characteristics began prior to Cargill's teenage years. Additionally, while not diagnosable, Dr. Proctor believed Cargill to have characteristics consistent with psychopathy. (68 RR at 43-78.) Dr. Edward Gripon, a psychiatrist, testified contrary to Dr. Lipman and asserted that most people on Klonopin and/or Celexa do not have side effects. Dr. Gripon asserted that Cargill took prednisone intermittingly and he would not expect it to have an effect on her cognitive functioning. In his opinion, the drugs Cargill was taking had no relevance to the case. (60 RR at 80-114.)

## III.

## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Cargill must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 812 ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

14

To establish deficiency, Cargill must show her counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688). A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland.*" *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (ABA standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("[W]e long have referred [to the *ABA Standards for Criminal Justice*] as guides to determining what is reasonable." (internal quotations and citations omitted)). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Cargill's trial, her attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, , 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at the "norms

15

of practice as reflected in American Bar Association standards and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 2003, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*") and the *ABA Standards for Criminal Justice* (3d ed. 1993) ("*ABA Standards*"); *see also* State Bar Tex., *Guidelines and Standards for Texas Capital Counsel* (April 21, 2006) ("*Texas Guidelines*").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the ABA Guidelines, counsel is required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 521; *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005). When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the ABA Standards state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1; *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense

16

counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1. The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

To establish prejudice, Cargill "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94). Cargill need not show that counsel's deficient conduct "more likely than not altered the outcome" in her case, *Strickland*, 466 U.S. at 693, but she must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

17

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigating evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence]." *Id.* The Texas Court of Criminal appeals "[has] adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Gonzales*, 204 S.W.3d at 394.

## B. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are governed by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

Appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v. State*, 206 S.W.3d 684, 689 (Tex. Crim. App. 2006)

18

(noting appellate counsel's "constitutional duty to review the record for any arguable error").

### C. Scope of the Waiver of Attorney-Client Privilege

Cargill recognizes that raising specific issues of ineffective assistance of counsel as developed in this Application operates as a limited waiver of privileged information; however, she asserts her right to have all privileged information not directly relevant to said claims remain privileged.

Under the Texas Rules of Evidence, confidential communications between a client and her attorney are privileged. TEX. R. EVID. 503(b)(1)(A) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client . . . and the client's lawyer."). The privileged nature of communications between client and attorney remains intact, even upon the termination of the attorney-client relationship. *See Maryland Am. Gen. Ins. v. Blackmon*, 639 S.W.2d 455, 458 (Tex. 1982).

The privilege between attorney and client is not absolute. It is "well-established . . . that when an attorney's professional conduct is challenged by the client, the privilege is waived so far as necessary to defend the attorney's character." *West v. Solito*, 563 S.W.2d 240, 245 n.3 (Tex. 1978). In the context of criminal law, courts across the nation have consistently "held that a claim of ineffective assistance of counsel by a defendant against a former attorney waives the attorney-client privilege." *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.— Houston [14th Dist.] 1999) (citing *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967)); *see also United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009).

However, any waiver of the attorney-client privilege only applies to communications relevant to the claim of ineffective assistance of counsel.

19

*Laughner*, 373 F.2d at 327 (where "the client alleges a breach of duty to him by the attorney, . . . he thereby waives the privilege as to all communications *relevant* to that issue" (emphasis added)). Courts have consistently limited the scope of these waivers, permitting disclosure of only those confidential communications that are *"necessary* to prove or disprove [the client's] claims." *Pinson*, 584 F.3d at 978 (emphasis added).[9]

---

[9] *See also Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) ("Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question."); *Johnson v. Alabama*, 256 F.3d 1156, 1179 (11th Cir. 2001) ("[A] habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel *relevant* to assessing the reasonableness of those decisions in the circumstances." (emphasis added)); *United States v. Basham*, 2012 WL 1130657 at *6 (D.S.C. Apr. 4, 2012) (unpublished) ("the Government will not use and will not make copies of any material or information in trial counsel's files that is not *related or relevant* to a claim in Basham's § 2255 Motion" (emphasis added)); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687, 692 (C.D. Cal. 1988) (in which the court "reject[ed] the suggestion made by some parties that 'selective' disclosure should not be allowed, that if the exception is permitted to be invoked, *all* attorney-client communications should be disclosed" as "directly contrary to the reasonable necessity standard"); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 886-87 (E.D. Pa. 1976) ("In almost any case when an attorney and a former client are adversaries in the courtroom, there will be a credibility contest between them. This does not entitle the attorney to rummage through every file he has on that particular client (regardless of its relatedness to the subject matter of the present case) and to publicize any confidential communication he comes across which may tend to impeach his former client. At the very least, the word 'necessary' in the disciplinary rule requires that the probative value of the disclosed material be great enough to outweigh the potential damage the disclosure will cause to the client and the legal profession."); *Alabama v. Lewis*, 36 So. 3d 72, 77-78 (Ala. Crim. App. 2008) (noting that, by alleging "ineffective assistance of counsel during the trial and direct appeal of these cases,

20

Predecessor counsel's duty to limit disclosure to information relevant to the claim of ineffective assistance also flows from counsel's continuing duty to the former client. Both the *ABA Guidelines* and *Texas Guidelines* stipulate that, "[i]n accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client." *ABA Guidelines*, Guideline 10.13; *Texas Guidelines*, Guideline 11.8. ABA Formal Opinion 10-456 states that in the context of an ineffective assistance of counsel claim, lawyers may disclose information "reasonably necessary" for resolution of the ineffectiveness claim. ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456, 5 (2010). However, the opinion further states that it is "highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable." *Id.*

---

the defendant waived the benefits of both the attorney-client privilege and the work product privilege, but *only* with respect to matters *relevant* to his allegations of ineffective assistance of counsel" (second emphasis added)); *Waldrip v. Head*, 532 S.E.2d 380, 387 (Ga. 2000) ("[W]e hold that a habeas petitioner who asserts a claim of ineffective assistance of counsel makes a limited waiver of the attorney-client privilege and work product doctrine and the state is entitled only to counsel's documents and files *relevant* to the specific allegations of ineffectiveness." (emphasis added)); *In re Dean*, 711 A.2d 257, 258-59 (N.H. 1998) ("We hold that claims of ineffective assistance of counsel, whether brought in a motion for new trial or in a habeas corpus proceeding, constitute a waiver of the attorney-client privilege to the extent *relevant* to the ineffectiveness claim; the waiver is a limited one." (emphasis added)).

21

## IV.

## ARGUMENT

## CLAIM ONE

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT CHERRY WALKER DIED OF SUDDEN UNEXPECTED DEATH IN EPILEPSY RATHER THAN HOMICIDAL VIOLENCE

Post-conviction investigation has revealed that Cherry Walker died not of homicidal violence at the hands of Kimberly Cargill, but of the relatively rare, but certainly not unknown, disorder Sudden Unexpected Death in Epilepsy ("SUDEP"). Trial counsel was aware of the existence of this disorder and the possibility that it caused Walker's death, yet inexplicably failed to present evidence of it in order to support and corroborate Cargill's version of events on the night of June 18, 2010. If not for this failure, at least one juror would have found there to be reasonable doubt that Cargill actually caused the death of Walker by means of homicidal violence and would not have convicted her of capital murder. Trial counsel's failure constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, both Cargill's conviction and death sentence should be reversed.

### A. SUDEP Evidence Presented during the Guilt/Innocence Phase of Trial

Cargill testified in her own defense at the guilt/innocence phase of her trial. (*See* Statement of Facts, *ante*, for a full recitation of Cargill's testimony.) Cargill testified that on the evening of June 18, 2010, she and Walker ate dinner at a local restaurant. Cargill was in the process of driving Walker home when Walker had a seizure. (53 RR at 39-41.) When the seizure ended, Walker was not breathing and had no pulse. (53 RR at 44-47.) Cargill attempted to resuscitate Walker but was

22

unsuccessful. In a moment of panic, and because she was convinced no one would believe she was not responsible for Walker's death, Cargill did not take Walker to a nearby hospital but instead drove around for almost an hour. Ultimately, Cargill left Walker's body on the side of a rural road. In an attempt to destroy any of her own biological material on Walker's person, Cargill set fire to Walker's shirt. (53 RR at 44-52.)

Cargill was cross-examined for hours and was subjected to ridicule, called a killer and a liar, and told by the State that her version of events could not possibly be true. (*See* 53-54 RR at *passim*.) Trial counsel did not present witnesses, expert or otherwise, or any other evidence in support of Cargill's explanation of Walker's death.[10]

In rebuttal, the State presented Dr. Richard Ulrich, a neurologist in the Tyler area, to counter Cargill's testimony that Walker suffered a seizure while riding in Cargill's car. Dr. Ulrich testified that Walker was his patient for an undetermined amount of time prior to 2003 and then again for a short period in 2009. He last saw Walker on April 24, 2009.[11] (55 RR at 9.) Dr. Ulrich testified that he had never known of anyone to die from epilepsy itself, only from other diseases in addition to the epilepsy. (55 RR at 10-11, 18.)

---

[10] Following Cargill's testimony, the defense presented Detective James Riggle, who testified he found medication in a pill organizer at Walker's house (54 RR at 86-102); Brenda Whitaker who testified she was aware Walker was babysitting several children (54 RR at 108-43); and Loren Puig who testified she was aware Cargill was looking for her lost dog. (54 RR at 145-62.) None of these witnesses had any bearing on Cargill's testimony regarding Walker's death.

[11] At the time of her death Walker was under the care of Dr. George Kariampuzha at the Trinity Clinic in Tyler, Texas. It is unclear why the State chose to present Dr. Ulrich to testify regarding Walker's medical history rather than her then-treating neurologist.

23

Dr. Ulrich also testified Walker suffered from "generalized tonic-clonic seizures" but that her condition was not extreme and as long as she took her prescribed medication, Tegretol,[12] she did not have any problems. (55 RR at 11-12.) To Dr. Ulrich's best recollection, Walker began having seizures at the age of sixteen and had them occasionally thereafter, sometimes when she ran out of medication. (55 RR at 13.) There was a time Walker had been out of medication for a week and another time for a month and she did not suffer from a seizure. (55 RR at 15.) Dr. Ulrich read from Walker's autopsy report that indicated there were no brain abnormalities detected and she had a concentration of 4.7 milligrams per liter of Tegretol reflected in the toxicology report, which would have been a therapeutic dose at the time of her death. (55 RR at 16-17.)

On cross-examination, Dr. Ulrich indicated that he was not aware that in 2010 Walker "self-reported" seizures to her doctor. (55 RR at 19.) He also acknowledged that factors such as missed medication, inadequate sleep, chronic fatigue, and stress could possibly bring on seizures. (55 RR at 19-20.) Dr. Ulrich testified that he was aware of the existence of SUDEP but claimed that it was rare and he could not ever recall seeing a seizure patient without other complications be more predisposed to death than someone without a seizure disorder. (55 RR at 20-21.) Defense counsel asked Dr. Ulrich to tell the jury what SUDEP was and he testified:

> Well, let me give you a short rundown on it. When you have a seizure, you don't breathe. If you don't get oxygen for a long enough time, because you're not breathing, or if you swallow food and the food goes down into your lungs and stops your oxygen from getting into your lungs, or if you have a seizure and you hit your head and you have bleeding, if you have an infection that increases your chance to have seizures, you could—you could die with that.

---

[12] Tegretol is the brand name of the drug carbamazepine.

24

(55 RR at 21.)

Following Dr. Ulrich's explanation of SUDEP, defense counsel handed him an article printed from the "Medscape" website (www.Medscape.com) and asked him to read it. (*See* Ex. 31 [Medscape Art. on SUDEP].)[13] Dr. Ulrich complied and stated that he did not believe what was said in "the first couple of paragraphs" and that he did not know anyone who believed that "consistent patterns and incidents are obvious in sudden unexpected death epilepsy for eight to seventeen percent." (55 RR at 23.) Defense counsel proceeded to recite from the document the criteria for SUDEP developed by the United States Food and Drug Administration in 1993. (*Id.*) Dr. Ulrich acknowledged that the studies regarding SUDEP existed but that he believed it was "very, very rare" unless there are already underlying problems in the brain. He also indicated that it "depends on who you read and who you believe" and "you have to use judgment in what you see and do and experience." (55 RR at 24.) Finally, Dr. Ulrich acknowledged that there is a phenomenon called "sudden unexpected death" where a person dies for no discernable reason and an autopsy will not reveal the cause. (55 RR at 25.)

On re-direct examination, Dr. Ulrich testified that based on Walker's history and the level of Tegretol in her body at the time of autopsy, he did not believe she died from a seizure. (55 RR at 27, 30.) Dr. Ulrich was shown the records of Walker's neurologist at the time of her death, Dr. Kariampuzha, and opined the seizures Walker self-reported in the months preceding her death could have been something other than a seizure. (55 RR at 27-30.) Dr. Ulrich further testified that while being under a lot of stress might increase Walker's chances of having a seizure, it would not have increased her risk of suffering from SUDEP.

---

[13] Despite the fact that the article was marked as a defense exhibit it does not appear to be in the Clerk's Record, and as such is included as Exhibit 31 to this Application.

25

Ultimately, Dr. Ulrich did not believe Walker died as a result of SUDEP, a message the jury was left with just prior to their deliberations. (55 RR at 35-36.)

## B. SUDEP Expert

The medical examiner who performed Walker's autopsy could not determine a cause of death, but concluded that there were suspicious circumstances consistent with homicidal violence as the manner of death. Therefore, it was vital to the defense that trial counsel offer an explanation for the cause of Walker's death that supported Cargill's testimony. Considering that counsel was aware of Walker's extensive medical history through discovery, including ongoing appointments with neurologists to address her recent seizures, there was reason to investigate the possibility of an accidental or natural cause of Walker's death.

An expert in seizure disorders and SUDEP, such as Dr. Samden Lhatoo, could have provided the jury with compelling testimony as to the existence and prevalence of SUDEP and the likelihood of that being the cause of Walker's death.[14] Dr. Lhatoo is the Director of the Epilepsy Center in the Department of Neurology at University Hospitals Case Medical Center in Cleveland, Ohio. (Ex. 1 at 2 [Aff. of Dr. Lhatoo].) He is also a professor of neurology at Case Western University and has specialized in the field of "mortality in epilepsy" over the past sixteen years. (Id.) Dr. Lhatoo is considered an international authority in SUDEP research and has published multiple landmark articles in the field. His peer-reviewed publications have collectively garnered over 340 citations.[15] (Id.)

---

[14] It is of note that Dr. Lhatoo was one of the many SUDEP experts cited in the Medscape article that counsel used to cross-examine Dr. Ulrich. (See Ex. 31 [Medscape Art. on SUDEP].)

[15] See Exhibit 1 at Attachment A [Aff. of Dr. Lhatoo] for a complete copy of Dr. Lhatoo's *curriculum vitae*.

26

Dr. Lhatoo was retained by current post-conviction counsel to review materials pertaining to Cargill's case and render an opinion as to the likelihood of Walker having died from SUDEP based on the knowledge that was available at the time of Cargill's trial. Based on Dr. Lhatoo's review of the autopsy report prepared by Dr. Meredith Lann, the full complement of Walker's medical records provided through discovery, and the trial testimony of Cargill, as well as the testimony of Dr. Lann, and Dr. Ulrich, Dr. Lhatoo could have informed Cargill's jury that "Cherry Walker's death is likely to have been a SUDEP death." (Ex. 1 at 9 [Aff. of Dr. Lhatoo].)

### 1. Explanation of SUDEP

SUDEP is defined as a sudden, unexpected, witnessed or unwitnessed, non-traumatic and non-drowning death in a patient with epilepsy with or without evidence of a seizure—excluding documented status epilepticus—in which postmortem examination does not reveal a toxicological or anatomical cause of death. (Ex. 1 at 6 [Aff. of Dr. Lhatoo].) It is believed SUDEP occurs by one or more of three mechanisms, occurring independently or in conjunction with each other: (1) the deceased's breathing stops due to a fatal dysfunction in the brainstem, which controls breathing; (2) her heart rhythm is fatally disturbed (also known as arrhythmia); and/or (3) she experiences a total electro-cerebral shutdown. (*Id.*)

In the United States alone it is estimated that between 3,000 and 5,000 epilepsy patients die from SUDEP *every year.* (*Id.*) Further, SUDEP occurs in approximately 1 in 3,000 epilepsy-sufferers per year. (*Id.* at 3-4.) In fact, SUDEP is the leading cause of death in people with chronic uncontrolled epilepsy. (Ex. 26 at 1 [Dr. Tomson Art.].) The rate further increases in patients who have "frequent

27

seizures,"[16] resulting in about one death per 200 patients per year. (Ex. 1 at 6 [Aff. of Dr. Lhatoo].) The concerning rate of SUDEP in epilepsy patients has led to considerable research in the field as well as fundraising and awareness-raising campaigns in the United States and other countries. (*Id.* at 6-7; *see also* Ex. 25 at 9 [Dr. Devinsky Art.] (noting that national guidelines in the United Kingdom recommend that all patients with epilepsy and their families be provided with information about SUDEP).) SUDEP is not a new phenomenon and is widely accepted in the medical field. (Ex. 25 at 7 [Dr. Devinsky Art.]; Ex. 26 at 1 [Dr. Tomson Art.] ("There has been increased awareness of . . . SUDEP over the past two to three decades, and what was once disputed is now acknowledged as a serious problem in epilepsy").)

### 2. Walker's Medical History Reveals Multiple Risk Factors for SUDEP

Based on his review of Walker's medical records, Dr. Lhatoo found numerous factors that were consistent with SUDEP and *no* significant factors inconsistent with it. There are multiple risk factors for SUDEP, but the two most significant factors are suffering from generalized tonic-clonic seizures (as opposed to a different type of seizure) and active epilepsy manifesting in intermittent seizures. (Ex. 1 at 6 [Aff. of Dr. Lhatoo].) Other risk factors include inadequate levels of epilepsy medication and being between the ages of twenty and forty. (*Id.* at 7.)

#### a. Walker Suffered from Generalized Tonic-Clonic Seizures

Suffering from generalized tonic-clonic seizures is widely considered to be one of the most significant risk factors for SUDEP. (*See* Ex. 1 at 6 [Aff. of Dr. Lhatoo]; Ex. 26 at 3 [Dr. Tomson Art.].) In most studied cases, SUDEP occurs after, or "in the context of", a tonic-clonic seizure. (Ex. 25 at 2, 6 [Dr. Devinsky Art.]; Ex. 26 at 1, 3 [Dr. Tomson Art.].) One study has even reported that the risk

---

[16] Seizures are considered "frequent" when they occur at least monthly. (Ex. 1 at 6 [Aff. of Dr. Lhatoo].)

28

41

of SUDEP to be about twenty-three times higher in epilepsy patients who had experienced a seizure in the preceding year compared to seizure-free patients. (Ex. 26 at 3 [Dr. Tomson Art.].)

Walker's medical records and testimony from her former neurologist establish that she suffered from generalized tonic-clonic seizures. Dr. Ulrich, indicated in a February 2003 letter to Dr. James Ryder that Walker suffered from "generalized tonic-clonic seizures without aura," and that Walker began having such seizures at the age of sixteen. (55 RR at 11; Ex. 37 [East Texas Neurology Records]; see also Ex. 1 at 2 [Aff. of Dr. Lhatoo].) Later, in 2004 and 2006, Dr. Ulrich conducted two electroencephalograms ("EEG")[17] on Walker, both of which indicated abnormalities consistent with genetic generalized epilepsy, which commonly manifests in generalized tonic-clonic seizures. (Ex. 37 [East Texas Neurology Records]; see also (Ex. 1 at 3 [Aff. of Dr. Lhatoo].) As mentioned above, tonic-clonic seizures have the strongest association with the phenomenon of SUDEP. (Ex. 1 at 3 [Aff. of Dr. Lhatoo].)

b. Walker's Epilepsy was Active

Despite the fact that Walker was prescribed medication to treat her epilepsy, there is evidence that she continued to experience intermittent tonic-clonic seizures. Roughly 20% to 30% of patients with epilepsy do not respond to any medical treatment and continue to experience intermittent seizures. (Ex. 1 at 3 [Aff. of Dr. Lhatoo]; Ex. 25 at 7 [Dr. Devinsky Art.].) It appears that Walker fell into that category. (Ex. 1 at 3 [Aff. of Dr. Lhatoo] "[Walker] suffered from an apparently medically intractable (not wholly responsive to treatment) form of epilepsy.").) In April 2009 , Dr. Ulrich indicated that Walker had not experienced

---

[17] An EEG is a brain wave test used to diagnose, among other things, epilepsy. (Ex. 1 at 3 [Aff. of Dr. Lhatoo].)

29

a seizure in "years." (Ex. 37 [East Texas Neurology Records]; *see also* Ex. 1 at 4 [Aff. of Dr. Lhatoo].) However, in February 2010, Dr. Kariampuzha—Walker's neurologist at the time of her death—wrote that Walker had been having severe seizures described as sudden blackouts. (Ex. 36 [Trinity Neurology Records.]) According the writing, Walker's last seizure had occurred in January 2010, just five months before her death. (*Id.*) However, Dr. Kariampuzha wrote one month later that Walker had been having seizures *and* that she had not. (*Id.*) "Thus," Dr. Lhatoo surmises, "there is evidence to suggest that [Walker] had chronic active epilepsy and had been having seizures in February 2010 but it is possible that she had no further seizures when she was reviewed a month later. The majority of SUDEP victims have active epilepsy, although it is well known to occur in patients whose epilepsy is apparently quiescent." (Ex. 1 at 4 [Aff. of Dr. Lhatoo].)

Even with the occasionally contradictory accounts from Walker's neurologists, there is other evidence to suggest that she was at a high risk of intermittent seizures. Most notably, Walker suffered from obstructive sleep apnea, a condition associated with poor epilepsy control. (Ex. 1 at 4 [Aff. of Dr. Lhatoo].) In 2008, Dr. Ulrich ordered a sleep study of Walker and the results were indicative of obstructive sleep apnea and sleep fragmentation. (Ex. 37 [East Texas Neurology Records]; *see also* Ex. 1 at 4 [Aff. of Dr. Lhatoo].) Research indicates that ongoing obstructive sleep apnea renders an epilepsy patient at risk of epileptic seizures. (Ex. 1 at 4 [Aff. of Dr. Lhatoo].) Based on the medical records available, it does not appear that Walker was ever prescribed anything to address the sleep apnea. (*Id.*) As a result, Dr. Lhatoo "assume[s] the patient continued to suffer from obstructive sleep apnea and . . . [was] at ongoing risk of seizures." (*Id.*) Those with active epilepsy are at a higher risk of SUDEP.

30

43

### c. Walker Consistently Had Inadequate Levels of Epilepsy Medication in Her System

Walker was prescribed Tegretol, an anticonvulsant medication, when she began having seizures at the age of sixteen, and continued on that prescription until her death. (Ex. 1 at 3 [Aff. of Dr. Lhatoo].) Walker's neurological records indicate that she had her Tegretol levels tested on at least two occasions prior to her death, and on both occasions her levels were sub-therapeutic. (*Id.*) Therapeutic levels of Tegretol range from eight to twelve micrograms per milliliter.[18] In September 2004, Dr. Ulrich reported that Walker's level of Tegretol was 2.52 micrograms per milliliter, and in November 2007 he reported 4.7 microgram per milliliter. (*Id.; see also* Ex. 37 [East Texas Neurology Records].) These levels suggest that Walker was either non-compliant with her medication—i.e. not taking the full amount prescribed to her—or she was not prescribed enough medication. (Ex. 1 at 3 [Aff. of Dr. Lhatoo].) Dr. Ulrich noted in a June 2006 letter that Walker had history of recurring seizures when her Tegretol levels were low or altogether absent, stating that when Walker stayed off medication for longer than a month, she had seizures. (*Id.; see also* Ex. 37 [East Texas Neurology Records].) Based on this information, Dr. Lhatoo concludes "that [Walker] was on inadequate Tegretol dosages and she was therefore at ongoing risk for further seizures." (Ex. 1 at 3 [Aff. of Dr. Lhatoo].)

At the time of Walker's autopsy, the toxicology report indicated that she again had a sub-therapeutic level of Tegretol in her system—4.7 micrograms per milliliter. (Ex. 1 at 3 [Aff. of Dr. Lhatoo].) Walker had also been prescribed primidone by Dr. Kariampuzha in March 2010. (Ex. 36 [Trinity Neurology Records].) Apparently, Walker was also prescribed a third antiepileptic drug at

---

[18] "Micrograms per milliliter" is a mathematically equal ratio to the "milligrams per liter" ratio referenced by Dr. Ulrich in his testimony.

31

some unknown time before her death, as phenobarbital was detected in her toxicology report but is not mentioned in her neurology records. (*Compare* State's Trial Ex. 265, *with* Ex. 36 [Trinity Neurology Records].) Her primidone level at the time of autopsy was "borderline low," while her phenobarbital level was "significantly low." (Ex. 1 at 3 [Aff. of Dr. Lhatoo].) Because these medications were also low, their presence would not have offset the poor coverage by the sub-therapeutic Tegretol dosage. (*Id.*) The low levels of epilepsy medication routinely found in Walker's system threatened to perpetuate her epilepsy rather than treat it. Low levels of epilepsy medication in patients is associated with SUDEP. (*Id.* at 7.)

### d. Other Risk Factors Exhibited by Walker

The most common age group in which SUDEP occurs is the twenty to forty years old range. (Ex. 1 at 7 [Aff. of Dr. Lhatoo].) Even so, a well-known Swedish study, published in The Lancet medical journal, found that nine of the fifty-seven patients who died of SUDEP were over the age of fifty-five. (*Id.*) Eighteen of the fifty-seven were over the age of forty-five. (*Id.*) Walker was thirty-nine years old at the time of her death, placing her well within the range typically associated with those who die of SUDEP.

Studies have indicated that epilepsy patients undergoing antiepileptic-drug polytherapy—prescribed three or more antiepileptic medications at the same time—greatly increases a patient's risk of SUDEP. (Ex. 25 at 2 [Dr. Devinsky Art.]; Ex. 26 at 3 [Dr. Tomson Art.].) In a survey of seven SUDEP studies in 2008, four of the studies showed polytherapy as a risk factor. (Ex. 26 at 3 [Dr. Tomson Art.].) While the use of polytherapy simply may have been an indication of severe epilepsy, "taking three [antiepileptic drugs] concomitantly compared with monotherapy was associated with an [odds ratio] of 8:1 after adjustment for seizure frequency." (*Id.*) Walker's toxicology report at autopsy showed various levels of carbamazepine, primidone, and phenobarbital—all of which are

32

45

anticonvulsant medications. This use of antiepileptic-drug polytherapy on Walker, therefore, greatly increased her risk of SUDEP.

Mental retardation has also been recognized as a risk factor for SUDEP. One survey of SUDEP studies noted three that three such studies identified mental retardation as a risk factor for SUDEP. (Ex. 25 at 2 [Dr. Devinsky Art.].) Similar results have been found in other studies as well. (Ex. 26 at 4 [Dr. Tomson Art.].) In 1995, Walker's IQ was assessed at 56, which resulted in her diagnosis of mild mental retardation. (*See* 42 RR at 116.) Walker's intellectual disability is yet another factor that increased her risk of SUDEP.

### 3. The Circumstances of Walker's Death are Indicative of SUDEP

During the defense presentation at the guilt/innocence phase of trial, Cargill took the stand to explain the events the night of Walker's death. After reviewing Cargill's testimony, Dr. Lhatoo found that the events as described by Cargill are indeed consistent with many aspects of SUDEP.

Cargill's description of Walker's seizure is consistent with a description of a tonic-clonic seizure. (Ex. 1 at 4 [Aff. of Dr. Lhatoo].) Cargill explained that as she and Walker were stopped at a light and waiting to turn at the intersection of Beckham Avenue and Houston Street in Tyler when Walker began to have a seizure. Walker was "banging against the glass and the door of the car" as she convulsed. (*Id.*) This is consistent with the clonic phase of a generalized tonic-clonic epileptic seizure. (*Id.*) During direct examination, Cargill estimated that Walker's seizure lasted approximately one and one-half minutes. (*Id.*; 53 RR at 43.) Cargill described parking the car, running to the passenger side, opening the passenger door, and Walker falling out of the vehicle onto the pavement. (Ex. 1 at 4 [Aff. of Dr. Lhatoo]; 53 RR at 43.) Walker's seizure stopped within a few seconds of her hitting the ground. (Ex. 1 at 4 [Aff. of Dr. Lhatoo]; 53 RR at 44.) After briefly searching for help, Cargill returned to Walker. Based on Cargill's

33

statement that she then "flipped [Walker] on her back [to perform CPR]," it appears that Walker was in the prone (face down) position when her seizure stopped. (Ex. 1 at 4 [Aff. of Dr. Lhatoo]; 53 RR at 44.) Cargill attempted to resuscitate Walker, but Walker was no longer breathing, nor did she have a pulse. (Ex. 1 at 4 [Aff. of Dr. Lhatoo]; 53 RR at 47.) This is consistent with many witness accounts of SUDEP, namely that the deceased's breathing and heart activity stop within a short while of cessation of a generalized tonic-clonic seizure. (Ex. 1 at 4 [Aff. of Dr. Lhatoo].) Moreover, those who die of SUDEP are most often found in the prone position. (Id.) Dr. Lhatoo summarizes in his report:

> The account, as provided by [Cargill] is consistent with (a) a generalized tonic-clonic epileptic seizure (the seizure type most strongly associated with SUDEP), (b) witness accounts of SUDEP as provided by friends/relatives/acquaintances of SUDEP victims; namely that breathing and heart activity cease within a short while (seconds to minutes) of cessation of a generalized tonic-clonic seizure, and (c) the position (prone) most often associated with SUDEP.

(Ex. 1 at 4 [Aff. of Dr. Lhatoo].)

### 4. The Autopsy of Cherry Walker is Consistent with SUDEP

In conducting Walker's autopsy, Dr. Lann was unable to establish a specific cause of death. (See State's Trial Ex. 265.) Dr. Lann noted that the injuries to the body were "minor" and non-fatal. (51 RR at 64-65, 73-75, 86, 102.) Nevertheless, she determined that the manner of Walker's death was homicidal violence based on the absence of natural disease, the condition in which the body was found, and the fact that Walker had been reported as a missing person. (Id. at 84-85.) While in no way conclusive, Dr. Lann did note the presence of petechial and confluent hemorrhages on the bulbar conjunctivae which she explained could be consistent with asphyxiation. (Id. at 53.) She went on to note that the hemorrhages could also be explained by postmortem changes to the early stage of decomposition

34

based on the positioning of Walker's body—a factor wholly unrelated to Walker's specific cause of death. (*See id.* at 53-54.)

After reviewing the autopsy report of Dr. Lann, Dr. Lhatoo concludes that the absence of an identifiable toxicological or anatomical cause of death is consistent with SUDEP. (Ex 1 at 7 [Aff. of Dr. Lhatoo].) Moreover, certain of the minor injuries identified by Dr. Lann during the autopsy were indicative of Walker suffering a generalized tonic-clonic epileptic seizure prior to her death, especially considering Cargill's description of the events that night. (*Id.* at 7-8.) Among those are the petechial and confluent hemorrhages discovered on the bulbar conjunctivae, minor injuries to Walker's head and face, a minor injury to the inside of Walker's mouth, and the presence of pulmonary edema in her lungs.

Dr. Lann noted that the petechial and confluent hemorrhages could be indicative of strangulation or the positioning of Walker's body postmortem. (51 RR at 53.) At trial, the State used Dr. Lann's speculation regarding the petechiae as a way to suggest that Cargill had, in fact, cause Walker's death. (*See* 56 RR at 43, 130.) Dr. Lhatoo notes, however, that the petechiae actually could be affirmative evidence of a seizure having occurred. He states, "it should be noted that these are well-described findings in autopsy series of SUDEP patients, are believed to be caused by the strain of a seizure, and in themselves do not contradict SUDEP as the cause of death." (Ex. 1 at 7 [Aff. of Dr. Lhatoo].)

Dr. Lann acknowledged that the minor injuries to Walker's head and face were not life-threatening. (51 RR at 65.) Nevertheless, she found them to be suggestive of homicidal violence as the manner of Walker's death. (*See* State's Trial Ex. 265.) Dr. Lhatoo explains that such injuries are quite common in those who have experienced a tonic-clonic seizure, especially in the prone position. (Ex. 1 at 8 [Aff. of Dr. Lhatoo.) Minor injuries to the face are consistent with "carpet burn"—injuries to the nose, forehead, and cheekbones that occur when a patient

35

experiences a tonic-clonic seizure in the face down position. (*Id.*) Dr. Lhatoo states, "Thus, in the event that the described injuries occurred premortem, these are consistent with seizure related injuries caused by a fall from a small height (car seat) and friction (a few seconds of twitching/jerking on the ground in the prone position)." (*Id.*)

The minor injury to the inside left of Walker's mouth was also indicative of having suffered a seizure. Injuries to the inside of the mouth, such as biting of the tongue, lip or cheek, are common occurrences in those suffering from seizures and are often considered as such by neurologists diagnosing seizures in practice. (Ex. 1 at 8 [Aff. of Dr. Lhatoo].)

It is also of note that a microscopic examination of the lungs at Walker's autopsy showed moderate pulmonary edema. (State's Trial Ex. 265.) Pulmonary edema is the most common autopsy finding in SUDEP cases. (Ex. 25 at 4 [Dr. Devinsky Art.].) In one study, pulmonary congestion and edema was noted at autopsy in forty-two of the fifty-two studied SUDEP cases. (Ex. 1 at 8 [Aff. of Dr. Lhatoo].) This is thought to be due to seizure discharges in the brain. (*Id.*) The presence of pulmonary edema and congestion at Walker's autopsy suggests that she died of SUDEP. (*Id.*; *see also* Ex. 25 at 4 [Dr. Devinsky Art.].)

After reviewing the autopsy report and Dr. Lann's testimony, Dr. Lhatoo finds that "the evidence is still consistent with a diagnosis of SUDEP and the evidence to the contrary is not sufficiently convincing." (Ex. 1 at 8 [Aff. of Dr. Lhatoo].)

### 5. Walker's Death Is Likely to Have Been a SUDEP Death

Based on his review of the full complement of Walker's medical records provided through discovery, Dr. Lann's autopsy report, and the testimony of Lann, Ulrich, and Cargill, Dr. Lhatoo is "of the opinion that Cherry Walker's death is likely to have been a SUDEP death." (Ex. 1 at 9 [Aff. of Dr. Lhatoo].) In support

36

49

of that conclusion, Dr. Lhatoo checks off each of the definitional elements of SUDEP that are met in this case. (*Id.* at 7.)

Walker's death was sudden and unexpected. It was witnessed by Cargill and appears to have occurred while Walker was in the prone position. At the autopsy, there was insufficient trauma to contradict the possibility that Walker's death was non-traumatic. It was clearly a non-drowning death. Walker's medical records and former neurologists confirm that she suffered from epilepsy. There is evidence that Walker experienced a seizure on the night of June 18, 2010 both through Cargill's testimony and the minor injuries to Walker's head, face, and mouth.[19] At no point was there any evidence of Walker experiencing status epilepticus, which is a condition in which the brain is in a state of persistent seizure. Finally, Walker's autopsy revealed no toxicological or anatomical cause of death. "Thus," Dr. Lhatoo concludes, "in the absence of an identifiable toxicological or anatomical cause of death, Cherry Walker's death is likely to have been a SUDEP death. I cannot identify any contradiction to this in the testimony provided by the defendant and the testimony provided by the medical examiner." (Ex. 1 at 7 [Aff. of Dr. Lhatoo.)

## C. Ineffective Assistance of Trial Counsel

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Cargill.

---

[19] Even assuming for the sake of argument that Walker was seizure-free and that Dr. Kariampuzha's medical records are inaccurate, it should be noted that in a well-known study of nine patients of SUDEP, one patient had been seizure free. (Ex. 1 at 8 [Aff. of Dr. Lhatoo].) Another well-known study of SUDEP published in The Lancet medical journal found that five of the fifty-seven SUDEP patients studied had between zero and two seizures in the previous year. (*Id.*) This suggests that SUDEP can occur even in those patients who are ostensibly seizure-free or have relatively mild epilepsy with infrequent seizures. (*Id.*)

37

*Strickland*, 466 U.S. at 687; *Jimenez*, 364 S.W.3d at 883. In order to meet the deficiency requirement, Cargill must show that her counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected guidelines, such as the American Bar Association standards. *Id.* To establish prejudice, Cargill must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Thompson*, 9 S.W.3d at 812.

Investigation and preparation are the keys to effective representation. While trial counsel need not investigate "frivolous, implausible, or meritless defenses," *United States v. Carr*, 740 F.2d 339, 349 (5th Cir. 1984), counsel must engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case. *Rummell v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); *see also Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972) ("When a defense counsel fails to investigate his client's only possible defense, although requested to do so by him; and fails to subpoena witnesses in support of the defense, it can hardly be said that the defendant has had the effective assistance of counsel."). Trial counsel has a duty to consider and investigate the basis for all possible legal claims and to present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8; *see also id.* at cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case"). Expert witness testimony is one of the most powerful tools at an attorney's disposal to present a compelling claim. *Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010).

38

In this case, trial counsel failed to take advantage of that opportunity. Cargill's trial counsel was ineffective for failing to call an expert with an actual working knowledge of SUDEP who could provide the jury with a precise explanation of the disorder itself, a description of the kind of individuals who are particularly vulnerable to it, and an explanation for why it was more likely than not that Walker did in fact die of SUDEP and not homicidal violence.

## 1. Trial Counsel's Failure to Call an Expert like Dr. Samden Lhatoo Constituted Deficient Performance

By putting Cargill on the stand as the defense's opening witness at the guilt/innocence phase, trial counsel made clear their intentions to anchor their case with Cargill's account of what happened on the night of June 18, 2010. Cargill rendered the vast majority of the State's case-in-chief moot by placing herself with Walker on the night in question. However, it was her explanation of what happened in a few short minutes that would decide her fate before the jury. Cargill explained that Walker had died unexpectedly following a brief seizure as Cargill was driving her home. Cargill was not able to definitively explain how Walker might have died from a seizure but maintained that she had not killed Walker. After hours of cross-examination from the State, the defense presented three more witnesses, none of whom were able to testify to how Walker might have died. The defense then rested its case, having wholly failed to support Cargill's testimony and explain how it was even possible.[20]

---

[20] There were other things trial counsel could have done to corroborate Cargill's testimony. For example, the State challenged Cargill's explanation that she knocked on doors at the apartment complex but no one responded. (See 54 RR at 18.) The doors at Walker's apartment complex were unique by virtue of the fact that each individual apartment had its own front door that locked, a small patio, and then a heavy wooden door that also locked. Therefore, Cargill would not have been able to knock directly on anyone's front door. Rather, she would have been

39

It was only during the State's rebuttal that trial counsel introduced the possibility that Walker died of SUDEP. This was addressed during the cross-examination of Dr. Richard Ulrich, using an internet article that counsel had printed from a medical website. (Ex. 31 [Medscape Art. on SUDEP].) Counsel's efforts were limited to establishing certain risk factors for seizures and allowing Dr. Ulrich to provide an inaccurate and misleading account of SUDEP. By the time Dr. Ulrich left the stand, the jury had been left with the impression that SUDEP was "very, very rare." (55 RR at 24.) Despite the incoherence of Dr. Ulrich's explanation of SUDEP on the stand,[21] counsel did not challenge him. Instead, counsel referred to the phenomenon as a "medical mystery." (Id. at 25.)

Counsel's failure to develop SUDEP as a plausible explanation for Walker's death can only be the result of an unreasonable pre-trial investigation. The fact that counsel used the Medscape article during its cross-examination of Dr. Ulrich shows that they were, at the very least, aware of SUDEP. Counsel must have noted that Walker met the exact definition of SUDEP as listed in the Medscape article; that Walker's autopsy was consistent with a SUDEP autopsy, including no cause of death and evidence of moderate pulmonary edema; and that Walker met several of the listed risk factors, including race, mental retardation, seizure type, antiepileptic-drug polytherapy, and was just outside the common age range. (Ex. 31 [Medscape Art. on SUDEP].) Considering that counsel believed the condition to be "very, very rare," they should have contacted someone who specialized in the

knocking or pounding on the heavy outside wooden door. Trial counsel should have provided the jury with photographs of how the individual apartment doors looked to corroborate Cargill's explanation of how and why it was reasonable that no one responded to her knocking. (See Ex. 35 [Photograph of Walker's Outer Door].)

[21] See Claim One(B)(1), ante, for the actual definition of SUDEP and an explanation of its mechanisms.

40

field. The best place to look might have been the list of expert authors of the thirty-five scholarly articles cited in the Medscape printout. Had counsel done so, they might have consulted with Dr. Lhatoo, listed in the fifth footnote of the article.

Walker's death exhibited simply too many consistencies with SUDEP for counsel to abandon it as a theory and leave Cargill's testimony uncorroborated, or to rely on the opinion of a general neurologist presented by the State on rebuttal. Counsel should have consulted with an expert in the area of SUDEP as part of their investigation into Cargill's only possible defense based on her account of the events. *See Gomez*, 462 F.2d at 597. Had counsel elicited an individualized opinion from an expert on whether this case was consistent with SUDEP based on Walker's medical records provided through discovery, the autopsy report, and Cargill's account of the events, the jury would have been presented with affirmative evidence that not only was Cargill's account of the events plausible, it was actually quite likely. Trial counsel's failure to do so constituted deficient performance under the prevailing norms at the time of Cargill's trial.

### 2. Trial Counsel's Failure Prejudiced Cargill

Trial counsel's failure to call an expert in SUDEP deprived Cargill of a compelling case for innocence, and, therefore, prejudiced her constitutional rights. In order to establish prejudice, Cargill must show that a single juror would have voted differently but for counsel's deficient performance. *See Strickland*, 466 U.S. at 694. In making that determination, the Court balances the existing evidence of Cargill's guilt against the evidence that counsel failed to present. *See Strickland*, 466 U.S. at 696 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors that one with overwhelming record support").

41

54

The State's case during the guilt/innocence phase of Cargill's trial was remarkably weak for a capital murder conviction. The vast majority of the witnesses that were presented testified to matters that turned out to be moot once Cargill took the stand; namely, attempting to place Cargill and Walker together on the night in question. The balance testified to Cargill's purported motive for the crime, and the State finished its case-in-chief by presenting Dr. Lann, who conducted Walker's autopsy and ultimately testified that a cause of death could not be established. Dr. Lann pointed out certain injuries to Walker that might be indicative of homicide, but carefully reminded the jury that she could not be certain of their cause. Ultimately, it was the absence of natural disease and the condition of Walker's body that led Dr. Lann to conclude it was a case of homicidal violence. That coupled with the near complete lack of alternative explanation for Walker's death apparently led to the jury's guilty verdict. Trial counsel's only attempt to address the unanswered cause of death question was a relatively brief cross-examination of a general neurologist who clearly did not understand SUDEP. The concept of SUDEP was significantly underdeveloped as a result, and the jury was asked to vote "not guilty" on the basis of fleeting references to a "very, very rare" condition that was described as nothing more than a "medical mystery."

During closing arguments, the State highlighted trial counsel's failure to present affirmative, reliable evidence to support the assertion that Walker died of SUDEP. The State reminded the jury that Dr. Ulrich had never known anyone to die of a seizure before, did not believe Walker died of a seizure, and that Walker's likelihood from dying of a seizure was not different than anyone else's. (56 RR at 47-48, 97.) The State repeatedly argued that Cargill was the only person claiming that Walker had a seizure on the night in question, and that her word was belied by the testimony of medical professionals. (56 RR at 42, 49, 55.) Finally, the State

42

55

drove home the point that no one other than Cargill had said that Walker died of a seizure. One prosecutor argued, "You tell me where the evidence of a seizure is. That's a lie, another one of [Cargill's] lies, like every other one. . . . Based on what? Not the medical evidence." (56 RR at 98.) The same prosecutor continued to argue regarding the seizure, "Who have we heard that from? That liar over there." (*Id.* at 99.) And, again, "What evidence do you have of a seizure? That liar's word." (*Id.* at 103.) Near the end of its guilt/innocence phase closing arguments, the State left the jury with the following comment on Cargill's defense: "[S]he's got this unbelievable story. What a disgrace to people who really have epilepsy and seizures and that go through that trauma." (*Id.* at 123.) Cargill was left with little to argue, as it was true that counsel had failed to provide medical evidence to corroborate her testimony.

However, counsel could have, and should have, presented the jury with the compelling and essential testimony of Dr. Lhatoo regarding the true prevalence of SUDEP in the epilepsy population and the factors of this case that are consistent with the condition. After review of Walker's medical records, the autopsy report, and Cargill's explanation of the events, such an expert could have testified that "Cherry Walker's death is likely to have been a SUDEP death." If counsel had presented such an expert, there is a reasonable probability that at least one juror would have harbored reasonable doubt that Cargill caused Walker's death by an unknown form of homicidal violence. Trial counsel's failure to call a SUDEP expert constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. As a result, Cargill's conviction and resulting death sentence must be reversed.

43

56

# CLAIM TWO

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO VICTIM IMPACT EVIDENCE PRESENTED DURING THE GUILT/INNOCENCE PHASE OF TRIAL

During the guilt/innocence phase of Cargill's trial, the State presented two witnesses who offered a significant amount of testimony irrelevant to Cargill's alleged criminal responsibility. Cherry Walker's stepmother and boyfriend testified about a range of topics that can only be classified as victim impact evidence, including discussion of Walker spending her last Christmas alone, her hobby of collecting stuffed animals, and the location of her grave. Cargill's trial counsel repeatedly failed to object, thus allowing the jury to hear an extensive amount of irrelevant and prejudicial testimony. Trial counsel's failure to object to this testimony constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, Cargill's conviction should be reversed.

### A. Trial Counsel Has a Duty to Preserve Error by Making Proper Objections

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Cargill. *Strickland*, 466 U.S. at 687; *Jimenez*, 364 S.W.3d at 883. In order to meet the deficiency requirement, Cargill must show that her counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected guidelines, such as the American Bar Association standards. *Id.* To establish prejudice, Cargill must show a "reasonable probability that, but for counsel's unprofessional errors, the result of

44

the proceeding would have been different." *Id.* at 694; *Thompson*, 9 S.W.3d at 812.

Trial counsel has a duty to object to inadmissible evidence or improper argument and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); ABA Standards for Criminal Justice, *Defense Function*, 4-7.1(d) ("defense counsel has a duty to have the record reflect adverse rulings"). In order to establish that counsel was ineffective for failing to object, Cargill must show that the trial judge would have committed error had the objection been made and overruled. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

## B. Victim Impact Evidence is Inadmissible during the Guilt/Innocence Phase of Trial

"Victim impact" evidence is testimony "about the victim and about the impact of the murder on the victim's family. . . ." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). In *Payne*, the Supreme Court lifted the *per se* bar against victim impact evidence under the Eighth Amendment and delegated the decision to the states as to whether to admit such evidence at sentencing. *Id.* Since then, victim impact evidence has been found to be generally admissible during the sentencing phase of a trial because evidence of the specific harm caused by the defendant may assist the jury in assessing the defendant's moral culpability and blameworthiness. *Ford v. State*, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996) (citing *Payne*, 501 U.S. at 825).

However, victim impact evidence is not admissible during the guilt phase of a criminal trial because it fails to meet the relevancy requirements under the evidentiary rules. Victim impact evidence does not have "any tendency to make

45

more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (citing TEX. R. CR. EVID. Rule 401 for the finding that victim impact evidence is irrelevant at the guilt/innocence phase). As noted in *Mosely v. State*, victim impact evidence is relevant only insofar as it relates to the mitigation special issue at punishment because that particular issue greatly broadens the scope of relevant evidence. 983 S.W.2d 249, 263 (Tex. Crim. App. 1998). However, victim impact evidence is "patently irrelevant" to other issues at trial, even including the future dangerousness issue at punishment. *Id.*

### C. Trial Counsel Failed to Object to the Victim Impact Testimony of Walker's Stepmother as Irrelevant

During the guilt/innocence phase of Cargill's trial, the State called as a witness Walker's stepmother, Rueon Walker.[22] Over the course of nearly fifty pages of testimony, Rueon spoke extensively about Cherry's living situation, relationship with Joseph Mayo, and other topics that had no tendency to make more or less probable the existence of any fact of consequence at the guilt/innocence stage of Cargill's trial. Shortly after Rueon took the stand, the State elicited testimony that Cherry had spent Christmas of 2009 alone, rather than with her family. (49 RR at 146.) Rueon recalled that Cherry usually came home for Christmas, and Rueon would often bake a strawberry cake for her. (*Id.*) The State went on to clarify, "So . . . her last Christmas was spent alone in her home?" (*Id.*) Rueon confirmed that that was true and trial counsel failed to object to the patently irrelevant testimony, which was offered only to tug at the heartstrings of the jury. (*Id.*) Next, Rueon explained that Cherry had chosen the apartment where she lived because it was close to a pizza restaurant. (*Id.* at 151.) She also testified

---

[22] Because Cherry Walker and Rueon Walker share the same last name, their first names only will be used for the remainder of Claim Two.

that one of Cherry's hobbies was collecting stuffed animals. (*Id.*) Despite the State's intent to elicit irrelevant testimony to paint Cherry as a simplistic and sympathetic victim, trial counsel again failed to object.

Rueon also testified about Cherry's biological mother dying of cancer, Cherry's various options on where to live once she chose to leave her parents' house, and even the location of Cherry's grave. (50 RR at 7-8.) Rueon then went into an extended discussion of Cherry's relationship with Joseph Mayo. She described a photograph of the couple that was hung in Cherry's apartment, noting that Mayo was white and "a little slow." (*Id.* at 13-14.) She testified that Mayo had a driver's license but Cherry was unable to drive, and that Cherry very much wanted a red car if she someday got her license. (*Id.*) She also recalled that Cherry and Mayo liked to exchange CDs, DVDs, and clothing with each other. (*Id.* at 16-17.) This was again an attempt by the State to build Cherry's image as a kind and pure victim by eliciting irrelevant facts about Cherry's relationship with Mayo, which went entirely unchecked by trial counsel.

Finally, Rueon described seeing Cherry's body at the morgue. "Her eyebrows were singed. She was cut. She was everything. But she was still my child. It didn't matter." (*Id.* at 30.) When asked by the State whether she was bothered that she was not there to protect Cherry when this happened, Rueon replied, "Yes. I just wonder what else I could have done, but I tried." (*Id.* at 30.) At this point, trial counsel finally objected to the victim impact testimony. (*Id.*) The trial court ruled that the testimony constituted "sentencing evidence," and instructed the State to move on. (*Id.* at 31.) However, the damage had already been done. The jury had been exposed to numerous facts that had no bearing on Cargill's guilt or innocence, and generally tended to confuse the issues for the jury. The State freely elicited irrelevant testimony regarding Cherry's background, her relationship with Joseph Mayo, her hobbies, and the location of her grave.

47

Rueon's victim impact testimony failed to meet the relevancy requirement of Texas Rule 401 under clearly established state and federal caselaw. *See Payne*, 501 U.S. at 825; *Mosely*, 983 S.W.2d at 263; *Ford*, 919 S.W.2d at 114; *Miller-El*, 782 S.W.2d at 895. The trial court hinted as much when it sustained trial counsel's objection to victim impact evidence toward the end of Rueon's testimony. (50 RR at 31.) Trial counsel's failure to object earlier to the inadmissible testimony and at least preserve the issue for appeal constituted deficient performance under the prevailing professional norms at the time of Cargill's trial. *See ABA Guidelines*, Guideline 10.8 cmt.; ABA Standards for Criminal Justice, *Defense Function*, 4-7.1(d).

### D. Trial Counsel Failed to Object to the Irrelevant Testimony Offered by Joseph Mayo

The State continued to build upon the image of Cherry that it had established through Rueon by next calling Joseph Mayo to the stand. Mayo, who had previously been described to the jury as "a little slow" offered very little testimony relevant to the guilt or innocence of Cargill. Aside from a few lines confirming his alibi for the evening of June 18, 2010, Mayo primarily spoke about his bond with Cherry and how their families felt about their interracial relationship. Mayo began by talking about how Cherry "loved scary movies" and he was afraid of them. (50 RR at 49.) He talked specifically about the movie "Paranormal Activity" and how he believed the footage in the film was real. (*Id.* at 50.) The State capitalized on the opportunity to clarify that the thirty-five year-old Mayo actually believed that the scary movie was real, asking "You thought it was real?" and following up with "You thought it was—the actual video was real?" (*Id.*) Despite the State's attempt to question Mayo on irrelevant matters so as to highlight his intellectual disability and provide the jury with a Cherry-like figure with which to relate, trial counsel

48

failed to object. Unchecked by trial counsel, the State went on to elicit a list of other scary movies that Cherry enjoyed. (*Id.*)

Mayo then told a story about a time that he had borrowed a DVD from Cherry but failed to return it for some time because he was busy taking care of his ailing grandparents. (50 RR at 50-52.) He recalled eventually showing up to Cherry's house in his new car to drop off the DVD and that Cherry was happy for him to have the new vehicle. (*Id.* at 52-53.) Mayo recalled another time when Cherry came to see him sing at Carreta's restaurant and how she told him, "I'm very proud of you for pursuing your dream." (*Id.* at 63.) Again, the State seized the opportunity to ask, "So Cherry believed in you?" (*Id.*) Mayo confirmed that she did, and trial counsel failed to object. Finally, on redirect, Mayo described the nature of his relationship with Cherry in more detail. He claimed that, while they had kissed before, they were never intimate. Mayo explained that he respected Cherry too much to rush into things and explained that that is generally true of relationships. (*Id.* at 72.) Mayo then talked about how he and Cherry had to overcome their families' prejudices in order to pursue their relationship. The issue came up when the State suggested that Mayo's grandmother did not approve of him dating a black woman, which Mayo confirmed. (*Id.* at 73-74.) Mayo confirmed that Cherry's father likewise disapproved of her dating Mayo. (*Id.* at 74.) The jury, then, was left with the impression that Cherry and Mayo had overcome the vestiges of racism in both of their respective families. Not even at this point did trial counsel object to this irrelevant testimony.

Other than the brief discussion of Mayo's alibi on the night of the incident, his testimony focused on issues that were entirely irrelevant to Cargill's guilt or innocence of the crime in question. As the trial court had sustained trial counsel's objection to the victim impact testimony of the immediately preceding witness, counsel should have been aware that the court was willing to prevent such

49

inadmissible testimony from being placed before the jury. Nevertheless, counsel did not object after each irrelevant story was introduced, thus precluding any possibility of relief on the issue on direct appeal.

## E. Cargill was Prejudiced by Trial Counsel's Failure to Object to Irrelevant Testimony and Preserve Error for Appeal

There is a reasonable probability that if trial counsel had objected early to the extensive amount of victim impact evidence that the state was eliciting from Rueon Walker and Joseph Mayo at the guilt/innocence phase of Cargill's trial that the outcome of the trial would have been different. The evidence supporting the jury's guilty verdict was tenuous to say the least. The medical examiner was not even able to identify the cause of Cherry Walker's death. While evidence that Cargill decided to dump Cherry's body was suspicious, she took the stand to thoroughly explain her reasoning. With such limited evidence that Cherry died of homicide, the State's best chance at securing a conviction of Cargill was to create a strong sense of sympathy for an innocent victim. The State did this by eliciting testimony regarding Cherry's intellectual disability, her childlike hobbies, and the impact that her sudden death had on her friends and family. The introduction of such irrelevant evidence at the guilt phase unfairly prejudiced Cargill and confused the issues for the jury. Considering the relative weakness of the State's evidence of guilt, there is a reasonable probability that the result of Cargill's trial would have been different had the jury not been presented with extensive emotionally-driven evidence. Counsel's deficient performance prejudiced Cargill in violation of her rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, Cargill's conviction should be reversed.

50

# CLAIM THREE

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER LAY TESTIMONY BY BRENDA WHITAKER DURING THE GUILT/INNOCENCE PHASE OF TRIAL

During the guilt/innocence phase of Cargill's trial, defense counsel called caseworker Brenda Whitaker to testify that she was aware that Walker was babysitting children; Walker had received training and earned a certificate in babysitting; and that Walker babysat children other than Cargill's. Whitaker's testimony as a lay witness should have been limited to her personal knowledge of Walker and logical inferences that could be made from that knowledge. However, during cross-examination, the State engaged in argumentative questioning of Whitaker and elicited testimony from her regarding the clinical definition of mental retardation as well as an unfounded estimate of the percentage of people who function at a higher level than Walker adaptively and intellectually.

Whitaker was a caseworker with the Andrews Center, not a psychologist or other mental health professional equipped to provide diagnostic or statistical information. Counsel not only failed to object to the State's argumentative questioning, but also failed to object to Whitaker's improper lay opinion which resulted from the State's questioning. Trial counsel's failure to object in both instances constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. For these reasons, Cargill's conviction should be reversed.

### A. Trial Counsel Has a Duty to Preserve Error by Making Proper Objections

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Cargill.

51

64

*Strickland*, 466 U.S. at 687; *Jimenez*, 364 S.W.3d at 883. To establish deficiency, Cargill must show that her counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected in the American Bar Association standards and the like. *Id.* To establish prejudice, Cargill must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Thompson*, 9 S.W.3d at 812.

Trial counsel has a duty to object to inadmissible evidence or improper argument and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); ABA Standards for Criminal Justice, *Defense Function*, 4-7.1(d) ("defense counsel has a duty to have the record reflect adverse rulings"). In order to establish that counsel was ineffective for failing to object, Cargill must show that the trial judge would have committed error had the objection been made and overruled. *Martinez*, 330 S.W.3d at 901.

### 1. Limitation on Lay Witness Opinions

Under Texas Rule of Evidence 701, a lay witness may offer opinions or inferences so long as they: (1) are limited to those which are rationally based on the witness's perception, and (2) would be helpful to the jury in coming to a clear understanding of the witness's testimony or the determination of a fact that is in issue. *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). In order to meet the first requirement, it must be established that the witness has personal knowledge of the events on which the opinion is based and the opinion must be rationally based on that knowledge. *Id.* A witness may not offer opinions which

52

are based on scientific, technical, or other specialized knowledge without first being qualified as an expert under Texas Rule of Evidence 702. *See Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010) ("observations that do not require significant expertise to interpret and which are not based on scientific theory can be admitted as lay opinions"). Accordingly, admission of such unqualified expert testimony over objection would constitute trial court error.

## 2. Counsel May Not Engage in Argumentative Questioning

Texas Rule of Evidence 611 provides the trial court with reasonable control over the mode of questioning of witnesses and presenting evidence. Wielding this power, the court is responsible for ensuring that the interrogation of witnesses and presentation of evidence is done effectively "for the ascertainment of the truth." Tex. R. Evid. 611(a). Among the objections contemplated by Texas Rule 611 is the "common law argumentative objection." *Pardee v. State*, 2012 WL 3516485, at *6 (Tex. App.—Texarkana 2012, pet. denied) (not published). This objection is often misunderstood as a way to object to opposing counsel who is "arguing with" the witness on the stand. *See id.* ("The argumentative objection is an objection commonly used, but not commonly understood."). However, it is more accurately an objection to the opposing party's attempt to argue its case while questioning a witness. *Id.* "Counsel may not, in the guise of asking a question, make a jury argument or attempt to summarize, draw inferences from, or comment on the evidence. In addition, questions that ask a witness to testify as to his own credibility are improper." *Id.* (quoting 2A Steven Goode, et al., *Texas Practice Series: Courtroom Handbook on Texas Evidence* § 611 cmt. 12 (2012)). If the trial court overruled an objection to questioning that meets these criteria, it would constitute trial court error.

**B. Trial Counsel Failed to Object to the Improper Lay Opinion Elicited from Brenda Whitaker**

During its guilt phase presentation, the defense called Brenda Whitaker, a caseworker with the Andrews Center. (54 RR at 108.) Whitaker worked closely with Cherry Walker over the course of roughly two years, and kept progress notes throughout that time. (*Id.* at 109.) The majority of Whitaker's direct testimony was spent going over several of the entries from the progress notes in order to establish that Whitaker was aware that Cherry Walker was babysitting, that she liked to babysit, she had taken a course in babysitting and scored well in it, and that she took care of at least two other children in addition to Luke Garner. (*Id.* at 110-16.)

On cross-examination, the State attempted to use Whitaker to establish Walker's degree of mental retardation. Whitaker reminded the State that she was not a psychologist, but nevertheless could gather that Walker was mentally retarded simply by virtue of her being a client of the Andrews Center. (54 RR at 120.) Whitaker went on to inform the jury that some of the clients of the Andrew Center have taken a course and received their driver's license. (*Id.* at 123.) Walker did not have a driver's license, but Whitaker testified that driving was never a specific goal of Walker's. (*Id.*) At that point, the State began to question Whitaker on the clinical requirements for a diagnosis of mental retardation, apparently in attempt to establish that Walker's condition was more severe than others who had learned to drive.

First the State asked Whitaker to "tell the jury what that means when you operate at two standard deviations below the mean." (54 RR at 123.) Whitaker did not appear to understand the question and responded, "Well, it just depends. I would say probably 70, you know, on some graphs would be normal. It just depends on that [client]." (*Id.*) The State then informed Whitaker of the three

54

aspects of mental retardation, and further testified to what it means to be two standard deviations below the mean.

Q. (By prosecutor) Well, you're talking about—well, there's three aspects of mental retardation: Onset before the age of 18, significant limitations in adaptive functioning, and an I.Q. below 70.

What I'm talking about is the two standard deviations below the mean in intellectual and adaptive functioning.

A. Intellectual and adaptive functioning. Now, adaptive functioning is her living skills, how she performs. And intellectual functioning is basically her IQ.

Q. Right. And as that pertains too—well, okay. That's kind of right, but as it pertains to being two standard deviations below the mean means that 98 percent of the people in the United States function intellectually and adaptively better than her. She is in the lowest 2 percent of the nation—

A. Right.

Q. —right?

A. Right.

Q. In her ability to function daily and intellectually, 98 percent of the people in the United States are better than her, correct?

A. (Nodded head affirmatively.)

Q. You agree with that?

A. Yes.

(*Id.* at 123-24.)

While Whitaker ultimately agreed with the State's clinical definition of mental retardation and what it means to function at two standard deviations below the mean, it was only after the State corrected her that she did so. Prior to that exchange it had never been established that Whitaker had the "scientific, technical, or other specialized knowledge" on which to base such an opinion. *See* Tex. R. Evid. 702. Neither did her responses to the State's questions regarding the

definition of mental retardation inspire confidence in her qualification to testify to such a scientific and technical topic.

By establishing that Cherry Walker functioned at a lower level than 98 percent of the country, the State was able to induce Whitaker to backtrack on her previous statements regarding Walker's competence to babysit children. (*Id.* at 124.) Yet, trial counsel did not object to Whitaker's improper lay opinion. Had counsel objected at this point to Whitaker's improper lay opinion, the trial court would have sustained and the State would have been prevented from undermining the vast majority of Whitaker's testimony. Because Whitaker had not been qualified as an expert, her testimony should have been limited to facts which she had personal knowledge of and logical inferences that could be made therefrom. Whitaker was qualified to testify to her observations of Walker and certain inferences she might make about Walker's intellectual disability based on those observations. However, the statistical breakdown of adaptive and intellectual functioning was well beyond Whitaker's competence as a lay witness. Her understanding, or lack thereof, of was not helpful to the jury in understanding her testimony or determining a fact in issue.

Even if counsel did not object to Whitaker's improper lay opinion, it at least should have objected to the argumentative nature of the State's questioning. While the State is permitted on cross-examination to offer statements to which the witness may agree or disagree, the State may not go so far as to correct the answers given by the witness. In this situation, the State made a concerted effort to put testimony before the jury which Whitaker was not able to offer. Whitaker did not appear to be familiar with the clinical definition of mental retardation, nor the implications of being two standard deviations below the mean. Nevertheless, the State offered the explanation "in the guise of asking a question." This evidence was an essential part of the State's case, considering that the primary motive for

56

the crime that was alleged was Cargill's desire to prevent CPS from finding out that she had hired a mentally retarded woman to babysit her son. Trial counsel's failure to object to the State's argumentative questioning constituted deficient performance under prevailing norms at the time of trial.

## C. Cargill was Prejudiced by Trial Counsel's Failure to Object to the Improper Lay Testimony of Brenda Whitaker

Trial counsel's failure to object to the State's argumentative questioning and the resulting improper lay opinion by Whitaker prejudiced Cargill. The State's argumentative questioning essentially called on Whitaker to testify to her own credibility. *See Pardee*, 2012 WL 3516485, at *6 ("questions that ask a witness to testify as to his own credibility are improper"). After Whitaker testified that she worked with the intellectually disabled at the Andrews Center and that Walker showed signs of being a capable babysitter, the State asked, "And so the Andrews Center does not have any problem with mildly mentally retarded people keeping—keeping children?" (54 RR at 138.) Whitaker explained that it was not within the Andrews Center's purview to determine whether or not clients would babysit children. (*Id.*) The State responded, "I just don't understand how someone who's functioning in the lower 2 percent of everyone in the nation, adaptively and intellectually, how anyone could think that they are capable of taking care of a child." (*Id.*) Whitaker was an important witness for the defense, as she testified that Walker was qualified to babysit, Cargill did not try to hide the fact that Walker was her babysitter, and, accordingly, there was no good reason for Cargill to obstruct Walker from testifying at the CPS hearing. However, the State's argumentative questioning and Whitaker's resulting improper lay opinion effectively undermined whatever credibility Whitaker possessed when she took the stand.

57

70

Whitaker's testimony was especially important because the defense called only four witnesses during the guilt phase of trial. In addition to Cargill taking the stand, the defense called Whitaker, Detective James Riggle, and Loren Puig. Riggle's testimony focused on his investigation of Walker's apartment following the incident. (54 RR at 86-102.) Specifically he was called to testify that he discovered a "pill organizer" in the apartment that seemed to indicate Walker had not taken her medication on the day of her death. (See id. at 89-91.) Puig was called for the very narrow purpose of establishing that Cargill did, in fact, have a dog named "Oreo" and that the dog had run away at some point. (Id. at 145-62.) Puig recalled seeing signs around the neighborhood for the dog. (Id. at 147.) Considering the balance of defense witnesses that were called at trial, Whitaker's testimony was vital to Cargill's defense for the purpose of undermining the motive alleged by the State. The State's impeachment of Whitaker through inappropriate means prejudiced Cargill's defense. Had counsel objected to the argumentative questioning by the State and Whitaker's improper lay opinion, the objection would have been sustained and there is a reasonable probability that the jury would have found that the motive for the crime proffered by the State was unconvincing. Therefore, if counsel had properly objected on these grounds, there is a reasonable probability that the outcome of the proceedings would have been different. As such, Cargill's conviction should be reversed.

## CLAIM FOUR

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILURE TO REQUEST A CHANGE OF VENUE DUE TO INFLAMMATORY PRE-TRIAL PUBLICITY

The Sixth Amendment to the United States Constitution declares that the accused in all criminal prosecutions shall enjoy the right to a trial by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 148-54 (1968). This fundamental right

58

includes the right to a trial by a jury free from outside influences, such as prejudicial pre-trial publicity. *Sheppard v. Maxwell* (1966) 384 U.S. 333, 362-63. Courts consider several factors in determining whether pre-trial publicity and community prejudice prevent a fair trial, including whether the news stories covering the crime contained blatantly prejudicial information and the severity and notoriety of the offense. *Skilling v. United States*, 561 U.S. 358, 382-83 (2010); *Henley v. State*, 576 S.W.2d 66, 71-72 (Tex. Crim. App. 1978).

In Cargill's case, the pre-trial publicity and media attention regarding Cherry Walker's death and Cargill's alleged involvement prevented her from receiving a fair trial. As a result, defense counsel's failure to request a change of venue denied Cargill the effective assistance of counsel and prejudiced her in violation of her applicable state and federal Constitutional rights, state statutory law, as well as United States Supreme court and state case law. Therefore, Cargill's conviction and death sentence should be vacated.

## A. The Media Coverage of Cargill's Arrest and Trial Was Extensive and Inflammatory

The Constitution guarantees a fair trial by an impartial jury, but the United States Supreme Court has expanded this right to include "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To justify a change of venue based on media attention, a defendant must show that the publicity about the case was pervasive, prejudicial, and inflammatory. *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). In 2010, Smith County maintained a population of 209,714[23] with 96,901[24] residing within the Tyler city limits. Various media outlets, including the

---

[23] http://en.wikipedia.org/wiki/Smith_County,_Texas (last visited July 17, 2014).

[24] http://en.wikipedia.org/wiki/Tyler,_Texas (last visited July 17, 2014.)

59

Tyler Morning Telegraph,[25] KLTV, KYTX, KCEN, and KETK, covered the story of Walker's death and Cargill's subsequent arrest in varying detail. The media coverage documenting the incident started as soon as Walker's body was found and continued through the end of trial, nearly two years later. The trial itself was extensively covered on television and in print. In fact, the trial was "live blogged" in its entirety, with a reporter publishing a recitation of testimony in real time for an online audience. News cameras were a constant presence in the courtroom and video footage was both uploaded to the news website and broadcast on television on a daily basis.

The court was aware that media coverage would affect the ability to find impartial jurors. As such, on July 7, 2011 the court signed a Restrictive and Protective order that acknowledged the existence of pre-trial publicity in the case and set forth restrictions regarding broadcast, information dissemination, and public statements. (1 CR at 39-43.) However, this order was entered *after* there had already been extensive coverage in the media regarding Walker's death and Cargill's arrest. Even despite the protective order, between July 7, 2011, and the commencement of trial, the Tyler Morning Telegraph alone published at least nine articles regarding the case.[26] (*See* Ex. 23 [Tyler Morning News Arts.].) On May 7,

---

[25] Circulation of the Tyler Morning Telegraph is fairly widespread, with a daily circulation of 22,556 and 27,568 on Sunday. (*See* http://en.wikipedia.org/wiki/Tyler_Morning_Telegraph (last visited July 17, 2014).

[26] On March 22, 2012, the first day of voir dire, defense counsel brought to the court's attention the fact that a video camera had "surreptitiously" been brought into the courtroom during a pre-trial hearing and video footage from that hearing was broadcast in violation of the restrictive and protective order. Trial counsel requested that either the current venire be dismissed or venue changed. District Attorney Bingham acknowledged he saw a story in the newspaper about the trial and was "upset at the fact that [the reporter] had reported that we were paying for information on jurors' criminal history." Bingham further stated there was nothing

60

73

2012, on the first day of testimony in the guilt/innocence phase of Cargill's capital trial, the court signed an order to grant media access to the Tyler Morning Telegraph, KLTV, and CBS 19. (42 RR at 37-38.)

The amount of coverage the case received throughout its pendency was extensive. However, it was the pre-trial publicity that was the most egregious. The Supreme Court has considered both the extent and distribution of pre-trial publicity and the substance of such publicity. Part of the analysis concerns whether the publicity was blatantly prejudicial, which can include the revelation of details of the defendant's background and/or previous crimes committed. *See Irvin*, 366 U.S. at 725-26. The amount and inflammatory nature of the information disseminated about Cargill in the media prejudiced her ability to receive a fair trial independent of outside influences.

News stories regarding Cherry Walker began the day her body was found,[27] and continued in earnest even after the pronouncement of Cargill's death sentence.[28] A common thread in the coverage was the identification of Walker as a mentally disabled individual who worked as a babysitter for Cargill. In fact, the

---

reported beyond what was said in open court and he believed the reporter was given permission to film by a member of the court's staff. The court denied the defense's request finding no prejudice to Cargill. (9 RR at 223-31.) Cargill alleges in this instant Application that it was the pre-trial publicity prior to the specific information regarding juror criminal histories that was in fact prejudicial to her constitutionally guaranteed right to a fair trial. That prejudice existed long before March 22, 2012, and trial counsel was ineffective for failure to recognize the issue as such.

[27] *See, Smith County Authorities Need Help Identifying Woman's Body*, first published June 19, 2010, http://www.kltv.com/story/12677701/smith-county-authorities-need-help-identifying-womans-body (last visited Aug. 2, 2014.)

[28] *See, Kimberly Cargill's Trip to Death Row Unit Begins Today*, first published June 7, 2012, http://www.kltv.com/story/18730483/kimberly-cargills-trip-to-death-row-unit-begins-today (last visited Aug. 2, 2014.)

74

majority of headlines identified Walker as "babysitter." Despite the fact that the investigation was still in its infancy, the media latched on to identifying Walker by her relationship to Cargill. Furthermore, on July 1, 2010 (less than two weeks after Walker's death), an article ran in at least two forms and on multiple news outlets identifying Cargill as a person who was believed to have "killed Walker to stop her testifying in court." (Ex. 15 [*Victim Set to Testify*]; Ex. 16 [*Woman Killed to Keep Her Silent.*]) Despite the fact that Cargill had not yet been arrested in or named as a suspect in Walker's death, the articles revealed specific details contained in search warrant affidavits and court documents.

These articles also contained statements from Walker's bereaved family that they definitively believed Cargill was guilty of Walker's death. Walker's step-mother, Rueon Walker, described Walker as someone with "the mind of a child but a heart of gold" and utterly "helpless." The articles revealed that Walker babysat Cargill's son despite the fact that Walker's parents "begged her not to." Rueon Walker made a number of other inflammatory assertions, including that Walker used her food stamp money to buy food for Cargill's son; Cargill often failed to pay Walker for her services; and Cargill left her son in Walker's care overnight without adequate compensation. The articles also contained inaccurate facts, including that some of Walker's belongings were found in Cargill's home and vehicle following the execution of a search warrant. (Ex. 15 [*Victim Set to Testify*]; Ex. 16 [*Woman Killed to Keep Her Silent*].)

KLTV-7 News ran an identical story regarding Cargill's alleged involvement with Walker's death, but on television. The video format included footage of the crime scene and the live interview with Walker's father and step-mother. The interview is intensely emotional and it is clear that Rueon Walker believes Cargill is not only responsible for Walker's death but mistreated Walker in her role as Cargill's babysitter. Rueon is distraught as she describes Walker as a

"child" and bemoans, "How could anyone take such innocence, that's what I want to say, such innocence and be so violent, so mean, so evil?" (Ex. 38 [News Footage].)

The very next day, July 2, 2010, KLTV online published an article entitled "Looking for Safety When Subpoenaed." Since, "the death of Cherry Walker has raised a question," a local attorney and law enforcement officials provided tips for people to keep themselves safe when called to testify at court. Although Cargill is not specifically named in the text, her photograph appears in conjunction with the article, immediately below a photo of Cherry Walker. (Ex. 17 [*Looking for Safety*].) The publication of such a story solidified Cargill as a person with a clearly defined motive to kill Walker—in order to prevent her from testifying in court.

Furthermore, multiple articles ran in various publications in print and online when Cargill was arrested in connection with Walker's death at the end of June 2010 and when Suzanne Jones-Davis was arrested for allegedly tampering with evidence. It was reported that DNA evidence connected Cargill to the crime scene. (*See* Ex. 18 [*Mother Charged*]; Ex. 19 [*Whitehouse Woman Arrested*]; Ex. 20 [*Friend of Cargill Charged*].) The story of Cargill's arrest received attention beyond just local media outlets as well. The website "Bad Breeders" publishes stories about "parenting so bad it's criminal." The website picked up news of Cargill's arrest and included her photo and colorful commentary on the site, asserting "so because not only were you 'allegedly' such an abusive mother you 'allegedly' had to kill an innocent witness and set her body of fire to try and hide your inadequacies as a parent." (Ex. 21 [*Texas Breeder*].)

However, it was an "expose" on Cargill written by news reporter Kenneth Dean with the Tyler Morning Telegraph that took the inflammatory nature of the coverage to an entirely different level. On September 12, 2010, the Tyler Morning

63

Telegraph published in the Sunday newspaper and posted online an article entitled, "Violence, Mental Illness Define Alleged Killer." (*See* Ex. 22 [Dean Art.].) The publication of this particular article came over a month prior to Cargill's grand jury indictment for the death of Walker and over a year-and-half before the selection of Cargill's capital jury. The article is a salacious and highly inflammatory report regarding Cargill's alleged prior violent behavior and history of tumultuous relationships.

From the first sentence to the last, it is clear that the author believes Cargill is in fact guilty of murdering Walker and Cargill's propensity for violence is indicative of her legal responsibility for Walker's death. In the article, intensely personal and intimate details of Cargill's life were revealed including specifics regarding her prior court and custody battles, treatment for depression and mental health issues, and history of difficult relationships. (*Id.*) From this the author surmises that, "...records detail court battles, arrests, court-ordered psychological evaluations, abuse accusations, violence, a planned kidnapping and even murder [sic] thoughts." (*Id.*) The article cites extensively to a psychological evaluation[29] of Cargill that at the time was over twenty years old, as an indication of Cargill's volatile personality and proclivity for violence and rage. Additionally, the article provides quoted material from Cargill's family members; ex-husbands and boyfriends; and ex-in laws who all had negative experiences with Cargill and accused her of various incidents of wrong doing. This ranged from filing "false" police reports, to "manipulating the judicial and welfare system," to abusing her own children. (*Id.*)

---

[29] The psychological evaluation used by the article was the one performed by Dr. Sandra Craig in 1993 as a part of the custody case involving Cargill's eldest son. Dr. Craig testified at the punishment phase of Cargill's trial. (58 RR at 32-105.)

Specifically, the article chronicled an interview that the author did with Cargill's ex-husband, Brian Cargill, who recounted that Cargill got pregnant despite her assertions she could not have additional children and had an explosive temper. The article quoted Brian Cargill as saying, "Sometimes [Cargill] would punch me right in the face in order to get some kind of response...[Cargill's] behavior was extremely erratic from one moment to the next. One minute she was great, and the next she was throwing dishes." (Ex. 22 [Dean Art.].) Brian Cargill went on to say that he was not surprised to find Cargill in her current situation of being arrested for murder and opined, "The person here that suffered the most is Ms. Cherry Walker and her family...that woman was a martyr for the rest of us. It's tragic this had to happen for the rest of us to have somewhat of a normal life. My heart goes out to Ms. Walker's family." (*Id.*)

However, what is perhaps most egregious is the representation within the article that those close to Cargill were living in fear of her and her potential for violence. One former relative was quoted as saying, "I know [Cargill's] in jail but we're all still scared that she will somehow beat the system and get out. I don't put anything past her." (Ex. 22 [Dean Art.].) Likewise, Brian Cargill was quoted as saying, "[Cargill] can convince people to do all kinds of things, and we're all worried about her, even though she's in jail." (*Id.*)

### B. Cargill Was Prejudiced by Trial Counsel's Failure to Move for a Change of Venue

The effect of pre-trial publicity can be pervasive. Prejudicial pre-trial publicity has been found to influence evaluations of the defendant's likability, sympathy for the defendant, perceptions of the defendant as a "typical" criminal, pre-trial judgments of the defendant's guilt, and in some cases, final verdicts. Christina Studebaker & Steven Penrod, *Pretrial Publicity: The Media, the Law, and Common Sense*, 3 Psychol.Pub.Pol'y & L. 428, 433 (1997) [hereinafter "Pre-

trial Publicity"]. Question No. 63 of the Juror Questionnaire in Cargill's case asked if the venire member had "Heard, red, seen or learned anything about this case from any source? (Radio, Television, Newspaper, Other)." Follow-up questions asked for the sources of information, timing of information, and an explanation of what the venire person heard, read, saw, or learned. Of the venire that was impaneled but not seated as jurors, almost sixty individuals had been privy to pre-trial publicity regarding Cargill and/or the alleged crime. (Ex. 27 [Excerpts from Juror Questionnaires].)[30] The explanations ranged from those who generally remembered reading something about Walker's death around the time it happened, to those who had detailed information regarding the relationship between Cargill and Walker and Cargill's alleged motive. (Id.)

One venire person wrote that she had seen media coverage in both the Tyler Morning Telegraph and on the television station KLTV and reported she knew, "That Cargill was already in trouble with the law and that she murdered her mentally handicapped babysitter to keep her from testifying in the case; the body was found, partially burned, off of a road just east of Paluxy south of Tyler." (Ex. 39 [Questionnaire of Betts].) This particular venire person later expressed in her questionnaire in the explanation for why she did not want to be a juror in the case, "The defense would have to overcome a lot of pre-trial publicity. Why no change of venue? This was/is a HORRIFYING case." (Id., emphasis in original.) This individual did not ultimately serve as a juror but is indicative of how pervasive and inflammatory the pre-trial coverage of the case actually was.

_____

[30] In July 2014, post-conviction counsel requested and received copies of the juror questionnaires from the Smith County court. The only page included from that questionnaire in Applicant's exhibits is the one with the relevant pre-trial publicity exposure question (as opposed to each questionnaire in its entirety) in an effort to save paper and protect the names and identifying information of the venire.

66

79

Of the impaneled jurors, two reported exposure to pre-trial publicity in some form. Juror Fields indicated on his questionnaire that he had seen coverage on television and was aware that "Ms. Walker had been killed. That her body was found near Whitehouse, TX. That Ms. Walker was a child care worker. That Ms. Cargill was later charged with murder." (Ex. 40 [Questionnaire of Fields].) During individual voir dire, Juror Fields reiterated that he had read and/or heard reports about the case but it was not enough for him to make a decision. He agreed he could put what he had read and/or heard out of his mind when making a decision about the case. (38 RR at 117-18.)

Likewise, Juror Shaffer answered in his questionnaire that he knew of the case from the news, "just that a lady was arrested of [sic] murder." (Ex. 41 [Questionnaire of Shaffer].) During individual voir dire, the only question Juror Shaffer was asked with regard to pre-trial publicity was, "You haven't really read, seen, or learned anything about this case that would cause you to have formed an opinion yet?" to which he simply answered "no." (22 RR at 158.) Neither of the jurors who admitted to being exposed to pre-trial publicity were asked about the extent of their exposure, what specific news reports or stories they either saw or heard, the specific media source they were exposed to, and/or what specific content was contained in the reports. With pre-trial publicity as extensive as it was in Cargill's case, it is reasonably probable that the jurors were exposed to the highly inflammatory and prejudicial reports described above. See also Norbert L. Kerr et al., On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study, 40 AM. U. L. REV. 665, 695–99 (1991) (concluding that the results of a study show that voir dire is not an effective barrier against juror bias created by exposure to pre-trial publicity).

Jurors can be prejudiced by publicity even though they are not consciously aware they are affected in this way. The majority of jurors tend to believe, and tell

67

the court, that they are in fact able to be impartial. *Pre-trial Publicity* at 433-34. Media exposure can contribute to the formation of a particular framework for organizing information and influence the way the case information is heard and processed. Similarly, pre-trial publicity shapes the way in which jurors later hear evidence at trial—"media coverage both affects and is affected by community sentiment about a case, including gossip, rumors, and pressure to conform to community opinion and to community normative values about justice." Ellen Brickman, et. al., *How Juror Internet Use Has Changed the American Jury Trial*, 1 Journal of Court Innovation 287, 288 (2008)[hereinafter "Juror Internet Use"].

It is exceedingly difficult for jurors to set aside extrinsic information during the course of a trail. While the court routinely and frequently instructs jurors not to rely on information they have learned outside the courtroom, the admonition makes little difference. Despite instructions to the contrary, jurors tend to bring to deliberations any issues that they consider to be relevant to the decision making process. *Juror Internet Use* at 291; citing Shari Diamond & Neil Vidmar, *Jury Room Ruminations on Forbidden Topics*, 87 Va.L.Rev. 1857, 1863 (2001). This phenomenon is not the result of intentional or deliberate disobedience to judicial instructions. Jurors are people and people are generally unable to disregard information that they already know and consider to be relevant, whether they ought to or not. Once heard, the information cannot be ignored. *Juror Internet Use* at 291; citing Shari Diamond, *Beyond Fantasy and Nightmare: A Portrait of the Jury*, 54 Buff.L.Rev. 717, 750-51 (2006).

A tremendous amount of information about Cargill and her history was disseminated to the general public even before she was indicted. This was information that portrayed her as emotionally unstable, prone to violence, and a virtual terror to those closest to her. (*See* Ex. 22 [Dean Art.].) While some of this information ultimately was presented to the jury by way of witness testimony, it

68

was not done so until the punishment phase of trial. Any juror who was exposed to the media coverage prior to that would have possessed knowledge of highly prejudicial and inflammatory information about Cargill before it was introduced by judicially appropriate means. It would have been next to impossible for a juror to "forget" about what was revealed through the course of pre-trial publicity and would have a natural, albeit unintentional, effect on the verdict.

## C. Conclusion

The inflammatory and prejudicial pre-trial publicity surrounding the death of Walker and Cargill's subsequent arrest created a situation where Cargill was not able to receive a fair trial. The media coverage was too wide-spread and too salacious not to have had an effect on the jurors. As a result, Cargill was prevented from being judged by an impartial, indifferent jury. Trial counsel's failure to request a change of venue prejudiced Cargill's trial, and thus, Cargill's verdict and sentence of death should be vacated.

## CLAIM FIVE

## CARGILL RECEIVED INEFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL REGARDING THE IMPROPER AND PREJUDICIAL ADMISSION OF AN AUTOPSY PHOTOGRAPH

It is well established that criminal defendants are entitled to effective assistance of counsel during their direct appeals. The effectiveness of appellate counsel is determined using the two-prong *Strickland* standard. *See Robbins*, 528 U.S. at 285; *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008); *Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007). Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant. *See Ries*, 522 F.3d at 531; *Amador*, 458 F.3d at 411.

69

Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief. *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the State Bar of Texas Guidelines and Standards for Capital Counsel outlines the duties of appellate counsel. Counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." Texas Guidelines, § 12.2(A)(8).

Cargill's direct appeal counsel failed to raise a significant issue on appeal that was apparent on the face of the record. Appellate counsel's failure to properly preserve and appeal these errors constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Thus, her conviction should be reversed.

A. **Appellate Counsel Performed Ineffectively When Failing to Appeal Trial Counsel's Overruled Objection to the Admission of the Autopsy Photograph During the Testimony of Cherry Walker's Hairdresser**

Sonya Burton, Cherry Walker's hairdresser, testified during the guilt phase that Walker came to her shop to have her hair done on June 18, 2010. Walker arrived around 12:30 p.m. and stayed for an hour-and-a-half to two hours. Walker seemed fine and was talking and laughing as usual and had no injuries. (43 RR at 105-08.)

After this brief testimony, the State offered three oversized photographs (State's Trial Exs. 78, 79, and 80) of Walker taken during her autopsy. The State's proffer was that there existed the need to establish that Walker was in fact dead and this witness could properly do that. Trial counsel objected because not only could

70

the pathologist properly establish death, but the photographs were far more prejudicial than probative. The photographs were poster sized and in one Walker's bare breasts could be seen. The State proffered that someone needed to identify Walker and did not want Walker's father to have to do it, but agreed to withdraw Exhibits 79 and 80, which showed the body "below the neck." Trial counsel reiterated their objection to Exhibit 78, which was overruled. (43 RR at 109-13.) Despite trial counsel's continued objection, Exhibit 78—a poster sized, color photograph of Walker's face at the time of the autopsy—was published to the jury. (43 RR at 113.)

Trial counsel's overruled objection and the subsequent publication of the inflammatory photograph to the jury was trial court error and direct appeal counsel should have argued as such.

**B. The Autopsy Photo Used by the State During the Testimony of Walker's Hairdresser Was Far More Prejudicial Than Probative and Thus Inadmissible.**

In order to be admissible at trial evidence must be relevant. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. However, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex. R. Evid. 403.

A photograph admitted as evidence should add something that is relevant, legitimate, and logical to the testimony that accompanies it and assists the jury in its decision making duties. If there are elements of the photograph that are genuinely helpful to the jury in making its decision, the photograph is admissible only if the emotional and prejudicial aspects substantially outweigh the helpful

71

aspects. *Dunklin v. State*, 194 S.W.3d 14, 25 (Tex. App.—Tyler 2006). At the time Burton was called as a witness at Cargill's trial, the State was in the process of establishing the relationship between Cargill and Walker. The medical examiner had not yet testified to the cause of death, or lack thereof, and no evidence regarding the state of Walker's body had even been introduced. The witness who discovered the body on the side of the road had not even been presented. (*See* 45 RR at 60.) Thus, there was no discernable explanation for why the State would choose to publish a photograph from Walker's autopsy during the testimony of her hair dresser other than to inflame the jury with the shocking and gruesome nature of the enlarged image.

Ultimately, admissibility of photographs over any challenge is within the discretion of the trial judge. *Kendrick v. State*, 942 S.W.2d 120, 126 (Tex. App.—Beaumont 1997). However, an abuse of that discretion occurs when the probative value of admitting the photograph is small and the inflammatory potential is great. *Kreyssig v. State*, 935 S.W.2d 886, 890 (Tex. App.—Texarkana 1996). The court must consider a host of factors affecting probativeness of evidence, including the relative weight of the evidence and the degree to which its proponent might be disadvantaged without it, and balance those factors against the tendency that the photographs have to encourage resolution of material issues on an inappropriate emotional basis. *Hooks v. State*, 44 S.W.3d 607, 615 (Tex. App.—Texarkana 2001). Specifically when dealing with photographs, in determining whether the inflammatory nature of the evidence outweighs its probative value relevant factors include the number of exhibits offered, their gruesomeness, detail, size, if they are in color, if they are close-ups, whether the body is naked or clothed and the availability of other means of proof. *Drew v. State*, 76 S.W.3d 436, 451-52 (Tex. App.—Houston [14th Dist.] 2002).

72

Even with the most cursory analysis it is clear in this case that the prejudicial effect of Exhibit 78 far outweighs any possible probative value. The photograph in question was particularly gruesome. It was a greatly enlarged close-up of Walker's face as she lay on the autopsy table. The photograph is in color and includes the number used to identify an individual for purposes of the autopsy. (*See* Ex. 34 [Autopsy Photo].)[31] Furthermore, that particular photograph at that point in testimony served absolutely no probative purpose. There was no need for Walker's hairdresser to identify her dead body. By publishing the larger than life size photo to the jury before any testimony regarding cause of death or the condition of Walker's body, the only reasonable result was for the jury to be emotionally inflamed. The trial court's decision to overrule trial counsel's objection and allow the photograph to be published was in error and would have been deemed such on appeal. Thus, direct appeal counsel was deficient to failing to raise it as a claim.

## C. Conclusion

Appellate counsel's performance fell below the reasonable standards of professional conduct and prejudiced Cargill's appeal. *Lucey*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all."). Therefore, Cargill's conviction and sentence should be vacated, or alternatively Cargill should be granted a new direct appeal proceeding.

---

[31] State's Trial Exhibit 78 is an oversized exhibit and thus was not included as a part of the normal record on appeal. Post-conviction counsel conducted an in-person review of the trial exhibits at the Smith County Courthouse in October 2014. The photograph attached as Exhibit 34 to this Application is a photo of the actual trial exhibit which is currently housed at the Smith County Courthouse.

## CLAIM SIX

## THE STATE COMMITTED MISCONDUCT WHEN IT ENGAGED IN IMPROPER ARGUMENT THROUGHOUT CARGILL'S TRIAL, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GREAT MAJORITY OF THESE IMPROPRIETIES

Every criminal trial entails obligations on the part of both the State and the defense. Both parties have an obligation to make proper arguments to the jury, to solicit relevant information from testifying witnesses, to frame their questions to witnesses consistent with the Texas Rules of Evidence, and, generally, to maintain decorum and to accord to the proceedings that dignity which is expected of officers of the court. At the heart of these obligations is a concern that criminal trials function as truth-seeking endeavors. Without them, neither the accused nor the public can have that measure of confidence in the outcome which is necessary to the administration of justice.

Throughout Cargill's capital trial for the murder of Cherry Walker, the State routinely disregarded these obligations. Moreover, these errors by the State received the faintest opposition from Cargill's trial counsel who, for the most part, sat by as their client was disparaged, as religious imagery was improperly invoked, as sidebar comments and sarcasm were permitted to infect direct and cross-examinations alike, as the State's role in the proceedings was misrepresented, as the qualifications of one expert were challenged through the questioning of another, as facts and assertions not in evidence were testified to by the prosecutors themselves, as the middle-aged victim was sympathetically referred to as "a child" and "childlike," and as the magnitude of the jury's responsibility was diminished. If not by any one of these errors then by them in combination, the prosecutors trammeled upon Cargill's rights under the Texas and United States Constitutions,

74

Texas statutory law, and United States Supreme Court and Texas case law. Accordingly, Cargill's conviction and her sentence must be reversed.

## A. Relevant Legal Standards

The State's arguments at trial may violate a defendant's right to due process of law in two respects. First, the argument may implicate a specific provision of the Bill of Rights that has been incorporated into the Fourteenth Amendment by the Due Process Clause. *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988). Such arguments are considered "manifestly improper, harmful, and prejudicial to the defendant." *Cortez v. State*, 683 S.W.2d 419, 420 (Tex. Crim. App. 1984). Second, arguments that do not implicate specific provisions of the Bill of Rights may amount to a general denial of due process. *Rogers*, 848 F.2d at 608 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In order to prevail on a general due process claim, the applicant must demonstrate that the prosecutor's statement was improper and that the impropriety "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly*, 416 U.S. at 643). To establish the requisite prejudice, controlling precedent requires a showing that a "reasonable probability [exists] that the verdict might have been different had the trial been properly conducted." *Rogers*, 848 F.2d at 609.

The Court of Criminal Appeals also has long held that the law provides for a fair trial—one free from improper argument by the prosecuting attorney. *Borjan v. State*, 787 S.W.2d 53, 56 (Tex. Crim. App. 1990) (citing *Dickinson v. State*, 685 S.W.2d 320, 322 (Tex. Crim. App. 1984); *Richardson v. State*, 257 S.W.2d 308 (Tex. Crim. App. 1953)). To be considered proper, jury arguments must fall within one of four categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App.

75

1999) (citing *Cannon v. State*, 668 S.W.2d 401, 404 (Tex. Crim. App. 1984)). Proper jury argument therefore avoids statements calculated to inhibit the jury from deciding the case based on the evidence presented, *Rogers*, 848 F.2d at 610, and it likewise limits itself to the record and those inferences which might reasonably be deduced therefrom, *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). As the Court has stated, "The purpose of closing arguments is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. 1980) (internal citations omitted).[32]

Just as the State has a duty to avoid improper argument, trial counsels' responsibilities to their client include objecting to inadmissible evidence or improper argument and establishing a record of the trial court's adverse rulings. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); ABA *Standards for Criminal Justice: Defense Function* (3d ed. 1993) (Standard 4-7.1(d) ("[D]efense counsel has a duty to have the record reflect adverse rulings"). To establish that counsel was ineffective for failing to object, Cargill must show that the trial judge would have committed error had the objection been made and overruled. *Martinez*, 330 S.W.3d at 901.

---

[32] *See also* ABA *Standards for Criminal Justice: Prosecution Function* (3d ed. 1993) (Standard 3-5.2(a)) ("As an officer of the court, the prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to codes of professionalism and by manifesting a professional attitude toward the judge, opposing counsel, witnesses, defendants, jurors, and others in the courtroom.").

76

## B. The State's Misconduct

The State's errors during Cargill's capital trial may be divided into eight overlapping categories, those being: (1) prosecution testifying to facts and assertions not in evidence; (2) disparaging remarks; (3) religious imagery; (4) sidebar comments and other expressions of personal opinion; (5) misrepresentation of the State's role; (6) improper challenging of an expert's qualifications; (7) sympathetic references to the victim; and (8) diminishing the magnitude of the jury's responsibility. For organizational purposes, each of these categories is addressed below in its own subsection. But while not every instance of prosecutorial misconduct may be credited with working an injustice in Cargill's case, the breadth and audacity of the State's errors leave no question as to their cumulative effect—namely, to deprive Cargill of her fundamental constitutional right to a fair adjudication of the charges levied against her. *See Guidroz v. Lynaugh*, 852 F.2d 832, 837 (5th Cir. 1988) (assessing the cumulative effect of the State's improper arguments to determine whether the defendant was prejudiced).

### 1. Prosecution Testifying to Facts and Assertions Not in Evidence

Throughout Cargill's capital trial, during both the guilt/innocence and penalty phases, the State testified to facts and frequently offered unsupported assertions, both practices in clear violation of the Texas Rules of Evidence and—when considered in the broader context of the State's misconduct at trial—of Cargill's right to a fair trial. The practical result was that the State pervasively testified *for* their witnesses, often not asking a question but instead offering lengthy recitations of the State's theory, testimony by other witnesses, or other facts not in evidence.[33]

---

[33] Examples of times in which the State provided improper testimony or imputed the State's theory of the alleged crime during either their direct or cross examination of witnesses during the guilt/innocence phase are as follows: Cory

77

90

For example, an exchange between the prosecutor and Gina Vestal, a former employee of Excel Staffing who worked with Kim Cargill and testified for the State during guilt/innocence, serves as an illustration of the degree to which the State felt unfettered in its examination of its witnesses. The only point at issue in the defense's recross-examination of Vestal was whether she had first called Cargill on Friday, June 18, 2010, around 8:30 p.m. (as Vestal testified) or around 10:30 PM (as was indicated in the phone records already admitted into evidence). (*See* 43 RR at 94-95.) On its redirect, and unable to resolve the contradiction between its witness's testimony and its own evidence, the State proceeded to testify through the guise of questioning the witness:

> Q.     These are calls that she is making here, starting like at 21:48. She makes one, she makes one, she makes one, she makes one, she makes one, she makes one. There's a call coming in to her. These are being answered – okay? 653 seconds, 525 seconds, a minute, a

Hoover (43 RR at 52-54); Angie Grant (43 RR at 125-27); William Selmon (43 RR at 206, 225-28, 237, 251, 290, 292); Paula Wheeler (44 RR at 52, 100); Larry Smith (45 RR at 172); Noel Martin (47 RR at 24); Forrest Garner (49 RR at 109); Brian Cargill (49 RR at 119); Kimberly Cargill (53 RR at 118-19, 132; 54 RR at 19-20, 62-63); Brenda Whitaker (54 RR at 124); Loren Puig (54 at 160-61). Additional examples of times in which the State provided improper testimony or improper personal commentary at the punishment phase are as follows: Sandra Craig (58 RR at 76-80, 100-04); Rachel Wilson (58 RR 157-64, 171-79, 185-91, 202, 206-07); April Pitts (58 RR at 227-28); Sharon Rushing (58 RR at 261); Noel Martin (59 RR at 11-16); Johna Booker (59 RR at 30); Barbara Chamberlin (59 RR at 65-66); Mike West (59 RR at 101-02, 107); Sonja West (60 RR at 37, 44-46); Leigh Ann Henry (60 RR 54-55); Brad Merritt (60 RR at 97-98); Brian Cargill (60 RR at 130-31, 151, 153); Jamie Cargill (60 RR at 175-76, 184; 61 RR at 41); Matt Robinson (61 RR at 61-63, 89, 98); Jill Lowe (62 RR at 104); Lisa Alexander (62 RR at 114); Wendie Turner (62 RR at 136-38); James Weaver (63 RR at 18); Bonnie Weaver (63 RR at 60); Susana Aguilar (63 RR at 240); Stephen Rogers (63 RR at 269); Bobbie Maxey (64 RR at 52-53); Kimberly Bowser (64 RR at 90); Antoinette McGarrahan (65 RR at 69-80, 89-90; 132-42); Tim Proctor (68 RR at 50); Edward Gripon (68 RR at 80-81, 93).

78

minute, a minute, a minute, okay? Some of them are going voicemail. Others she's answering.

Like these last three right here, at 10:57, 525 minutes – I mean seconds. 345 seconds, 65 seconds. But even before then, do you see all of these calls?

(43 RR at 97.) Following two more perfunctory questions, the State continued its testimony:

Q. Okay. Well, you said she liked to work, so I just – look on this one.

Now, she's still at work on the 18th, right? Here's 11:19 a.m. And there's a call being made from her to this number. She should be at work – I mean, here's from 11 to 12, 12 to 1 o'clock. Look how many calls you've got.

A. (Nodding.)

Q. And I mean, this one is lasting 1659 seconds, 101 seconds, 200 seconds, 560 seconds, 725 seconds. And y'all are paying her, aren't you, while she's making all of these calls?

A. Yes.

(*Id.* at 97-98.) As the State continued to ask improper questions of this witness, it also seized the opportunity to portray Cargill as shiftless and dishonest for having made personal calls while at work:

Q. Okay. Is that what – that would not –I mean, would that be good with y'all?

A. No. No. Huh-uh.

Q. I mean, you've paid her $299, or whatever it is that day, to make one, two, three – well, one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 – hold that one second for me – 49, 50, 51, 52, 53. And then she gets off right there.

79

92

So 53. And before that, she gets to work at about – what time?

A. 6:45.

Q. See right here, she's at work. So 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77 – 78 calls – 78 calls while at the hospital while she's supposed to be caring for patients, and you're paying her 200-something dollars a day. Does that surprise you?

A. Yes.

Q. Okay. That's a pretty good gig, isn't it?

A. Yes.

(*Id.* at 98-99.) The State, still continuing to testify through its witness and still endeavoring to besmirch Cargill through its improper questioning, then began to baselessly speculate:

Q. Because you're going to make $299 that day and you get to make almost 70 calls, some of them lasting – let's see – like take this one, for instance right here – I don't know how many seconds is – well, I'm kind of scared to add without my phone.

But like – that's the wrong page.

Here's some on the 18th. You might hold that for me one more time.

Let's give her the – let's say she took half an hour for lunch. Let's give her the benefit of a doubt and pick this one right here at 2:17 on the 18th. She's definitely not on lunch at 2:17, and you've got 1464 seconds. That's 24 minutes right there, just for that one call.

Here's another one down here 1,058 seconds. That call right there is 17 minutes.

Just in those two calls, that's the better part of 45 minutes. That's – I mean, that's not what y'all – that would not have been okay with y'all.

A. Correct.

80

(*Id.* at 99-100.) Despite being a redirect examination—during which counsel is subject to the same rules against leading questions as during a direct examination—the exchange with Vestal functioned as an extended opportunity for the State to testify to facts and to make assertions unsupported by the evidence.[34]

The State also used its guilt-innocence direct examination of Huma Nasir, a forensic DNA analyst at Orchid Cellmark, to engage in comparable misconduct. For example, the State went on at length as to how facts independent of the DNA analysis would affect the likelihood that Cargill contributed DNA to a creamer found near the decedent:

> Q. Okay. I guess from a – if you're looking at Kim Cargill and whether or not she's the contributor to that DNA or if it might be some other person at random – so you've got Kim Cargill in this fact scenario and some other person selected at random, if you can bring in 227,000 individuals, I guess statistically the fact that she knows the victim, that she said she was coming to get the victim, that the victim is dumped in Whitehouse near the same location where she lives and the creamer – her DNA is on the creamer top, all of those might be things that statistically would increase the likelihood of her committing it, it would have nothing to do with your statistical calculations?

(48 RR at 167-68.) The State also invited Nasir to speculate on the results that would obtain had a particular DNA test been performed on the door handle to Cargill's vehicle, a line of questioning that was both speculative and inappropriate. (*See* 48 RR at 172-74.)

The State's direct examinations of Meredith Lann during the guilt-innocence phase and Sandra Craig during the penalty phase often occasioned no more than reading verbatim from reports prepared those witnesses. (*See* 51 RR at 49-53; 58

---

[34] During the questioning of another State's witness, the district attorney himself had to admit, "I have a problem with leading, so I'm trying not to lead you." (61 RR at 89.)

81

RR at 76-80, 98-101, 103-04; *see also* 43 RR at 125-27 (comparable error during the direct examination of Angie Grant); *id.* at 225 (comparable error during the direct examination of William Selmon, Jr.).) The State's examination of Dr. Lann, who performed Walker's autopsy, also included several other instances of especially egregious misconduct, as when it solicited Dr. Lann's opinion on the reasonableness of Cargill's defense:

> Q.     And then you could have other scenarios. You could say, well, maybe it's possible that the obese Cherry Walker – who was obese, wasn't she?
>
> A.     Yes.
>
> Q.     That she took off on a long walk, walked ten miles to a place she didn't know, walked into a side road, fell over dead from a seizure or some other reason, and somebody just came along at random and said, "Look, there's a dead body; I think I'm going to take this liquid accelerant that I have with me, pour it on the body and set it on fire."
>
> Does that make sense to you?
>
> A.     No.
>
> Q.     Or maybe it was this: Maybe she was riding around with someone, and they're talking to her in the car, and they're riding over there, they're like, "Cherry, Cherry, you okay?" And Cherry's had a seizure and died in the car. And they're like, "God dog, I'm going to drive out to a remote location, dump that body out, even though I've done nothing wrong, but I'm going to set that body on fire and try to hide it."
>
> Does that seem reasonable to you?
>
> A.     No.

(51 RR at 57-58), or misstated the results of Nasir's DNA analysis,

Q. ... State's Exhibit 122 shows the body as it was found with a creamer top between the legs here, which had a profile of the defendant's DNA on the creamer top. ...

(*Id.* at 62), or associated two pieces of evidence without there being any basis for doing so,

Q. Okay. In the defendant's washer – I'll represent to you her house was less than picked up. There was a lot of clothes that could have been washed at one time. But there was one sheet like that in the washer that was wet. When they opened it up, it had a red straw fall out, which I'm not saying that that would have been the straw wrapper found by the – by the body of the victim. I don't know if it was or not. And I'm not representing that.

(*Id.* at 66).

Worse still, the State's redirect examination of Dr. Lann devolved into an extended recitation of the State's theory of the case, against which Cargill's trial counsel offered few objections. (*See* 51 RR at 111-19, 131.) The witness's response—that she did not consider the surfeit of facts and assertions raised by the State to reach her autopsy conclusions (*see, e.g., id.* at 130, 132)—cannot reasonably be said to have cured the prejudice to Cargill from the State's unregulated opportunity to testify before the jury.

**2. Disparaging Remarks**

In the State of Texas, as elsewhere, it is well-established that "an accused [must be convicted] only upon the evidence presented, without attempting to inflame or prejudice the minds of the jurors." *Stein v. State*, 492 S.W.2d 548, 551 (Tex. Crim. App. 1973). Among the many ways in which the State can engage in improper argument is to debase a defendant through name-calling and personal insults. *Gaffney v. State*, 937 S.W.2d 540, 543 (Tex. App.—Texarkana 1996). Further, the "wide latitude" which counsel enjoy when they draw inferences during their closing arguments is not without limitation, for these inferences must be

83

"reasonable, fair, legitimate, and offered in good faith." *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

Cargill's capital trial was replete with instances in which the State made disparaging and improper remarks against the defendant. On seven occasions, two of which occurred during the State's guilt-innocence opening argument and before Cargill had testified in her own defense, the State referred to the defendant as either a "liar" or a "manipulator."[35] On six occasions—three times during closing arguments in the guilt-innocence phase, three times during closing arguments in the penalty phase—the State referred to Cargill as a "monster." (56 RR at 127, 132; 69 RR at 93, 99, 109.) Equally churlish was the State's reference to Cargill as a "fruit bag" and "fruit cake;" (56 RR at 29, 31), and it drew a rare objection when, in its cross-examination of Cargill, it asked, "[W]here is – where is the remorse? Where is the stress? Where is everything that comes along with not being sociopathic?" (54 RR at 73-74; *see also*, 56 RR at 99 ("And let me make something real clear. I never said she was smart. I think she's stupid and a lot of other things. How dare she lie about that woman?").) Even on the rare occasion that defense counsel did object and the remark was sustained, the impact that the

---

[35] For example, 42 RR at 89 ([reading text messages] "'Sorry I missed your calls. I was sleeping.' No, you weren't. Liar. You're getting gas at 9:16. You were calling Cherry on the phone at 8:02. You were going over to pick her up and take her out. Liar."); 53 RR at 117 ("But – so you – so you're saying right here – I mean, when we're looking at whether you really are a liar and a manipulator and you look on this LVN application"); 56 RR at 37 ("And you know what a manipulator she is? She testified that she thought it was crappy that the DA's Office subpoenaed her. Man, what is wrong with her?"); 56 RR at 99 ("They told you that he said, oh, she might have died of a seizure, a seizure, a seizure, a seizure. Who have we heard that from? That liar over there."); 56 RR at 112 ("So we worked, all of us, and that selfish liar sat back and did not one thing. And then she came in here with her fake cries (demonstrating) until we go up to the bench, and then it's like, huh, wait a minute (demonstrating).")

84

97

statement had on the jury was already accomplished. It is a bell that cannot be un-
rung.

However one might describe the State's treatment of Cargill—tactical or
imprudent, planned or improvised—these disparaging remarks against Cargill were
neither tasteful nor fair. (*See e.g.* during the direct exam of Sonja West when the
witness describes Cargill grabbing her daughter's arm, the State remarks, "Why
didn't you take a baseball bat and knock her head off? That's what I'd have done."
(60 RR at 37).) Moreover, most of these remarks were made during closing
argument when, as the courts of appeals have noted, "[s]tatements . . . are uniquely
compelling since they are the last thing that the jury hears before they retire[] to
deliberate." *Amis v. State*, 910 S.W.2d 511, 515 (Tex. App.—Tyler 1995, pet.
ref'd); *see also Jackson v. State*, 726 S.W.2d 217, 221 (Tex. App.—Dallas 1987,
pet. ref'd). These statements therefore constitute not merely error but prejudicial
error, which thereby deprived Cargill of her right to a fair trial.

### 3. Religious Imagery

Although counsel are afforded considerable deference in making their
arguments, an appeal to the jury's religious instincts or prejudices nevertheless is
improper. *See Oakley v. State*, 68 S.W.2d 204, 264 (Tex. Crim. App. 1934); *Ward
v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005) (finding a prosecutor's reference to
the Biblical "millstone passage" improper "because it reached beyond the record
evidence and encouraged the jury to base its sentencing determination on notions
of divine retribution"). While not directly calling upon the jury to allow its faith to
influence its decision-making, the State made repeated references to God,
particularly in ways calculated to arouse the jury's sympathy toward the decedent.

In the State's closing argument during the guilt-innocence phase, it
repeatedly and improperly alluded to divine providence:

85

- "Well, you want to know what I think her word 'crappy' is? That she'd leave a four-year-old with Cherry Walker, God bless her soul, who her own family says she ought not to keep four-year-olds." (56 RR at 116.)

- "And then miraculously, Cherry Walker, at 233 – God bless her – 233 pounds, and by the time this trial is over, I'll probably be about the same, she's not going to fit in the floorboard of a Montero. How does that work? She said she fell completely out." (*Id.* at 125.)

- "She has to admit what law enforcement has done. And to you all, I say great job. Thank you. Praise God. People who know me know this, and you'll know, Preacher." (*Id.* at 127.)

- "I say this: You know how we figure it out? Sometimes it's the hand of God. I think he does like this over a coffee creamer (demonstrating). Says 'Burn the rest. Leave that. They'll figure it out.' That's what I think." (*Id.* at 128.)

- "Cherry Walker was not disposable. She was not trash. She was a precious child of God who had nobody to come to her rescue until today. And you're it. I'm passing it to you. I can't do any more." (*Id.* at 135.)

Moreover, the State used the opportunity of closing argument to speculate as to Walker's mental state at the time of her death while again injecting religious themes into the proceedings, saying,

> Dear God, [Walker]'s a child in a 39-year-old body, and she's terrified. She's going to do exactly what Paula [Wheeler], who knew her best, said. She's just going to take whatever that monster dished out. God, I wish I had been there.

(56 RR at 132), and

> [Walker] would just sit there and take it, eyes forward, like a little kid. Do you think she asked for her daddy? Do you think she said, "Paula, I told you"? Do you think she prayed? "Please, God, help me." All because she got a piece of paper. Her crime was honesty. "I got a piece of paper."

> And God made her in a special way, a little bit different. She had a slower mind than most, 98 percent of the people, but she a bigger heart than just about everybody.

86

(*Id.* at 133).

The State's invocation of religion was not limited to the guilt-innocence phase. Indeed, every aspect of the State's penalty phase presentation embraced these allusions—opening statement (e.g., "Most important to mention, is [Cargill] has hurt physically and emotionally the children God gave her to protect," 58 RR at 15); the questioning of witnesses (e.g., "Do you think that human beings have the capacity to change? ... Maybe with God's intercession for whatever reason," 64 RR at 81); closing statement (e.g., "She took Cherry's ability to ever go listen to her daddy preach again, to ever sing a song in church ...," 69 RR at 109-10). And, much like the guilt-innocence phase, the State's penalty phase closing argument was shot through with references to God, as when Mr. Bingham opined, "We all have our life. It belongs to us, given to us by God. That's my belief. What [Cargill] did is she took [Walker's]. She took her life." (*Id.* at 21.) Not dissimilarly, Ms. Sikes described Walker as "an angel sent from God" and closed with the freighted intonation, "May God forever rest the precious soul of Cherry Walker." (*Id.* at 113.)

As with the State's disparaging remarks against Cargill, its use of religious imagery to impel the jury to convict Cargill and to sentence her to death based on considerations independent of the evidence adduced at trial constituted prejudicial error, thus her conviction and sentence must be set aside.

### 4. Sidebar Comments and Other Expressions of Personal Opinion

Texas law recognizes that error is committed when a prosecutor makes improper, inflammatory, and prejudicial sidebar remarks, *see Cazares v. State*, 488 S.W.2d 110, 112 (Tex. Crim. App. 1972); *Crawford v. State*, 412 S.W.2d 57, 59 (Tex. Crim. App. 1967), and the ABA's *Standards for Criminal Justice* admonish that "[a] prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible

87

evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury." ABA *Standards for Criminal Justice: Prosecution Function* (3d ed. 1993) (Standard 3-5.6(b)).

At Cargill's trial, the State's violations of these legal and professional requirements were unremitting and ranged from the banal (*see, e.g.*, 58 RR at 159-60 (regarding whether the district attorney himself ever utters a particular expression); 59 RR at 30 (regarding the district attorney's spouse's profession as a teacher); 68 RR at 93 (regarding the district attorney's medication for a suspected strep throat infection)), to the intemperate (*see, e.g.*, 46 RR at 115 ("Well, she's not conferring with nurses about the great care she's giving to her patients, because that phone call lasts 'til 11:05."); 54 RR at 82 ("I can assure you, Ms. Cargill, I never know or care what you have on.")), to the sarcastic (*see, e.g.*, 53 RR at 66, 162), to even commenting on the answers solicited from witnesses (*see, e.g., id.* at 119; 53 RR at 140 ("I mean, everything is – it's like the perfect storm against you. 'Dang, she's having a seizure. My phone – I left my phone at the house.'"); 53 RR at 121 ("That's a hoot. Calling me a liar?")). These errors contributed to the patronizing atmosphere surrounding Cargill's trial and, in conjunction with the State's countless other errors here mentioned, worked to deprive Cargill of the fair trial to which she was entitled.

### 5. Misrepresentation of the State's Role

In addition to the above-mentioned improprieties, the State also misrepresented its role in the case against Cargill during individual voir dire. In particular, the State made the following statement to prospective juror Reeves, who later would be chosen to serve on Cargill's jury: "We don't have anybody sitting by us, because she's dead. Cherry Walker, that's who we represent." (12 RR at 79.) In truth, and per the Code of Criminal Procedure, "[e]ach district attorney [] represent[s] the State in all criminal cases in the district courts of his district" and

88

not the person alleged to have been harmed by the defendant. *See* Tex. Code Crim. Proc. art. 2.01. The State also made a comparable statement to Venireperson Burdett when it intimated that it represented the victim, stating: "We don't have anybody sitting here with us [the State]. She's dead." (10 RR at 185.)

A third example of the State's improper conduct arose in its questioning of Mr. Bell, a venire person who, like Ms. Reeves, later was selected to serve on Cargill's jury. To Mr. Bell, the prosecutor offered: "You know, I told you earlier, Cherry Walker was a real live human being, but she's not sitting here because she's dead." (13 RR at 64-65.) While it is unclear exactly what the prosecutor had in mind when she invoked the word "here," one may fairly presume that "here" meant "with the State" in view of her earlier questioning of Venireperson Burdett.

The Court of Criminal Appeals has stated that any suggestion by the State to the jury which contradicts Article 2.01 of the Code of Criminal Procedure is "erroneous, whether it occurs during *voir dire*, final argument, or some other important stage of the trial." *Draughon v. State*, 831 S.W.2d 331, 336 (Tex. Crim. App. 1992) (citing *Rougeau v. State*, 738 S.W.2d 651, 657 (Tex. Crim. App. 1987)). It is altogether reasonable to conclude that, without these and so many other instances of prosecutorial misconduct tainting the proceedings against Cargill, the result of her capital trial would have been different.

6. Improper Challenging of an Expert's Qualifications

As suggested previously, the State's improprieties were not confined to its opening and closing arguments but also contaminated its questioning of witnesses. For example, in its questioning of defense expert Antoinette McGarrahan, a forensic psychologist, the State sought to challenge the qualifications of another defense expert, Jonathan Lipman, a neuropharmacologist who by that point in the proceedings had not yet taken the stand to offer testimony:

89

Q. Well, is it something – and the reason I'm asking you is because a neuropharmacologist [such as Dr. Lipman] is not a medical doctor; they're not a psychologist or, obviously, a psychiatrist.

So they can't, I don't believe, assess patients, prescribe medication, do anything of that nature. However, you do assess patients and make clinical diagnoses.

(65 RR at 69-70.) Later, the State again returned to this line of questioning:

Q. But he [Dr. Lipman] – he's really – he's not – and that's why I'm – I'm trying to find out who really looks at that, because he's not a doctor. He has no license from which he testifies under that I know of. He can't assess patients. He can't prescribe medication.

And so I don't – I don't know that he can testify as to – you know what I'm saying – with these disorders.

(65 RR at 79.) The appropriate opportunity to challenge an expert's qualifications is a Rule 705 hearing, a hearing which necessarily takes place without the presence of the jury. Moreover, the State's error was all the more egregious for having "poisoned the well," viz., it disputed Dr. Lipman's qualifications within earshot of the jury before Dr. Lipman had had a chance to testify.

The State also questioned Dr. McGarrahan repeatedly about the effects of prescription medication on Cargill's personality disorder despite Dr. McGarrahan's maintaining that she was not a neuropharmacologist and therefore unqualified to answer the State's questions. (See 65 RR at 69-76.) Likewise, the State asked Dr. McGarrahan about the effect Cargill's medical conditions would have on her behavior and mental state even though Dr. McGarrahan indicated that a medical doctor would be a far more appropriate expert to answer those questions. (See 65 RR at 85-92.)

90

103

### 7. Sympathetic References to the Victim

Claim Two, *ante*, discusses the improper introduction of victim impact evidence into the guilt-innocence phase of Cargill's trial. Those errors by the State were compounded, however, by the prosecutors' repeated suggestion during the guilt-innocence phase that Cherry Walker—the thirty-nine-year-old decedent—was "a child" or "childlike":

- "She's a child in an adult body." (42 RR at 62.)

- "And being a child in an adult's body, Cherry said, 'Sure, okay [I'll watch Luke].'" (42 RR at 63.)

- "[W]ould you have found Cherry Walker to be childlike if you remember . . ." (42 RR at 120.)

- "Was [Cherry Walker] very childlike? . . . Okay. Sweet? . . . Q. Good heart?" (44 RR at 34.)

- "Cherry was 39 years old, and you – you stated very childlike." (44 RR at 48.)

- "Was your impression of Cherry like a lot of children, kind of honest to a fault?" (44 RR at 50.)

- "Cherry Walker's got the mind of a child?" (44 RR at 67.)

- "When she would play with the dolls – was that – is that a doll that she had that she would play with much like a child would play with a doll?" (44 RR at 87.)

- "Okay. So she's – was she very childlike?" (45 RR at 12.)

- "She was like a child?" (45 RR at 13.)

- "In – I notice Cherry Walker also liked to – she like to go to the – did you know her to sit and play with toys for much younger children?" (49 RR at 148.)

- "Yeah, she – tell me if you disagree. Cherry Walker, she was a 39-year-old lady who – kind of like a child in an adult's body, wasn't she?" (49 RR at 151-52.)

91

- "And I'll tell you [the jury] this: When you go get an M.R. babysitter, who's mentally – the mental equivalent of a young child . . ." (56 RR at 54.)

- "I told y'all [the jury] in voir dire, the ones I questioned, that anybody that knew me knew one thing, that I would always, till the day I die, stand up for a kid. I'd give my life for a child. And there's one right there (indicating [at photograph of Cherry Walker])." (56 RR at 99-100.)

- "Dear God, she's a child in a 39-year-old body . . ." (56 RR at 132.)

- "She was a precious child of God who had nobody to come to her rescue until today." (56 RR at 135.)

Even if some of these references might be justified to support the State's theory that Cargill had strangled a pliant Walker as the latter sat in the passenger seat of Cargill's Mitsubishi Montero, the preponderance of these references are better understood as improper attempts by the State to tug at the heartstrings of the jury. Accordingly, Cargill's conviction for the murder of Walker should be reversed.

## 8. Diminishing the Magnitude of the Jury's Responsibility

In *Caldwell v. Mississippi*, the Supreme Court observed that "many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion." 472 U.S. 320, 329 (1985) (citations omitted). Although *Caldwell* concerned a prosecutor's improper argument to the jury that its "job is reviewable," an argument which thereby reducing the weight of responsibility the jury would feel in making its sentencing determination, *id.* at 345 (internal quotations omitted), shifting the jury's sense of responsibility to an appellate court is not the only means by which the importance of its role may be diminished. Indeed, the Court of Criminal Appeals recognized the broader implications of *Caldwell* when, in *Draughon v. State*, it observed that "reliability of the decision to impose death is reduced impermissibly when, among other

92

reasons, jurors are misled into believing that their decision may be less momentous than it really is." 831 S.W.2d 331, 337 (Tex. Crim. App. 1992).

In its closing argument during the penalty phase of Cargill's capital trial, the State made the following statements to the jury:

> This case isn't hard. You're not executing anybody. *You're not taking and shouldering responsibility for anything.* She made those choices on June 18th. She bought and paid for those answers. She did it. And she bought and paid for it with her hands around the neck of Cherry Walker. She bought and paid for that "yes," "no" answer when she took lighter fluid – showed you how she did it – and squirted it on the body, the still-warm body of Cherry Walker.

(69 RR at 110-11 (emphasis added).) Although the first statement is a matter of interpretation and the second statement technically true, the third statement is an unequivocal abrogation of the jury's responsibility to reach a sentencing determination based upon its appreciation of the facts adduced. Furthermore, the State cannot be said to have cured its error by going on to discuss Cargill's choices, for—and this bears repeating—the State's blanket statement to the jury was that it would not be "taking and shouldering responsibility *for anything.*" *Id.* (emphasis added).

In like fashion, the State also sought to diminish each juror's sense of its responsibility—more precisely, the means by which each juror was to carry out its responsibility—by arguing to them that emotion should factor into their decision-making. This the State did in its closing argument during both the guilt-innocence phase and the penalty phases of Cargill's trial, saying,

> And if [the assertion that Cherry Walker died of a seizure] doesn't make you mad, it ought to. It ought to infuriate you. It's pitiful. It's pathetic that she can come in here in this court of law, after I've worked for two years with that Sheriff's Office out there, and throw it out there, and her lawyer go, well, would you jump out of a plane? Who cares about a plane?

93

106

(56 RR at 99), and

> And she chose to take that stand and lie to you about it. That ought to make you mad. It really ought to.

(69 RR at 105).

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.". *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Consistent with this expectation, the ABA *Standards for Criminal Justice* call upon prosecutors to "refrain from argument which would divert the jury from its duty to decide the case on the evidence." ABA *Standards for Criminal Justice: Prosecution Function* (3d ed. 1993) (Standard 3-5.8(d)). Accordingly, there can be no doubt as to the impropriety of the State's argument to the jurors that they "ought to" be angry with Cargill for having mounted a defense to the capital charge, and, in combination with the innumerable errors already addressed, these errors erode confidence in the fairness of the proceedings against Cargill.[36] *See also Summers v. State*, 182 S.W.2d 720, 722 (Tex. Crim. App. 1944) ("The accused is entitled to a fair trial without reference to outside influence.").

## C. Conclusion

Throughout eighteen days of trial—memorialized in over 5,000 pages of transcription—the prosecution routinely and variously neglected its unqualified obligation to ensure that the proceedings against Cargill were fair and the outcome in her case reliably reached. The State's errors were, in short, pervasive,

---

[36] Like the State's other misconduct during closing argument, the errors complained of here are of particular concern because "[s]tatements occurring during final argument are uniquely compelling since they are the last thing that the jury hears before they retired to deliberate." *Amis v. State*, 910 S.W.2d 511, 515 (Tex. App.—Tyler 1995).

94

107

significant, and effective. But for this misconduct and the prejudice it engendered, the jury's verdict during either the guilt-innocence phase or the penalty phase likely would not have disfavored Cargill. Accordingly, the weight of these errors and the interests of justice require that Cargill's conviction or sentence be set aside and a new trial on the merits and on punishment ordered.

## CLAIM SEVEN

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MITIGATING LAY WITNESS TESTIMONY AT THE PUNISHMENT PHASE OF CARGILL'S CAPITAL TRIAL

Cargill's defense counsel was expected to investigate and prepare a full mitigation presentation for the punishment phase of her capital trial. However, counsel's incomplete investigation and subsequent failure to present lay witnesses to testify regarding Cargill's life history failed to ensure Cargill received the effective assistance of counsel guaranteed by the Constitution.

At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability. Moral culpability acknowledges an elementary psychological reality—that people do not arrive at their choices from the same path. Thus, it follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. A jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense.

Mitigating evidence is not developed to provide a defense to the crime or to challenge evidence of guilt; nor is it an excuse or explanation for a crime. Instead, it provides a context for the crime by describing an individual's life experiences that serve to inspire compassion, empathy, mercy, and/or understanding. Indeed,

95

mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).

The failure of trial counsel to present lay witnesses at the punishment phase of Cargill's capital trial prejudiced Cargill's punishment phase presentation and violated her applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Cargill's death sentence should be vacated.

## A. Trial Counsel Failed to Present a Comprehensive Picture of Cargill's Life History During the Punishment Phase of Her Capital Trial

The State presented forty-one witnesses during the punishment phase. These witnesses spanned Cargill's life history and included Cargill's own family members; ex-husbands and in-laws; three of her four children; former friends and neighbors; teachers from her children's schools; peace officers involved in prior arrests of Cargill; and county jail correctional officers. All of these witnesses testified, in varying detail and intensity, to the detriment they suffered as a result of their interactions with Cargill. Many witnesses described incidents of chaos, violence, and emotional turmoil they experienced because of Cargill's volatile behavior. (58-68 RR, *passim*.)

Alternatively, the defense presented at punishment two persons to rebut the prosecution's assertion that Cargill had contraband in her jail cell while awaiting trial; four correctional officers who testified Cargill did not cause problems at the county jail; a fellow inmate who testified Cargill was kind and compassionate to her; and two experts—a forensic psychologist and a neuropharmacologist. The defense did not present a single witness who knew Cargill prior to her arrest or had any personal connection to Cargill's complicated and tumultuous life history. The result was that the jury heard the singular and one-sided story of a woman who

96

109

created chaos in the lives of everyone she encountered and was violent, abusive, and cruel to those who were closest to her. This was an inaccurate portrayal of Cargill and enormously prejudicial.

Professional norms require that counsel's investigation should include the thorough interviewing and development of witnesses such as family members and friends. *ABA Guidelines*, Guideline 10.7 (commentary) ("penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); *Texas Guidelines*, Guideline 11.1(A)(3)(b)(i) ("The investigation for the punishment phase of the trial should generally encompass . . . [d]evelopment of character witnesses and family background evidence."). In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory for the offense for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death. *ABA Guidelines*, Guideline 10.11(F)(1).

Post-conviction investigation has revealed a number of witnesses who had first-hand knowledge of trauma Cargill suffered during the course of her life including parental alienation of affection; parental abandonment; parental physical and emotional abuse; adolescent sexual assault; and physical, emotional, and psychological abuse by a spouse. These witnesses were available and willing to testify on Cargill's behalf regarding not only the details of the trauma, but also to the significant effect the trauma had on Cargill's emotional development and perception of the world around her.

Trial counsel's failure to uncover detailed mitigating information from family members and friends about Cargill's background, and subsequent failure to

97

present these witnesses at the punishment phase of Cargill's trial prejudiced Cargill in two ways. First, as a result of not hearing this kind of critical mitigation evidence, the only understanding the jury had of Cargill's background and life history was through the filter of the State's aggravation presentation. The jury heard from a multitude of witnesses who had negative experiences with Cargill or were the recipients of her destructive behavior. By all accounts, Cargill was portrayed as unpredictable, volatile, and emotionally unstable. However, this portrayal was incomplete. There were a number of people available and willing to offer an alternative and more balanced perspective—individuals who not only, knew first-hand the trials, tribulation, and trauma Cargill experienced, but who also saw her for the kind, considerate, and good-natured person that she could actually be.

Secondly, the failure to discover this type of mitigating evidence undermined the defense's presentation of their own expert witness, Dr. Antoinette McGarrahan, who opined that Cargill suffered from a personality disorder that likely originated in environmental factors present in Cargill's childhood. However, Dr. McGarrahan had no knowledge, other than what was reported by Cargill herself, of any kind of trauma or other environmental factors occurring or what the effect might have been on Cargill's emotional and psychological development. There were a number of lay witnesses willing to provide Dr. McGarrahan with the necessary background information that she lacked in order to contextualize and support her belief that Cargill suffered from some kind of early trauma. Not presenting this testimony was prejudicial and denied Cargill her constitutional right to a fair trial.

98

## B. Cargill Suffered From Trauma During Childhood, Adolescence, and Early Adulthood

Testimony from lay witnesses would have established that Kimberly Cargill's[37] life was marked by instability and dysfunction from its early origins. Despite the outward appearance that she had a supportive and loving home environment, Kimberly's development was rooted in insecurity and feelings of abandonment, both by adults who were a constant presence in her life and those who were entirely absent. This would have a noticeable impact on the rest of her life and ability to form and maintain positive and fulfilling interpersonal relationships.

### 1. Kimberly Is Born Into a Chaotic and Unstable Family Environment

Kimberly was born to Eddie Upton and Rachel Dean Upton[38] in November 1966. Eddie and Rachel went to high school together. (Ex. 11 at ¶3 [Aff. of Lucy Scoggin]; Ex. 14 at ¶5 [Aff. of Rachel Wilson].) Rachel was pretty and Eddie worshipped her. However, Rachel was not friendly, hard to get along with, and did not have close friends. Rachel enjoyed being the center of attention but wanted things done her way. (Ex. 11 at ¶5 [Aff. of Lucy Scoggin].) Eddie and Rachel secretly eloped their senior year of high school when Rachel was only seventeen. (Ex. 11 at ¶5 [Aff. of Lucy Scoggin]; Ex. 14 at ¶6 [Aff. of Rachel Wilson].) Rachel was raised in Mississippi by a traditional family where she was the only girl. (Ex. 14 at ¶¶2-3 [Aff. of Rachel Wilson].) Rachel's father was strict and domineering. He often spoke to Rachel's mother as though she was his child,

---

[37] For ease of reading all persons in sections B and C of this Claim will be referred to by their first names, including Kimberly Cargill.

[38] Rachel Wilson testified for the State at the punishment phase of trial. However, she was interviewed multiple times by the defense and the information contained here could have been properly elicited during cross-examination.

99

rather than his wife. Marriage was a way for Rachel to escape her father's house. (Ex. 11 at ¶¶3-5 [Aff. of Lucy Scoggin].)

Eddie also had a complicated family situation. Eddie was sent to live with foster parents when he was five years old and stayed with them until adulthood. His biological parents suffered from drug and alcohol addiction and he saw them only sporadically. (Ex. 11 at ¶2 [Aff. of Lucy Scoggin]; Ex. 14 at ¶5 [Aff. of Rachel Wilson].)

After they married, Eddie and Rachel lived in a house trailer that Eddie's foster parents financed for them. Eddie was unemployed and Rachel worked for the phone company. (Ex. 11 at ¶6 [Aff. of Lucy Scoggin].) After being married for only five months Eddie and Rachel decided to have a baby. Rachel's pregnancy with Kimberly was difficult. Rachel was sick the entire pregnancy and suffered from anemia. As soon as Rachel brought Kimberly home from the hospital they had to return because Kimberly had projectile vomiting and was allergic to the formula she was taking. (Ex. 14 at ¶¶6-8 [Aff. of Rachel Wilson].)

Rachel did not take maternity leave and instead went back to work as soon as she could. Eddie left town to join the National Guard when Kimberly was a mere five weeks old, leaving Rachel to care for the baby on her own. (Ex. 11 at ¶7 [Aff. of Lucy Scoggin]; Ex. 14 at ¶¶9-10 [Aff. of Rachel Wilson].) Rachel worked a full-time job at the phone company, taking the 3:00 to 11:00 p.m. late shift. While Rachel worked Kimberly was left in the care of her teenage aunt. Soon after Eddie's departure, Rachel started seeing Kenneth Pitts. Kenneth was a classmate of both Eddie and Rachel and Eddie's best friend. Rachel often stayed out with Kenneth late at night after her work shift ended. (Ex. 11 at ¶¶7-8 [Aff. of Lucy Scoggin].)

When Eddie returned from National Guard training he was a different person. He drank and was abusive towards Rachel. (Ex. 14 at ¶10 [Aff. of Rachel

100

Wilson].) It was very difficult for Eddie to see Rachel and Kenneth together because Eddie and Kenneth were such close friends. Eddie took a swing at Kenneth after seeing Kenneth and Rachel out at a bar one night and spent a night in jail. (Ex. 11 at ¶9 [Aff. of Lucy Scoggin].) Soon after Eddie's return Rachel filed for divorce. Eddie did not want the divorce and the proceedings were not amicable. Eddie and Rachel went to court several times. (Ex. 14 at ¶10 [Aff. of Rachel Wilson].) Rachel pursued child support from Eddie. Rachel agreed to drop the child support claim if Eddie relinquished his rights and allowed Kenneth to adopt Kimberly and Eddie agreed. (Ex. 11 at ¶¶9-10 [Aff. of Lucy Scoggin]; Ex. 14 at ¶11 [Aff. of Rachel Wilson].) Rachel and Kenneth were married as soon as Rachel and Eddie's divorce was final and Kenneth adopted Kimberly. (Ex. 14 at ¶11 [Aff. of Rachel Wilson].)

Eddie did not have contact with Kimberly following Rachel and Kenneth's marriage. Eddie's family members who had been close to Kimberly lost contact with her as well. Eddie's mother kept in touch with Rachel's mother and even taught Kimberly's Sunday School class. However, at that time Kimberly had no idea the woman was actually her grandmother. (Ex. 11 at ¶11 [Aff. of Lucy Scoggin].)

2. **Kimberly's Childhood and Adolescence are Wrought with Dysfunction and Feelings of Abandonment**

When Kimberly was about two-and-a-half years old, Rachel and Kenneth had a biological daughter together they named April. Kimberly and April rarely played together as children. (Ex. 14 at ¶12 [Aff. of Rachel Wilson].) Kimberly did not feel as though Rachel approved of her and never felt good enough. (Ex. 5 at ¶8 [Aff. of Mary Eoff].) Kimberly and April were treated differently. (Ex. 8 at ¶3 [Aff. of Teena Livengood].) Kimberly was not told she was adopted by Kenneth until she was nine years old. The revelation was disclosed to Kimberly in a casual

101

manner by Rachel after Kimberly remarked that she wondered why she did not look like Kenneth. (Ex. 14 at ¶13 [Aff. of Rachel Wilson].) Learning Kenneth was not her biological father significantly affected Kimberly. She did not feel accepted within her own family because of their biological differences. (Ex. 9 at ¶5 [Aff. of Tina Nelson]; Ex. 5 at ¶8 [Aff. of Mary Eoff].)

The estrangement that Kimberly felt from her family was compounded by her difficult relationship with Rachel. This was due in part to the fact that Rachel was physically abusive towards Kimberly. There were times Kimberly confided in girlfriends about incidents of being hit by her mother. Kimberly's friend Tina saw markings of physical violence on Kimberly's body, including a welt from a belt buckle. Tina saw the imprint of the round metal part from the belt on Kimberly's body and head. Additionally, Tina was at Kimberly's house when she witnessed Rachel physically assaulting Kimberly. Tina was upstairs in one of the bedrooms and heard Rachel choking and smacking Kimberly in the next room. Tina even covered her ears to block out what she was hearing. When Kimberly came into the room where Tina was Kimberly was crying. (Ex. 9 at ¶¶5-6 [Aff. of Tina Nelson].)

Kimberly's friend Teena saw Rachel physically strike Kimberly. Teena was waiting for Kimberly in Kimberly's bedroom and heard Rachel and Kimberly yelling in another room. Teena walked in on Rachel hitting Kimberly with a hairbrush because Kimberly did not mop the floor correctly. It was significant enough that Teena later wished she had reported the incident to someone. Teena saw bruises on Kimberly's arms when they changed into gym clothes at school. Several times Kimberly took a deduction in her grade rather than change clothes and risk the other girls seeing the marks on her body. (Ex. 8 at ¶¶4-5 [Aff. of Teena Livengood].)

Kimberly also suffered from several significant health crises during childhood. When Kimberly was twelve years old she contracted meningitis. The

102

family had recently returned from vacation and Kimberly was at softball practice when the coach called Rachel to report that Kimberly was not feeling well. Kimberly was feverish and clammy and was vomiting. Kimberly was rushed to the emergency room and a spinal tap was performed. Kimberly was in quarantine briefly and then remained in the hospital for several weeks. While in the hospital Kimberly contracted a strain of mumps which resulted in tinnitus and hearing loss in one of her ears. (Ex. 14 at ¶14 [Aff. of Rachel Wilson].) Kimberly continued to be plagued with medical problems even after recovering from the acute meningitis. Getting well was a process that took close to a year. Because the lining of the spinal tissue in her tailbone was affected, Kimberly had a difficult time sitting down. Kimberly had another episode where she temporarily lost control of her lower extremities. She went to the emergency room but doctors could not determine the cause. (Ex. 14 at ¶15 [Aff. of Rachel Wilson].)

In junior high school Kimberly was well liked and got along with other students. (Ex. 4 at ¶2 [Aff. of Greyson Dunn]; Ex. 9 at ¶2 [Aff. of Tina Nelson].) However, one night she experienced a traumatic event involving a group of male classmates. Kimberly went to the home of one of the boys and something sexual happened. Rumors circulated that Kimberly's parents threatened to bring statutory rape charges against at least one of the boys. (Ex. 4 at ¶3 [Aff. of Greyson Dunn].) Ultimately Kimberly's parents refused to acknowledge that an assault had been committed against their daughter. (See Ex. 14 at ¶19 [Aff. of Rachel Wilson].)

When Kimberly was a teenager she wanted to meet her biological father, Eddie. Kimberly traveled to Mississippi a few times and was able to meet her father and members of her paternal family. (Ex. 13 at ¶¶5-6 [Aff. of Deborah Upton].) Due to Kimberly's persistent and significant issues with Rachel, it was decided Kimberly should go to Mississippi to stay with her biological father for a

103

significant period of time. Eddie and his wife Deborah filed for legal guardianship so Kimberly would be able to stay permanently. (*Id.* at ¶8.)

However, Kimberly did not have a good experience in Mississippi. Kimberly expressed how affected she was by learning of her adoption and that she felt very different from the rest of her family. Kimberly felt as though she should have been told about the adoption much earlier. (Ex. 13 at ¶9 [Aff. of Deborah Upton].) The relationship between Kimberly and Eddie while she was in Mississippi was strained. (*Id.* at ¶10.); *see also*, Ex. 8 at ¶6 [Aff. of Teena Livengood].) Kimberly was not able to make the connection with Eddie she so desperately wanted. (Ex. 11 at ¶13 [Aff. of Lucy Scoggin].) Kimberly reached out to Eddie but he did not reach back.[39] (Ex. 14 at ¶18 [Aff. of Rachel Wilson].) Ultimately, Kimberly left Mississippi much earlier than expected. After that, Kimberly did not have contact with Eddie or the other members of her biological family for a significant period of time. (Ex. 13 at ¶11 [Aff. of Deborah Upton]; Ex. 11 at ¶¶12-13 [Aff. of Lucy Scoggin].)

Kimberly coped by keeping her emotions bottled inside. (Ex. 8 at ¶8 [Aff. of Teena Livengood].) There was a change in Kimberly's personality during her teenage years. Even her parents did not understand why, but Kimberly started to be emotionally unstable and irrational. (Ex. 14 at ¶21 [Aff. of Rachel Wilson].) After graduation from high school, Kimberly enrolled at a community college but slept instead of going to class. This was particularly unacceptable to her adoptive father, and Kenneth and Kimberly's relationship soured. (*Id.* at ¶¶22-23.)

---

[39] Kimberly had a life-long fear of abandonment. It caused issues and insecurities in her future relationships. (*See* Ex. 2 at ¶6 [Aff. of Brian Cargill].)

104

### 3. Kimberly's First Divorce Takes a Significant Toll on Her Emotional Health

After leaving community college, Kimberly went to work in a law office and there she met her first husband, Mike West. Mike's father was the one who first met Kimberly and introduced them. Kimberly's mother found Mike to be polished and well educated. (Ex. 14 at ¶¶24-25 [Aff. of Rachel Wilson].) Mike was good looking, successful, and from a good family. Kimberly thought if she married Mike she could prove to her mother that she had value as a person and was worthy of being loved. (Ex. 5 at ¶8 [Aff. of Mary Eoff].) Kimberly and Mike were young and immature when they married and they argued often. Their arguments became mutually physical and at times the police were involved. Mike once threw Kimberly into a wall and left the imprint of her body in the sheetrock. (*Id.* at ¶2.)

Kimberly and Mike tried to have a baby soon after they were married but were plagued by fertility issues. After treatment Kimberly was able to get pregnant with her first son David and was ecstatic. Kimberly believed a baby would fix the problems in her marriage. Kimberly focused her energy on having a healthy baby and was in heaven when David was born. Kimberly loved nursing and having a newborn and it seemed to those around her that Kimberly was finally where she wanted to be in life. (Ex. 5 at ¶3 [Aff. of Mary Eoff].)

However, the birth of David did not fix the turbulence in Mike and Kimberly's marriage. Issues between them remained unresolved and the relationship did not get better.[40] When David was about three years old, Kimberly became very ill with Crohn's Disease[41] and spent time in the hospital. Two weeks

---

[40] Mike testified at trial that Kimberly was quick to anger and had a volatile temper. (*See* 59 RR at 79-81.)

[41] Crohn's Disease is a chronic inflammatory condition of the gastrointestinal tract. It causes a variety of symptoms that are often debilitating

after Kimberly was released from the hospital Mike left Kimberly and filed for divorce. (Ex. 5 at ¶4 [Aff. of Mary Eoff].) Mike ultimately took Kimberly to court over custody of David and brought in Kimberly's own mother to testify on his behalf at the temporary custody hearing. Kimberly was prohibited from seeing David freely and instead was held to a court-ordered custody arrangement. Losing custody of David affected Kimberly tremendously and threw her in a deep depression. Kimberly became so depressed that she checked herself into an out-patient mental health program. (Id. at ¶5.) Kimberly did not want the marriage to end and was overwhelmed by what was happening to her. (Ex. 10 at ¶3 [Aff. of Deborah Newman].)

Mike had money and legal resources at his disposal and Kimberly did not. Kimberly was at a serious disadvantage during the legal proceeding. (Ex. 6 at ¶6 [Aff. of Cindy Henry]; Ex. 7 at ¶8 [Aff. of Doug Henry].) Kimberly did not even have support from her own family during the divorce and felt abandoned by them yet again. (Ex. 10 at ¶4 [Aff. of Deborah Newman].)

Kimberly had to move out of the home she and Mike shared and Mike married a woman named Sonja. Mike and Sonja created a new family together and tried to get their exes out of their lives. (Ex. 5 at ¶6 [Aff. of Mary Eoff].) By all accounts, Sonja made life difficult for those she wanted out of her life. Sonja divorced Doug Henry when their daughter Leigh Ann was three years old. In order to be vindictive, Sonja accused Doug of sexually abusing Leigh Ann and forced him and his new wife to endure a lengthy and expensive court battle. This was going on at the same time that Kimberly was fighting for her right to see David. (Id. at ¶6; Ex. 6 at ¶3 [Aff. of Cindy Henry]; Ex. 7 at ¶5 [Aff. of Doug Henry].)

---

and can interfere with daily life. There is no cure for Crohn's Disease and treatment involves management of symptoms. (See http://www.ccfa.org/what-are-crohns-and-colitis/what-is-crohns-disease, last visited Aug. 16, 2014.)

106

Kimberly and Sonja had a physical altercation on a day when Doug asked Kimberly to pick up Leigh Ann from Sonja's house. Kimberly could not risk a felony on her record because she was trying to get a nursing license so she had to plead guilty to a lesser charge. (Ex. 5 at ¶6 [Aff. of Mary Eoff]; Ex. 7 at ¶10 [Aff. of Doug Henry]; Ex. 6 at ¶8 [Aff. of Cindy Henry].)

After the altercation with Sonja, Kimberly was only allowed supervised visitation with David. Visits Kimberly had at a friend's house went well. It was more difficult when Kimberly had to have her visitation at a facility. It was impossible for David to be natural and have a good time with Kimberly when someone was watching everything Kimberly and David said or did. Kimberly also had to pay several hundred dollars in fees and court costs for each visit and because of this she saw David less and less. (Ex. 5 at ¶7 [Aff. of Mary Eoff].) The impact of the conviction on Kimberly was significant and she was emotionally downtrodden. (See Ex. 6 at ¶8 [Aff. of Cindy Henry].)

## C. Despite Assertions to the Contrary, There Was a Positive and Compassionate Side to Kimberly Cargill

The State asserted during the course of the punishment phase of trial that there was nothing good about Kimberly Cargill and instead she was "evil...in its purest form." (69 RR at 96.) Despite the fact that a fundamental part of their duty was to present positive aspects of the client's life, trial counsel failed to present a single witness, other than an inmate in the county jail, to testify that Kimberly had a different side to her than what was offered by the State. (See ABA Guidelines, Guideline 10.11; 68 RR at 21-26.)

At the time of trial there existed a number of people who knew and cared for Kimberly and would have testified on her behalf had they been located and asked. (Ex. 3 at ¶7 [Aff. of Thomas Decker]; Ex. 4 at ¶7 [Aff. of Greyson Dunn]; Ex. 5 at ¶14 [Aff. of Mary Eoff]; Ex. 6 at ¶2 [Aff. of Cindy Henry]; Ex. 7 at ¶2 [Aff. of

Doug Henry]; Ex. 9 at ¶7 [Aff. of Tina Nelson]; Ex. 10 at ¶7 [Aff. of Deborah Newman]; Ex. 11 at ¶14 [Aff. of Lucy Scoggin]; Ex. 13 at ¶2 [Aff. of Deborah Upton].) Each of these individuals could have provided insight into Kimberly's character and ability to act kind, compassionate, and loving towards those around her. These people would also have testified that while certainly not perfect, Kimberly did in fact love her children and took good care of them.

As an adolescent, Kimberly was well-liked. She had a sweet personality. She was fun to be around and got along well with others. (*See* Ex. 4 at ¶2 [Aff. of Greyson Dunn]; Ex. 9 at ¶2 [Aff. of Tina Nelson].) As a young adult, Kimberly was sweet and bubbly and had a number of friends through her neighborhood and church. (*See* Ex. 10 at ¶2 [Aff. of Deborah Newman]; Ex. 5 at ¶1 [Aff. of Mary Eoff].) All Kimberly ever wanted was a "normal life," as a wife and a mother. (Ex. 5 at ¶9 [Aff. of Mary Eoff].) Kimberly loved being a mother and took good care of a young David. Kimberly loved David very much. (Ex. 10 at ¶4 [Aff. of Deborah Newman].)

Kimberly was sweet and a bit naïve. (Ex. 6 at ¶6 [Aff. of Cindy Henry].) Doug and Cindy Henry got to know Kimberly when they would all get together with their kids. Kimberly frequently brought David to the Henry house and the adults talked while the kids played. (*Id.* at ¶5.) Kimberly was loving and very sweet towards David. David enjoyed being around Kimberly and they were physically affectionate with one another. (*Id.* at ¶7.)

Kimberly was a friend to the Henrys. The only reason they stopped seeing her was because Sonja prohibited Kimberly from being around Leigh Ann. This prevented Kimberly from driving the kids or being at the Henrys house when Leigh Ann was present. As a natural result the Henrys saw her less and less. (Ex. 7 at ¶10 [Aff. of Doug Henry].)

108

Thomas Decker, a friend frequently around Kimberly from 1996 to 1998, also found her to be a "normal and friendly" person. While Thomas saw Kimberly upset sometimes due to the custody situations she was dealing with, it was never out of the realm of a normal level of intensity. (Ex. 3 at ¶6 [Aff. of Thomas Decker].) Thomas also knew Kimberly to take good care of her second son Jamie, and did not see any kind of abuse or neglect. Thomas and Kimberly spent a significant amount of time together and he also saw Kimberly parent David. There were numerous times Kimberly took both Jamie and David over to Thomas's house to barbeque and swim with him and his family. (Id. at ¶¶4-5.)

Even many years later, after Kimberly had been through years of marital strife and seemingly never-ending custody battles, she could be warm and open to others. A parent of one of Zach's classmates liked Kimberly very much. She saw Kimberly with both Zach and Luke often and Kimberly was not rough with them. In fact, Kimberly was the opposite of rough, especially with Luke who ran around on the field during Zach's sporting events. (Ex. 12 at ¶¶2-4 [Aff. of Kimberly Slavinksy].) Zach's classmate stayed overnight at Kimberly's house several times and Zach stayed overnight at his friend's house as well. There was not ever anything amiss and the classmate's parent found Kimberly to be responsible and conscientious. (Id. at ¶3.)

There was, by all accounts, a great deal of aggravating evidence presented during the punishment phase of trial. There were a significant number of people who experienced a negative side of Kimberly and were willing to testify in that regard. Because of that, it was even more essential that trial counsel seek to provide a more complete and balanced picture of Kimberly. It is impossible to convey to a jury every moment of a defendant's life. The job of the State in presenting a case in aggravation is to find the most egregious events and convince a jury that those events are representative of the defendant as a whole. It is

109

122

therefore incumbent upon trial counsel to counter that one-sided presentation and demonstrate to the jury that adding up the aggravating events did not reach the sum total of Kimberly's worth as a person. To the contrary, there were people whose lives she touched in a meaningful and positive way and the fact that the jury was not privy to those people denied her the meaningful assistance of counsel.

### D. Trial Counsel Presented an Expert Who Testified That Cargill Suffered From Borderline Personality Disorder Without Independent Corroboration of Environmental Factors

Dr. Antoinette McGarrahan, a forensic psychologist, testified during the defense case-in-chief that she conducted a clinical interview of Cargill and administered psychological tests. She also reviewed a multitude of family court documents, investigative materials relating to Cargill's arrest, and reports of Cargill's psychiatric and psychological history. (65 RR at 30-31.) Based on her clinical assessment, Dr. McGarrahan proffered at trial that Cargill suffers from Borderline Personality Disorder ("BPD") and exhibits personality traits consistent with both narcissistic and anti-social personality disorders.[42] (65 RR at 45.) Dr. McGarrahan opined that as a result of the BPD, Cargill has significant interpersonal relationship difficulties. Sufferers of BPD have pervasive difficulties with how they think about things, perceive the world, experience emotions, and

---

[42] Dr. McGarrahan testified that those with narcissistic behavior have grandiose opinions of themselves and feel entitled. They can act in a demanding fashion and lack empathy for others. They can also exploit others for personal gain. Dr. McGarrahan offered that Cargill has "some of these symptoms." (65 RR at 48-49.) Additionally, Dr. McGarrahan testified that an individual with anti-social traits has difficult following the rules and will engage in behavior that subject them to arrest. There is deceit, manipulation, lying, and impulsivity. (65 RR at 49.) Dr. McGarrahan indicated that in order to meet the criteria for anti-social personality disorder, a person must have exhibited conduct disorder problems prior to the age of fifteen, and there was no indication in Cargill's history that she engaged in those kinds of behaviors in childhood. (65 RR at 51-52.)

110

interact with others. (65 RR at 45-46.) Dr. McGarrahan further offered that individuals with BPD are emotionally unstable, unpredictable and feel chronically empty so they are "always trying to fill that emptiness with relationships." Persons with BPD will frantically try to avoid abandonment and often have very intense and volatile romantic relationships. They can also have chronic anger problems which can manifest with aggressiveness and violent behavior. (65 RR at 47-48.)

When asked by defense counsel how a person develops these types of personality disorders, Dr. McGarrahan replied:

Most of the literature and the research, particularly on borderline personality disorder, suggests that at least a majority of it is environment. An individual is not necessarily born with the disorder and starts showing it at the age of one or two, but they may have a vulnerability genetically to develop some type of mental illness or psychiatric problem. And what that turns out to be probably depends on that person's environment. And the research tells us that with respect to borderline personality disorder, a majority of those individuals had emotionally neglectful caregivers. These are not caregivers who left and left them alone but emotionally did not share love, did not express emotion, did not tell the individual they loved them, did not show affection toward them...The research also suggests that a large number of individuals with that diagnosis did have a history of sexual abuse in childhood.

(65 RR at 53-54.)

Dr. McGarrahan testified that she did not have independent knowledge that Cargill was sexually abused. (65 RR at 54.)

On cross-examination, Dr. McGarrahan testified that under the DSM IV, personality disorders were characterized under Axis II, which provides for mental disorders rather than mental illnesses. Dr. McGarrahan acknowledged that personality disorders were more difficult to treat with medication than mental

111

124

illness.[43] (65 RR at 57-59.) With regard to the information Dr. McGarrahan had at her disposal, she acknowledged that she has to take some background information (such as the fact that Cargill suffered from numerous head injuries or was sexually abused by a maternal uncle) with a "grain of salt" because her only basis of knowledge was a report from Cargill herself absent independent corroboration. (65 RR at 88, 127.) The State proffered that growing up, Cargill had it "pretty good...from all accounts." In lieu of asking Dr. McGarrahan a question, the State offered during cross-examination:

> Because the testimony of her mother was that she was very involved in her [Cargill's] life. She had her college paid for, which in of itself is a pretty neat deal. Had college paid for, apartment paid for, was—got just about anything she asked for material-wise...Her mother was involved in her [Cargill's], all her activities growing up.. Her original dad left when she was about six months. I think went into the military. Her mom and biological father divorced. Mr. Pitts raised her, and they had a very good relationship, actually adopted her...What was it in her early relationship that was not good?

(65 RR at 127-28.)

Had Dr. McGarrahan been provided with the information from lay witnesses, she would have been more appropriately able to explain and contextualize the environmental factors present in Cargill's life that may have contributed to her emotional and psychological development.

---

[43] The State spent a considerable amount of time asking Dr. McGarrahan about the effect of prescription medication on Cargill's personality disorder despite Dr. McGarrahan's persistent assertion that she was not a neuropharmacologist and thus not qualified to answer his line of questioning. (See 65 RR at 69-76; see also Claim Six, ante.) Additionally, the State repeatedly questioned Dr. McGarrahan about the effect Cargill's medical conditions (specifically Lupus and Crohn's Disease) had on her behavior and mental state, despite her consistent assertion that she was not a medical doctor and not the appropriate expert to answer his questions. (65 RR at 85-92.)

112

Specifically, as described above, lay witnesses provided corroborating evidence that Cargill was deeply impacted and traumatized by learning that her father Kenneth Pitts was not in fact her biological father. Cargill felt isolated and alienated from the rest of her family and never felt as though she belonged. Cargill also believed she could never live up to her mother's expectations. Furthermore, Cargill was subjected to physical violence at the hand of her mother and suffered from meningitis in childhood, a serious and potentially debilitating disorder.

Exacerbating her already existing low self-worth and feeling as though she did not belong within her family structure, Cargill attempted to connect to her biological father and establish a meaningful relationship with him. The relationship did not develop as expected and Cargill was once again left disappointed and estranged. Cargill entered into marriage as a young adult with the expectation that she would finally receive her mother's approval. The marriage was not sustainable and the tumultuous, contentious, and acrimonious divorce and subsequent loss of custody of her first son sent Cargill into a deep depression and further undermined her sense of security and self-worth.

During trial counsel's closing argument they offered: "We don't—we don't know what it is. We don't know what did it. We don't know what caused it, but we know something did. When Ms. Cargill was born, when she came into this world, on this earth she was an innocent baby. Something happened, and we don't know what." (69 RR at 77.) However, there were people available and willing to provide that missing information that would have enabled Dr. McGarrahan to provide the jury with specific traumatic environmental factors that may have contributed to Cargill's development. Not doing so undermined the presentation of the defense's own expert and undermined the credibility of the defense case as a whole.

113

126

## E. Trial Counsel's Failure Prejudiced Cargill

Trial counsel's deficient conduct prejudiced Cargill's right to a full presentation of mitigation evidence at the punishment phase of her trial. *See Williams*, 529 U.S. at 393 ("[I]t is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."].) Counsel's performance is therefore deficient. *Wiggins*, 539 U.S. at 527 ("Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

The State argued that there is nothing about a personality disorder that is mitigating. (69 RR at 46-47, 95-96.) However, trial counsel's deficient performance prejudiced the punishment phase of Cargill's trial because the jury was denied the opportunity to consider the full story of Cargill's complicated familial, emotional, and social history. Regardless of whether the jury believed the trauma suffered by Cargill either directly or indirectly resulted in her development of BPD, the underlying trauma itself is *still mitigating*. The type of information trial counsel could have uncovered about Cargill's difficult life is the kind of information courts have ruled is relevant to assessing a defendant's moral culpability. *Wiggins*, 539 U.S. at 535. Some aspect of that story; some seemingly minute detail, could have been the one fact that caused a single juror to decide that Cargill's life should be spared. This failure unfairly prejudiced Cargill and as such her conviction of death should be reversed.

114

127

# CLAIM EIGHT

## TRIAL COUNSEL WERE INNEFFECTIVE FOR FAILING TO REBUT THE STATE'S CASE IN AGGRAVATION DURING THE PUNISHMENT PHASE OF TRIAL

During the punishment phase of trial, the State presented numerous witnesses to testify to aggravating evidence regarding Cargill's behavior prior to arrest. Among the evidence presented were details of Cargill's divorce and custody battle with Mike West, an alleged assault against Mike's wife Sonja West, and the Injury to a Child case filed against Cargill in March 2010 pertaining to an injury to Zach Robinson's forehead. Despite the aggravating nature of this testimony, trial counsel provided little-to-no evidence to rebut and/or impeach the State's witnesses. Post-conviction investigation has revealed several witnesses and other evidence that could have been used to challenge the State's accounts of these instances, all of which was readily available to counsel at the time of trial. Trial counsel's failure to attempt to cast doubt on the State's narrative with available evidence constitutes ineffective assistance, prejudicing Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. As such, Cargill's sentence should be reversed.

### A. Trial Counsel Has a Duty to Rebut the Prosecution's Case in Favor of the Death Penalty

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Cargill. *Strickland*, 466 U.S. at 687; *Jimenez*, 364 S.W.3d at 883. Cargill must show that her counsel's representation fell below an objective standard of reasonableness in order to establish deficiency. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected in the American Bar Association standards and the like.

115

*Id.* To establish prejudice, Cargill must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Thompson*, 9 S.W.3d at 812.

Trial counsel has a duty to investigate and present evidence at the punishment phase of trial. *See ABA Guidelines*, Guidelines 10.7-10.8. Not only should counsel affirmatively present mitigating evidence during the punishment phase, but they must also rebut the aggravating evidence presented by the State. *See Porter v. McCollum*, 558 U.S. 30, 41-42 (2009); *ABA Guidelines*, Guideline 1.1 cmt. ("At [the punishment] phase, defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death."); *see also* Guideline 10.11(A) (stating that counsel has a continuing duty to investigate information that rebuts the State's anticipated case in aggravation); Guideline 10.11(F)(2) (stating that, in determining which witnesses and evidence to present at punishment, counsel should consider lay witnesses with the ability to rebut or explain the evidence presented by the State). This duty is also recognized by the Guidelines and Standards for Texas Capital Counsel and the Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Death Penalty Cases.

### B. Trial Counsel Failed to Rebut the Aggravating Testimony of Several State Witnesses During the Punishment Phase of Trial

At the punishment phase of trial, the State presented numerous witnesses to testify to bad acts allegedly committed by Cargill prior to her arrest. While trial counsel did impeach and/or rebut some of these witnesses through cross-examination and rebuttal witnesses, many of the bad acts went wholly unchallenged. As a result, over the course of its punishment phase presentation,

116

the State was able to present unchallenged testimony establishing Cargill as a difficult, dysfunctional, and violent person.

### 1. Trial Counsel Failed to Rebut Mike West's Account of the Custody Battle Relating to Their Son, David

At punishment, the State called each of the fathers of Cargill's children in chronological order. It began with Mike West, Cargill's first husband and the father of her first child, David. On direct examination, Mike[44] discussed the custody battle that ensued between him and Cargill pertaining to their son. Mike explained that upon filing for divorce from Cargill, the standard visitation schedule was implemented; that is, Cargill maintained custody and Mike was given visitation every other weekend. (59 RR at 92.) However, by the time the divorce was finalized, the tables had turned. Mike was granted custody and Cargill was reduced to visitations every other weekend. (*Id.* at 92-93.) Mike testified that he later sought an order to limit Cargill to supervised visitations because he was contacted by CPS and informed that he must do something about Cargill or else CPS would remove David from Mike's care. (*Id.* at 95.) No evidence of that conversation was presented. Mike then claimed that based on that conversation with CPS he decided to hire a lawyer and attempt to limit Cargill's visitation rights even further. (*Id.* at 97-98.) Later in his direct testimony, Mike recounted his suspicions that Cargill was abusing David before testifying that he was granted sole custody of David in 1993, when David was only three years old. (*Id.* at 108-11.) He went on to point out that such rulings were "very rare at the time," suggesting that Cargill's treatment of Mike and David was especially egregious. (*See id.* at 111.)

---

[44] With the exception of Applicant, first names will be used for the ease of the reader throughout this Claim.

117

On cross-examination, trial counsel failed to adequately develop a more balanced history of the custody issue for the jury. In fact, counsel did not address the issue at all other than to point out that the proceedings were contentious. (59 RR at 113.) Trial counsel overlooked the opportunity to contextualize the custody proceedings regarding David in order to demonstrate that it was a traumatic experience for Cargill to lose custody of her first born, a point quite relevant to mitigation. Post-conviction investigation has uncovered four witnesses who would have been available and willing to testify at Cargill's trial regarding how traumatic the divorce and custody proceedings were for Cargill and the significant impact it had on her.

### a. Deborah Newman

In addition to being a vital witness for the development of Cargill's social history,[45] Deborah Newman could have shed light on Mike's account of the divorce and custody proceedings. Deborah was a friend of Cargill in the early 1990s when they both lived in Allen, Texas. (Ex. 10 at ¶1 [Aff. of Deborah Newman].) She was not contacted by Cargill's trial team, but would have been willing to testify on Cargill's behalf. (Id. at ¶7.) Cargill and Mike were still married when Deborah met them. Cargill, Mike, and Deborah all attended the First Baptist Church in Allen, and Cargill and Mike taught Sunday School to Deborah's daughter. Cargill was "very sweet and bubbly" when Deborah was around her. (Id. at ¶2.) Deborah recalls when Mike filed for divorce. Cargill did not want the marriage to end and seemed overwhelmed by the whole ordeal. It seemed to Deborah that Mike was "much meaner about it than he needed to be." (Id. at ¶3.) Mike had the support of his family so he was able to hire expensive attorneys. The power balance was in Mike's favor, and he used that to Cargill's

---

[45] See Claim Seven, ante.

118

detriment. (*Id.*) Much to the contrary, Cargill did not have support from her own family and she felt abandoned by her mother during the divorce. (*Id.* at ¶4.)

Cargill was "devastated emotionally" when Mike began pursuing custody of David and trying to limit Cargill's visitation rights. (Ex. 10 at ¶4 [Aff. of Deborah Newman].) Deborah believed that Cargill loved David very much and took good care of him. (*Id.*) As the proceedings carried on, Cargill began to call Deborah late at night to talk. Cargill sounded distraught and did not know how to handle the prospect of losing her son. (*Id.* at ¶5.) Deborah encouraged Cargill to pray, but could not do much else for her. (*Id.*)

Deborah's recollection of the divorce and custody proceedings provides an alternative account to the one Mike testified to at trial. Rather than Cargill being portrayed as an especially violent and unpredictable mother who got what she deserved, Deborah could have explained that the result of those proceedings may actually have been the influenced by Mike's economic and psychological power in the courtroom. The emotional toll that those events took on Cargill would also be relevant to the jury's punishment deliberations. Not only did Cargill lose her first born, but she was abandoned by her family in the process. Deborah's confirmation of the disparity in resources between Mike and Cargill is relevant to rebutting the first piece of the State's preferred narrative during the punishment phase. Trial counsel's failure to call a witness such as Deborah Newman to contextualize the custody proceedings and rebut Mike's account of them constituted ineffective assistance.

b. Mary Eoff

Mary Eoff also could have served the dual purpose of mitigation and rebuttal witness. Mary was Cargill's friend and neighbor in the early 1990s. (Ex. 5 at ¶1 [Aff. of Mary Eoff].) Mary was not called as a witness, but would have testified on Cargill's behalf. (*Id.* at ¶14.) Eoff met Cargill when Cargill and Mike moved

119

in to the house next door to her in Allen, Texas. (*Id.* at ¶2.) Cargill and Mike were just newlyweds at the time but were immature and argued a lot. (*Id.*) Mike eventually left Cargill and filed for divorce shortly after she was discharged from an extended hospital stay. (*Id.* at ¶4.) Mike antics in the courtroom as well as Cargill's depressive response to losing custody of David also counter the story as it was presented by the State at trial. (*See id.* at ¶5.)

In addition to providing context for Cargill's complicated social history, Mary's testimony could have shown that Cargill was not the sole aggressor in her relationship with Mike and there were many factors other than Cargill's limitations as a spouse and parent that ultimately had an effect on the custody situation with David.

### c. Cindy Henry

Cindy Henry, too, could have served the dual-purpose role of mitigation and rebuttal witness. Cindy is married to Doug Henry, who was formerly married to Sonja West. (Ex. 6 at ¶1 [Aff. of Cindy Henry].) Cindy got to know Cargill around the time of Cargill's divorce from Mike and ensuing custody battle. (*Id.*) Cindy was not contacted by anyone on Cargill's trial team, but would have testified on Cargill's behalf. (*Id.* at ¶2.) Cargill was going through her custody battle with Mike around the same time that Doug was going through his with Sonja. (*Id.* at ¶5.) As a result, Cindy got to be friends with Cargill. (*Id.* at ¶¶1, 5.) Cargill frequently brought David over to Cindy and Doug's house to play. (*Id.* at ¶5) Cindy considered Cargill to be "very sweet and a bit naïve." (*Id.* at ¶6.) By Cindy's account, "Mike really beat up [Cargill] emotionally." (*Id.*) She believes that Cargill was unprepared to deal with divorce proceedings because Mike filed for divorce and full custody of David around the time when Cargill was in the hospital. Mike had money so he could hire good attorneys. Cargill, on the other hand, was on her own. (*Id.*)

120

Cindy could have further confirmed the testimony of Deborah and Mary regarding Mike being a difficult spouse and taking advantage of his power to secure custody of David. Trial counsel's failure to call her as a witness constitutes deficient performance.

### d. Doug Henry

Finally, Doug Henry also could have confirmed this alternative account of the divorce and custody proceedings. Doug was a friend of Cargill when they were both going through custody battles with their exes. (Ex. 7 at ¶1 [Aff. of Doug Henry].) Doug's ex-wife Sonja Henry-West is now married to Mike West. (*Id.*) Doug was not contacted by anyone on Cargill's trial team but would have testified on Cargill's behalf. (*Id.* at ¶2.) Doug liked Cargill and developed a trust with her while they were both going through their respective custody suits. (*Id.* at ¶7.) They helped each other out with the kids, and Doug never saw Cargill act aggressively or out of the ordinary around them. (*Id.*) Doug did not believe Cargill ever stood a chance in her custody battle with Mike, however. (*Id.* at ¶8.) Mike was a "sharp and [] smooth-talking business man," while Cargill "wore her emotions on her sleeve." (*Id.*) Unlike Cargill, Mike had money, which "gave him a definite edge in the courtroom." (*Id.*)

Doug is the fourth witness that could have shed light on the personal and financial dynamics of Cargill's custody battle with Mike. The jury should have been presented with such evidence in order to rebut, explain, and contextualize the nature of those proceedings. Rather than leave the jury with the impression that Cargill was abusing her children from the very beginning, trial counsel should have presented witnesses to explain that Cargill may have lost custody of her first child, not due to her treatment of David, but because she was vastly overmatched in the courtroom. Trial counsel's failure to adequately investigate the issue and present

121

the testimony of Deborah Newman, Mary Eoff, Cindy Henry, and Doug Henry constituted deficient performance and prejudiced Cargill's constitutional rights.

## 2. Sonja West Incident

On multiple occasions over the course of the punishment phase, the State elicited testimony regarding an altercation between Cargill and Sonja West. Mike West, David West, Sonja West, and Leigh Ann Henry all testified to some extent regarding the incident. Despite the fact that the State repeatedly returned to the incident, trial counsel never attempted to rebut or contextualize what really happened.

Sonja testified that she, David, Leigh Ann, and a nanny were at Sonja's house in Rockwall, Texas on the day of the incident. (60 RR at 34.) Cargill planned to come over to the house and pick up David and Leigh Ann for visitation. Cargill was picking up Leigh Ann because Leigh Ann's father had arranged to have her picked up by Cargill and dropped off at his house. (*Id.*) Mike was still at work. (*Id.* at 35.) Sonja testified that she did not want Cargill to take Leigh Ann, but felt that she had no choice. (*Id.*) Cargill pulled up to the house, knocked on the door, and the children came outside. (*Id.* at 36.) David walked up the stairs to the sidewalk and waited. (*Id.*) Leigh Ann stayed by the door for some time to say goodbye to Sonja. (*Id.* at 37.) Sonja testified that, at some point, Cargill became irritated with how long it was taking for Leigh Ann to say goodbye so she grabbed Leigh Ann by the arm and began to walk her up the stairs. (*Id.* at 37-38.) Sonja then reached out and grabbed Leigh Ann's other arm in order to get Cargill to let go of her. (*Id.* at 39.) In response, Cargill let go of Leigh Ann's arm and proceeded to kick Sonja in the stomach and throw Sonja's hand against a brick wall. (*Id.* at 40.) Leigh Ann hid behind Sonja throughout the altercation. (*Id.* at 41.) David, on the other hand, began to run away. (*Id.*) Cargill chased David,

122

caught him, and carried him back to her car. (*Id.*) At some point during the incident, the nanny called the police and Cargill was later apprehended. (*Id.* at 42.)

Mike West testified that he was not present during the incident but saw Sonja's injuries afterward. (59 RR at 101-02.) He observed bruises on Sonja's arms, stomach, and one of her knees. (*Id.* at 103.) Mike also stated that Leigh Ann and the nanny were visibly shaken up by the incident. (*Id.* at 103-04.)

David West testified that he, Leigh Ann, Sonja, and the nanny were all at Sonja's house on the day of the incident. (60 RR at 24-25.) David stated that Cargill arrived at Sonja's house and came inside to use the restroom. (*Id.* at 25.) Then, Cargill came outside and tried to leave with David and Leigh Ann. David believed that Sonja was not aware that Cargill was planning to pick up Leigh Ann as well that day. (*Id.* at 25-26.) He testified that Cargill was taking him and Leigh Ann to her car when Sonja tried to get Leigh Ann away from Cargill. (*Id.* at 26.) At that point, Cargill threw Sonja's hand against the outer wall of the garage. (*Id.* at 26-27.) David did not recall seeing Cargill kick Sonja. (*Id.* at 27.)

Leigh Ann testified that she recalled Cargill coming to the front door at Sonja's house to pick her up. (60 RR at 51.) Leigh Ann was hugging her mother goodbye when Cargill came over and told her it was taking too long and grabbed her by the arm. (*Id.*) As Cargill was trying to walk away with Leigh Ann, Sonja grabbed onto Leigh Ann's other arm. (*Id.* at 51-52.) Leigh Ann testified that Cargill then kicked Sonja in the stomach in order to get her to let go. (*Id.* at 52.) David ran off after that so Cargill had to chase him and eventually take him back to the car. (*Id.*) The whole incident took roughly ten minutes, according to Leigh Ann. (*Id.* at 54.)

Approximately six weeks before trial, counsel was given notice that the State intended to use the Sonja incident as aggravating evidence during the punishment phase. (*See* 3 CR at 577.) Despite the fact that the State included the incident on

123

its March 21, 2012 "Second Notice of Intent to Offer Evidence under Article 404(b)," counsel failed to investigate and present evidence to rebut and/or contextualize the altercation. Post-conviction investigation has uncovered three witnesses who could have testified to the complex relationship between Cargill and Sonja and added context to a story that, at trial, was told by two people who were children at the time of the incident, one person who was not present at the time of the incident, and Sonja herself who held a clear bias against Cargill.

### a. Doug Henry

As explained above, Doug Henry is Sonja's ex-husband. (Ex. 7 at ¶1 [Aff. of Doug Henry].) Doug was married to Sonja for approximately ten years. (Id. at ¶¶3-5.) After their divorce, Sonja did a lot of things to make Doug's life "miserable." (Id. at ¶4.) Doug and Cindy wanted Leigh Ann to be in their wedding but Sonja was adamant that she not be involved. (Id. at ¶5.) In fact, Sonja called CPS and reported that Doug was sexually abusing Leigh Ann. (Id.) As a result, Doug and Cindy had to spend extensive amounts of time and money fighting the allegation. (Id. at ¶¶5-6.) In total, Doug spent about $77,000 fighting for custody of Leigh Ann. (Id. at ¶6.) In the end, Doug and Sonja ended up with a standard custody arrangement. Sonja continued to make things difficult for Doug regarding Leigh Ann even after the case was over. (Id.)

Doug's potential testimony could have revealed that Sonja had a history of being manipulative and unnecessarily difficult when it came to custody issues. Such testimony could have provided context the jurors and given them reason to suspect the complete accuracy of Sonja's account of the incident. Trial counsel's failure to interview Doug and call him to testify to this and various other aspects of Cargill's social history constituted ineffective assistance.

124

### b. Cindy Henry

Cindy knew Sonja as a result of Doug's divorce and custody battle with her. (*Id.* at ¶1.) Cindy could have testified about her experience with the divorce and custody battle between Doug and Sonja and her opinion regarding Sonja's character. Such testimony is relevant to Sonja's manipulative nature, impeaches her credibility, and provides relevant evidence to substantiate Cargill's social history.

Sonja has made things difficult for Cindy and Doug since Sonja and Doug's divorce. (Ex. 6 at ¶3 [Aff. of Cindy Henry].) Just a few days before Cindy and Doug's own wedding, they had a big fight with Sonja. (*Id.*) Cindy and Doug wanted Leigh Ann, Doug's daughter, to be in the wedding but Sonja objected. Shortly thereafter, CPS opened an investigation against Doug for allegedly molesting Leigh Ann. Sonja accused Doug of doing something inappropriate when he was bouncing Leigh Ann on his knee. Cindy describes the allegations as "vague and outrageous." (*Id.*) This led to a contentious custody battle that lasted a long time and cost the Henry's tens of thousands of dollars. (*Id.*)

Following the molestation allegation, Cindy and Doug were not allowed to have unsupervised visitation with Leigh Ann. (Ex. 6 at ¶4 [Aff. of Cindy Henry].) They were required to go through a series of psychological tests, and Leigh Ann had to go to play therapy. Sonja remained difficult throughout the process. If Doug and Cindy went even a short time over their allotted time with Leigh Ann, Sonja would "throw a fit about it and get the lawyers involved." (*Id.*) Based on Sonja's behavior throughout this process, Cindy believed she was "unbalanced." (*Id.*) Cindy recalls when Sonja accused Cargill of assaulting her. (*Id.* at ¶8.) This was a very difficult time for Cargill because she would not be able to be a nurse with an assault conviction on her record. (*Id.*) "It seemed like Kimberly gave up after that—both emotionally and spiritually." (*Id.*)

125

138

Cindy is another example of a witness who could have testified to the manipulative nature of Sonja, leading the jury to question Sonja's credibility. In addition, such testimony would have more fully explained the context of the alleged assault.

### c. Rachel Wilson

Rachel Wilson, Cargill's mother, testified on behalf of the State at the punishment phase. She testified to a variety of aggravating issues but never commented on the Sonja incident or the dynamics of Sonja's relationship with the family. Following the State's direct examination, trial counsel declined to cross-examine Rachel; instead, opting to call her during the defense case. (58 RR at 210.) However, trial counsel never recalled Rachel and her testimony was left entirely unexamined by the defense. If counsel had re-called Rachel for the defense case, she could have testified to the numerous aspects of Cargill's social history[46] as well as the following.

Rachel remembers Mike's divorce from Cargill and Mike's subsequent marriage to Sonja. Based on Rachel's experiences with Sonja, Rachel found her to be a "trouble-maker." (Ex. 14 at ¶25 [Aff. of Rachel Wilson].) Sonja was cruel to David and emotionally abused him. (*Id.*) Rachel, too, described Sonja as manipulative. (*Id.*)

While Rachel's testimony regarding Sonja is relatively limited, it tends to be consistent with what others could have said about Sonja—namely that she could be cruel and manipulative and had an interest in getting both her and Mike's exes out of their lives. Moreover, if counsel had recalled Rachel, they could have elicited an abundance of mitigating evidence from her in addition to the testimony about

---

[46] *See* Claim Seven, *ante.*

126

Sonja.[47] Considering Rachel's potential testimony along with that of Cindy and Doug, the jury would have been provided with a much more nuanced portrayal of the alleged assault. Instead, jurors were left with an almost wholly unchallenged account of an assault by Cargill against Sonja. Trial counsel's failure to challenge the incidence constituted deficient performance and prejudiced Cargill's constitutional rights.

### 3. Injury to a Child Charge Pertaining to Zach Robinson

Over the course of the punishment phase of trial, the State called three witnesses to testify about the injury to Zach Robinson's forehead that led to the Injury to a Child charge being filed against Cargill in March 2010. It was that Injury to a Child charge that later led to Luke Garner being removed from Cargill's care, prompting the CPS case to which Walker was subpoenaed to testify. According to Zach's testimony, the bruise to his forehead occurred one morning before school when Cargill was attempting to put contact lens solution in Zach's eye. (61 RR at 114.) Zach blinked and flinched as Cargill was trying to apply the solution, which frustrated Cargill. Zach testified that Cargill then took the aerosol can that the solution was contained in and hit Zach in the forehead with it. Zach stated that she hit him with the bottom edge of the can. (Id.) Zach then identified some photos of the injury to his forehead. (Id. at 115.) On redirect, the State asked Zach if he had ever heard Cargill tell people that the forehead injury was the result of hitting his head on a basketball goal. (62 RR at 22.) Zach stated that he had not heard that before, but that such a statement would be a lie. (Id.)

The State also called Zach's father, Matt Robinson, to testify to the injury. Matt testified that he picked Zach up from school on a Friday and Zach acted "real

---

[47] *See* Claim Seven, *ante* for further favorable testimony that Rachel could have provided on Cargill's behalf.

127

"weird all weekend." (61 RR at 83.) Prior to picking Zach up from school, Cargill had repeatedly told Matt not to cut Zach's hair. (*Id.*) Matt testified that on Sunday of that weekend, he noticed a large bruise on Zach's forehead which had been covered by his hair. (*Id.* at 84.) Based on Zach's explanation for the bruise, Matt decided to take photos for CPS. (*Id.* at 85.) Despite not being able to testify to what Zach's explanation actually was for the injury, Matt later identified a photo of the aerosol can. (*Id.* at 86.) Matt stated that after he dropped off Zach at school on Monday, he went to the sheriff's department to report Zach's injury. (*Id.* at 88-89.) Cargill was arrested after that. (*Id.* at 89.)

Finally, the State called Zach's fourth grade English teacher, Johna Booker. Johna testified that she saw a bruise about the size of a golf ball on Zach's forehead during the spring semester of 2010. (59 RR at 26, 31.) She testified that it was very noticeable. (*Id.* at 32.) When she asked Zach what it was from, he gave her a story that she found "very unlikely, almost ridiculous." (*Id.* at 26.)

Despite the repeated testimony regarding Zach's injury, counsel did little to rebut the issue. The only attempt by trial counsel was during the cross-examination of Johna Booker when counsel made the point that Johna could not be sure that the bruise was not a football injury. (59 RR at 33.) Post-conviction investigation has uncovered an investigative report that provided an alternative explanation for Zach's injury and an additional witness who could have testified to Cargill's positive interactions with Zach.

### a. Report of Investigator Danny Green

Cargill's trial counsel, Brett Harrison, was already representing Cargill in the Injury to a Child case when she was arrested in June 2010. After Cargill was finally charged with capital murder in late July of that year, Harrison agreed to continue to represent her and Jeff Haas was appointed as second chair. (*See* CR at 1-2.). For purposes of the Injury to a Child case, and prior to Cargill's arrest in

128

connection with Walker's death, Harrison hired investigator Danny Green. In the course of Green's investigation he interviewed Adam Roberts, a friend of Zach. Green produced a report based on that interview. (Ex. 30 [Report by Green].)

In early May 2010, Green interviewed Adam at his home located in the same neighborhood as Cargill's. (Ex. 30 at ¶¶1-2 [Report by Green].) At the time of the interview, Adam had known Zach for approximately two years and visited Zach at Cargill's home three to four times per week. (*Id.* at ¶9.) Over the course of those two years Adam never observed Cargill hit or spank Zach. (*Id.* at ¶10.) About one week before the interview, Adam went to Cargill's house to see Zach. (*Id.* at ¶4.) Cargill informed him that Zach was staying at his father's house. (*Id.* at 5.) Adam then had a conversation with Cargill where he told her that he had seen Zach hurt the top part of his forehead while playing basketball about a week or two after spring break. (*Id.* at ¶¶6-7.) Adam stated that Zach had to sit down after hitting his head. (*Id.* at ¶7.) In the Whitehouse school district, spring break occurred from March 8 to March 12, 2010. (*Id.* at ¶8.) Finally, Adam stated that he has known Zach to tell stories to get what he wants. (*Id.* at ¶13.)

The report itself may not have been admissible at trial. However, it did provide integral information for the purpose of impeaching and/or rebutting the State's account of Zach's injury. The report provided trial counsel with a good faith basis to question Zach about Adam's version of the story. Counsel should have asked Zach whether the injury occurred while playing basketball. If Zach denied that it did, then counsel should have further questioned him to develop the nature of Zach's friendship with Adam. Counsel could have completed the impeachment and/or rebuttal (depending on how Zach answered the questions) by returning to the original question: "If your friend Adam says he remembers seeing you hit your head on the basketball goal around the time of your forehead injury, would that be true?" Even if Zach continued to deny the story, the jury would still

129

be notified that there is an alternative explanation for the injury to Zach's forehead that was provided by a friend who claims to have witnessed the injury. Counsel should have further solidified that in the jury's mind by simply asking Matt Robinson and Johna Booker if they had heard of the alternative explanation. Even if they denied having heard the alternative account, counsel would have gotten the issue out before the jury.

Zach's injury was the catalyst to the events that eventually led to Cargill being charged with capital murder. As such, any reasonable opportunity to cast doubt on the injury should have been pursued. It is inexplicable why trial counsel did not use the report as a tool to impeach and/or rebut the Injury to a Child issue considering that it was counsel's own investigator who conducted the interview. Trial counsel's failure to use the report constituted deficient performance and prejudiced Cargill.

### b. Kimberly Slavinsky

Trial counsel should have called Kimberly Slavisnky[48] to demonstrate positive aspects of Cargill's relationship with Zach. In addition to her social history testimony, Slavinsky could have spoken specifically to Cargill's relationship with Zach for the purpose of rebutting the Injury to a Child issue. Slavinsky knew Cargill at the time when Cargill lived in Whitehouse, Texas. (Ex. 12 at ¶1 [Aff. of Kimberly Slavinsky].) Her son, Nicholas, was in the same elementary school class as Zach and the boys played sports together. (Id. at ¶2.) Slavinsky often saw Cargill at sports practices and games. (Id.) She liked Cargill and "sympathized with [her] because she was a single mom and her younger son was very rambunctious." (Id.) Nicholas spent the night at Cargill's house a few

---

[48] Slavinksy will be referred to by her surname to avoid confusion with the name of the Applicant.

130

times, and Zach did the same at Slavinsky's house. (*Id.* at ¶3.) Nicholas enjoyed staying at Cargill's house. (*Id.*) Slavinsky was around Cargill, Zach, and Luke often and never saw Cargill be rough with them. (*Id.* at ¶4.) She felt that Zach was comfortable coming to her if he needed anything, and he never mentioned being hurt by Cargill. (*Id.* at ¶5.) Later on, Slavinsky even wrote a letter on Cargill's behalf for a CPS case. (*Id.* at ¶7.)

Had Slavinsky been called as a witness, she could have testified to her perception of Cargill as a mother, both through her own observations and her knowledge that Nicholas enjoyed spending time at Cargill's home. The positive interactions that Slavinsky had with Cargill and her perception of Cargill's relationship with Zach were relevant to rebutting the State's case in aggravation and the jury should have been apprised of them.

By calling Slavinsky at trial and cross-examining Zach, Matt Robinson, and Johna Booker with the report written by Danny Green, counsel could have cast significant doubt on the State's account of Zach's injury. Considering the significance of Zach's injury in the overall narrative of Cargill's prosecution for capital murder, trial counsel's failure to challenge the State's version of events in any meaningful way constituted deficient performance and prejudiced Cargill's constitutional rights.

### C. Cargill was Prejudiced by Trial Counsel's Failure to Rebut the State's Case in Aggravation

The State presented three topics of aggravating evidence through several witnesses that went virtually unchallenged by trial counsel. The State was given free rein to establish that Mike West was given sole custody of David because CPS demanded that he remove David from Cargill's abuse; Cargill assaulted an unsuspecting Sonja West for no apparent reason; and Zach Robinson's injury to his forehead was a clear-cut case of child abuse. As evidenced by the State's decision

131

to continually return to these aggravating topics, they were vital to jury's verdict. Post-conviction investigation uncovered five witnesses and one report that could have been used to either impeach or rebut the aggravating topics and the witnesses supporting them. The witnesses could have revealed that Mike and Sonja West were hardly the innocent and credible witnesses that they were made out to be at trial. However, because nothing was presented to rebut their testimony, the jury had no reason to question their credibility.

With regard to the Injury to a Child case, counsel missed a prime opportunity to cast doubt on what was clearly the catalyst to the State's preferred narrative at trial. Had counsel used the Danny Green Report to impeach Zach and introduce the alternative account of his injury, the jury would more than likely questioned Zach's story. The alternative account was offered by one of Zach's good friends from the neighborhood who claimed to actually witness the injury happening during a basketball game. The evidence may have been even more compelling considering that Zach was only twelve years old when he was testifying at Cargill's trial, calling into question his competency to testify to begin with. Considering counsel's failures to rebut in sum, there is a reasonable probability that proceedings would have ended different if this rebuttal evidence had been presented to the jury. Because Cargill was prejudiced by trial counsel's deficient performance, her sentence should be overturned.

CLAIM NINE

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO IMPEACH
FORREST GARNER WITH THE TRUE NATURE OF HOW HIS
CRIMINAL CONVICTIONS WERE VACATED

Trial counsel has a duty to investigate and present evidence at the punishment phase of trial. *See ABA Guidelines*, Guidelines 10.7-10.8. Not only should counsel affirmatively present mitigating evidence during the punishment

132

145

phase, but they must also rebut the aggravating evidence presented by the State. *Wiggins*, 539 U.S. at 524; *see also ABA Guidelines*, Guideline 1.1 cmt. ("At [the punishment] phase, defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death."); Guideline 10.11(A) (stating that counsel has a continuing duty to investigate information that rebuts the State's anticipated case in aggravation). This duty to rebut evidence presented in aggravation includes the investigation of all sources of impeachment of prosecution witnesses.

Forrest Garner, an ex-husband of Cargill, testified to a litany of incidents where he alleged aggravating behavior on the part of Cargill. These allegations went unchecked during cross-examination by defense counsel and rebuttal evidence to challenge Garner's assertions was virtually non-existent. (*See* Claim Eight, *ante*.) Despite the fact that Garner pled guilty to two counts of misdemeanor assault with family violence against Cargill in 2007, he was permitted to testify that his convictions were vacated in 2011 because he was actually the victim and not the aggressor in the incidents that gave rise to his original convictions. However, the true circumstances by which Garner's convictions were vacated were not explicitly made clear to the jury. The lack of disclosure of this information made it impossible for the jury to fully and effectively assess Garner's credibility. Because trial counsel was aware of the circumstances surrounding both Garner's convictions and subsequent post-conviction dismissal, yet did nothing to impeach Garner's credibility, denied Cargill the effective assistance of counsel. As such, Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law were violated.

133

## A. Forrest Garner's Testimony at the Punishment Phase of Cargill's Trial Was Detrimental and Highly Prejudicial

Forrest Garner, Cargill's ex-husband and father of her youngest son Luke, testified extensively to a multitude of inflammatory and enormously aggravating incidents he allegedly experienced as a result of Cargill's temper and volatile nature. Garner testified that Cargill spoke negatively of her previous ex-husbands despite the fact that he knew them to be good people (63 RR at 69-70); Cargill told him that her mother and eldest son David were dead (63 RR at 71-73); Garner married Cargill because she was unexpectedly pregnant (63 RR at 76); and Cargill threw out an engagement ring he gave her. (63 RR at 93.) Additionally, Garner testified Cargill often harassed him with phone calls and when he tried to break up with her and she refused to leave his apartment. Garner said he left his apartment and went to his parents' house and the next morning learned that someone had set his apartment on fire.[49] (63 RR at 83-85.) Moreover, Garner testified to an occasion where Cargill allegedly became irrationally angry over a bag of chips that had been opened and hit him in the face and chest and physically assaulted Garner's young son Tucker. (63 RR at 95.) Garner claimed Cargill falsely accused him of breaking her jaw during the altercation. Following the incident, Garner claimed Cargill tried to help his ex-wife get custody of Tucker by alleging Garner had a drug problem, but then backed down when he promised not to press charges against her for the assault on Tucker. (63 RR at 97-99.)

Garner further testified that his relationship with Cargill ended after she hit Tucker; Cargill refused to relinquish his belongings after he moved out; Cargill

---

[49] Garner provided unsubstantiated, speculative, and yet inflammatory details about why he thought Cargill was the one who set the fire, including the fact that a framed photograph of him and his son and nephews was placed in the corner of a bedroom and had no soot underneath it. This led him to believe someone deliberately moved the photo prior to the fire. (63 RR at 89-90.)

134

verbally assaulted him; Cargill kicked Garner's apartment door in; Cargill told Garner she wanted to have her ex-boyfriend Matt Robinson killed; Cargill used Garner's credit and bank cards without authorization; Cargill filed assault charges against Garner for an incident that occurred months prior to her contacting the police simply because he would not return her calls; Cargill threw their infant son Luke around in his car seat carrier; Cargill threw hot coffee on Garner; Cargill alienated Garner from his mother; Cargill threatened to burn Garner's mother and son in their home; and Cargill secretly made herself a key to Garner's apartment. (63 RR at 102-19.)

Garner testified that every time he contacted the police to file a report regarding Cargill's behavior nothing was done because of his prior arrest for assaulting her. (63 RR at 113-14.) The cross-examination of Garner by defense counsel focused on Garner's substance abuse issues and history of treatment and the fact that he continued to call and text Cargill with relative frequency despite the bad acts he alleged were committed against him.[50] (63 RR at 135-48.)

On re-direct examination Garner testified that he believed Cargill was bi-polar because her mood changed like "flipping a switch;" he never knew Cargill to have any significant medical issues; Cargill violated a custody agreement by picking Luke up from daycare in May 2010; Garner feared retaliation from Cargill with regard to his agreement to let Cargill's mother take temporary custody of Luke; Cargill faxed his arrest reports to his employer; and he was not aware Cargill reported him to CPS for "abandonment." (63 RR at 148-60.) On re-cross examination Garner testified that he was not sure if the police officer who

---

[50] Trial counsel did not authenticate the records reflecting the text messages between Cargill and Garner and were prohibited from introducing them as evidence. Trial counsel was limited to asking Garner only if he remembered making or receiving the relevant text messages. (63 RR at 138-39, 143.)

135

responded to one of the domestic violence calls between himself and Cargill accused him of injuring himself. (63 RR at 161-63.)

## B. Trial Counsel Failed to Impeach Garner with Information Regarding How His Criminal Convictions for Assault Were Vacated

During direct examination, Garner testified that he was never the aggressor in altercations with Cargill, but only did things to her in order to defend himself. (63 RR at 77.) He claimed that back in 2007, Cargill "filed one felony and two misdemeanors of family assault violence" against him and he and his family spent over $27,000 defending the cases. Garner testified it was upsetting to him to watch his elderly parents have to go back to work in order to help him financially. (63 RR at 77-78.) Garner testified that he ultimately entered a plea agreement to have all of the cases "disposed." (63 RR at 78.)

District Attorney Bingham asked Garner what the plea agreement he entered into was, claiming "I don't know—I don't know who handled the case."[51] Garner said the deal was that if he pled guilty to two misdemeanors the felony would be dropped and he would be sentenced to two years of probation. (63 RR at 78.) Garner claimed that his attorney Bobby Mims wanted him to go to trial but he did not because he was exhausted financially; was scared for the safety of himself and his kids; and a felony conviction would jeopardize his ability to support his kids. Garner was ultimately convicted of assault family violence in 2007 and sentenced to two years of probation and community service. DA Bingham told the jury, "I didn't handle those cases" and said he never talked to Garner before the day of Garner's testimony at Cargill's trial. (63 RR at 79-80.)

---

[51] Even if District Attorney Bingham did not in fact handle Garner's guilty pleas back in 2007, his assertion that he did not know who handled the case suggested to the jury that he also had nothing at all to do with the convictions being vacated in 2011, which was disingenuous at best. Mr. Bingham himself filed Garner's writ of habeas corpus. (*See*, Ex. 28 [Joint Application].)

136

149

Mr. Bingham further provided that in August 2011 "one of his assistants went down" with Mr. Mims and had the assault conviction removed from Garner's record. Garner testified he needed the conviction removed because he could not get into his respiratory therapy school program with an assault conviction on his record. (63 RR at 80-81.) Prosecutor Bingham then had Garner reassure the jury that Garner received nothing in exchange for his testimony at Cargill's trial. (63 RR at 81.)

Cross-examination on the issue of Garner's assault conviction being vacated was brief. Garner testified that he was first arrested on August 13, 2006 and again on August 20, 2006. He was ultimately charged with two misdemeanors and one felony. Garner testified that he appeared in court and pled guilty. Defense counsel asked, "...and the DA's office came in and on some kind of joint motion I guess and cleared your record—is that right? Is that fair?" To which Garner responded, "Yes sir." (63 RR at 134-35.) That was the full extent of trial counsel's cross-examination on the issue.

However, the jury was not privy to the full story regarding how Garner's convictions for assault with family violence—violence against Cargill herself—were inconspicuously set aside without a shred of newly discovered evidence, a practice that is virtually unheard of in the criminal justice system. On August 18, 2011, a Joint Application for Writ of Habeas Corpus Seeking Relief was filed in the 7th Judicial District in Smith County. It was signed by District Attorney Bingham and Garner's attorney. (See Ex. 28 [Joint Application].) The application asserted the same rationale that Garner testified to at Cargill's trial—that he was in fact the victim, not the aggressor, but pled guilty to the assault charges because he was in fear of Cargill. (Id.) There was no support for these allegations in the application itself, other than the assertion by Garner of unsubstantiated bad acts committed by Cargill in the years prior to and after his guilty pleas. (Id.)

137

The very next day, August 19, 2011, a hearing was held in front of District Court Judge Kerry Russell. Judge Russell was immediately taken aback by the filing and remarked, "I'll admit I've never had one of these filed in my 9 years on the bench, so it's new ground for me." The defense attorney[52] handling the case for Mr. Mims agreed. (Ex. 29 at 6 [Transcript of Hearing].) The following discourse then took place:

Q. (By court) I haven't got an announcement of the State. So, Mr. West, Mr. Vance, which one of y'alls in charge today?

A. (By DA West) Yes, your honor. Mr. Bingham asked to come down here and let the Court know that he fully agrees with the writ of habeas corpus that Mr. Mims has filed. And he agrees that the defendant is entitled to grant of habeas corpus in this—in both his cases.

Q. Does this have anything to do with the fact that the alleged victim in the case was a capital murder defendant at present?

A. I really didn't have any conversations about that.

Q. I'm sure you didn't.

A. (By Pace) And I know nothing about that either. I'm just the run in guy.

Q. I'm happy to hear the evidence. It just strikes me as unusual in the 9 years on the bench I've never seen this. And that in this particular case, 2 years after the defendant's been discharged from his community supervision, that we're asked to set aside everything that's gone before.

(Ex. 29 at 7-8 [Transcript of Hearing].)

Garner himself testified that he was currently enrolled in a respiratory therapy program with a high grade point average but was not going to be able to participate in the practicum portion of the program because of his prior assault convictions. (Ex. 29 at 10-16 [Transcript of Hearing].) The court expressed its

---

[52] Mr. Mims was unavailable to personally appear at the writ hearing and attorney Robert Pace represented Garner. (Ex. 29 at 4 [Transcript of Hearing].)

138

reticence in granting the joint request because Garner pled guilty and served his sentence and to reverse all of that called into question the integrity of the judicial system. (*Id.* at 19.) Garner testified that he would not have pled guilty back in 2007 had it not been for his fear of Cargill and the fact that he just wanted it to be over. (*Id.* at 21-22.) On behalf of the District Attorney's Office, Mr. West explained to the court the reasoning behind the joint request was not from his own personal knowledge but only from what had been conveyed to him by Mr. Bingham. This included the fact that in investigating the case against Cargill, Mr. Bingham now believed Garner to be a victim and that Garner pled guilty under duress. (*Id.* at 23-24.) Mr. Pace reiterated that Garner would receive no benefit for his testimony against Cargill and truly the only reason for the joint motion was so that Garner could attend respiratory school. (*Id.* at 24-25.)

## C. Trial Counsel's Failure to Impeach Forrest Garner Prejudiced Cargill

Trial counsel was well aware of Garner's post-conviction writ and subsequent hearing. (*See* Ex. 29 at 28 [Transcript of Hearing](Cargill's attorney Mr. Harrison was present at the hearing in question).) Yet, for inexplicable reasons did not present evidence of the strange proceeding and unique result. The jury should have been provided with the information that it is exceedingly rare for the District Attorney's Office (and unheard of in Judge Russell's court) to intervene on behalf of an individual who pled guilty and successfully completed probation several years before seeking to vacate their conviction. There was no newly discovered evidence presented and no re-opening of the investigation regarding the underlying assault with family violence cases.

Garner's testimony was integral to the State's presentation at punishment, as he testified to the intense and pervasive nature of Cargill's alleged erratic and violent behavior. Instead of characterizing the relationship for what it truly was—a volatile and dysfunctional marriage wrought with mutual physical and emotional

139

abuse, Garner was portrayed as an unsuspecting victim of Cargill's rage and instability. If trial counsel had impeached Garner with the full details of how his convictions were ultimately vacated it is more likely than not that the jury would have discredited the remainder of his testimony and been more likely to accept that while Cargill certainly contributed to the dysfunction in her own life, she was not the monster that Garner made her out to be.

Furthermore, it is simply not the case that Garner did not receive a benefit other than his free and clear admission into respiratory school and a clean criminal record. As a result of the State's intervention, Garner was permitted to testify that he was never the aggressor in any of his interactions with Cargill and was a victim of both her emotional and physical abuse. This was despite the fact that particular positioning was contradicted in large part by police reports, CPS investigation reports, and medical records surrounding the incidents of violence. The relationship between Cargill and Garner was volatile at best, but to allow Garner to testify that he was the consummate victim and acted entirely out of self-preservation was inaccurate and highly misleading.

## D. Conclusion

Vacating Garner's convictions subsequently allowed him to testify that he was never at fault when it came to dealings with Cargill. This had an undeniable (and improper) impact on his credibility as a whole and violated Cargill's fundamental rights. Not informing the jury of the fact that District Attorney Bingham was intimately involved in vacating Garner's convictions, nor conveying to the jury that Garner's post-conviction remedy was highly unique and virtually unheard of, denied Cargill the effective assistance of her own trial counsel. Thus, Cargill's death sentence should be reversed.

140

153

# CLAIM TEN

## TRIAL COUNSEL WERE INNEFFECTIVE FOR FAILING TO OBJECT TO HEARSAY STATEMENTS OFFERED BY JILL LOWE

During the punishment phase of Cargill's trial, the State elicited multiple hearsay statements from witness Jill Lowe. Lowe was permitted to testify to testimonial, out-of-court statements by Luke Garner and Zach Robinson without objection from trial counsel. As a result, the jury was presented with inadmissible testimony establishing that Luke deeply feared his mother, Cargill had hit Zach in the face on at least one occasion, and Zach feared returning home to stay with his own mother. Counsel's failure to object to these hearsay statements constituted deficient performance under prevailing professional norms at the time of Cargill's trial. Additionally, the inadmissible evidence that was placed before the jury as a result of counsel's failures prejudiced Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. As such, Cargill's sentence must be reversed.

### A. Trial Counsel Has a Duty to Preserve Error by Making Proper Objections

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Cargill. *Strickland*, 466 U.S. at 687; *Jimenez*, 364 S.W.3d at 883. To establish deficiency, Cargill must show that her counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected in the American Bar Association standards and the like. *Id.* To establish prejudice, Cargill must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Thompson*, 9 S.W.3d at 812.

141

Trial counsel has a duty to object to inadmissible evidence or improper argument and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); ABA Standards for Criminal Justice, *Defense Function*, 4-7.1(d) ("defense counsel has a duty to have the record reflect adverse rulings"). In order to establish that counsel was ineffective for failing to object, Cargill must show that the trial judge would have committed error had the objection been made and overruled. *Martinez*, 330 S.W.3d at 901.

Hearsay testimony is not only inadmissible under Texas Rule of Evidence 802, but also violates Cargill's rights under the Confrontation Clause of the Sixth Amendment. The Confrontation Clause guarantees criminal defendants "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court held that out-of-court, testimonial statements are inadmissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 68 (2004); *see also Del Carmen Hernandez v. State*, 273 S.W.3d 685, 687 (Tex. Crim. App. 2008). A trial court's failure to sustain counsel's objection to an out-of-court statement offered for the truth of the matter asserted would constitute trial court error.

### B. Trial Counsel Failed to Object to Multiple Hearsay Statements Offered by Jill Lowe

Lowe is a former friend of Cargill. (62 RR at 73-74.) They met at their sons' baseball game in 2005. (*Id.* at 73.) Shortly thereafter, Lowe and Cargill began meeting for lunch or dinner and developed a friendship. (*Id.* at 74.) During the punishment phase of trial, the State called Lowe to testify that she discovered in

142

July 2010 that Cargill had used Lowe's identify to set up a cell phone contract. (*Id.* at 75-76.) Cargill had run up a bill of over $900 under Lowe's name, which Cargill's parents later paid off. (*Id.* at 76.) Nevertheless, Lowe's credit was damaged by the identify theft. (*Id.*) Lowe also testified that she used to see bruises on Jamie and that Cargill's kids seemed to be "intimidated" by their mother. (*Id.* at 80.)

### 1. Hearsay Testimony Regarding Luke Garner

Following Lowe's general comments regarding Cargill's children, the State asked for specific examples of how Lowe knew that Cargill mistreated her children. (*Id.* at 81.) Lowe then launched into a story about a time when she was playing ball with Luke in her house and Luke accidentally broke a thermometer that was kept on Lowe's mantle. (*Id.*) She testified that Luke then said, "Ms. Jill, Ms. Jill, my mama's going to kill me. My mama is going to kill me. I'm going to get a spanking. I'm going to get a spanking." (*Id.* at 81-82.) Trial counsel failed to object to these statements despite them being a clear case of hearsay. Lowe continued on with the story, and told the jury "[Luke] said, 'My mama is going to spank me. My mama is going to spank me.'" (*Id.* at 82.) Again, trial counsel failed to object.

### 2. Hearsay Testimony Regarding Zach Robinson

Later on in her testimony, the State asked Lowe if she had ever seen Cargill abuse any of the children. Lowe stated that she had never personally witnessed abuse but recalled statements made to her by Zach on one occasion.

Q.    (By prosecutor) Do you know whether or not [Cargill] ever choked her children?

A.    I've never seen her do that personally, no.

Q.    Punched them in the face with her fist?

A.    I've never seen that personally.

Q.    A—

143

A. I've been told by the children, by one child.

Q. Who was that?

A. Zach.

Q. He had told you some things his mom had done to him, punching him?

A. Yeah. I don't know if the word was "punch" but he was frightened.

(62 RR at 87-88.) Despite the fact that Lowe began her answer by stating that she had not personally seen the event happen, Lowe went on to say that she had been "told" something by one of the children, and that the State repeated that Lowe had been "told" about the incident in its final question, Counsel did not object. Had counsel objected, the trial court would have sustained the objection under Texas Rule of Evidence 802.

After that, Lowe began to tell a story about "an incident with [Zach's] tonsils that just tore [her] up." (62 RR at 87-88.) At that point, trial counsel objected to hearsay and lack of notice under Texas Rule of Evidence 404(b). (*Id.* at 88-89.) The State explained that it did not know anything about the incident that Lowe was apparently about to go into. (*Id.* at 90.) The trial court recessed the jury and Lowe was taken on voir dire by the State to determine to what exactly she was going to testify. (*Id.* at 90-91.) Lowe explained that there was a time when Cargill and Zach came over to her house after Zach had his tonsils removed. (*Id.* at 91-92.) When Cargill left the room, Lowe asked Zach if he wanted to go home and he responded that he did not. (*Id.* at 92.) She then asked him if he was scared and he responded that he was. Lowe responded by writing her cell phone number on a piece of paper and giving it to Zach without Cargill's knowledge. (*Id.*) Based on the State's voir dire, counsel stated that he had no objection to the testimony. (*Id.*) The jury was called back into the courtroom and the State resumed its direct

144

examination. (*Id.* at 93.) Lowe recounted the story again, this time before the jury. (*Id.*)

> Q. (By prosecutor) Go ahead. I'm sorry. I think when you left, Zach was on the couch and he was staring at you. Go ahead.
>
> A. Pleading with his eyes. And Kim had gone to my office or the bathroom or somewhere. And I leaned over and whispered to him, "Are you—are you afraid?"
>
> And he said—he just looked at me with his eyes and went like that. "And you don't want to go home, do you?"
>
> And he said (shakes head.)
>
> Q. Okay.
>
> A. And so I wrote my cell phone number down and I put it in his hand.

(*Id.*) As promised, trial counsel did not object to the hearsay. The State then took the opportunity to clarify that Zach was not scared about having his tonsils removed, but rather insinuated that he was afraid of his own mother. (*Id.* at 93-94.)

Zach's head nods and shakes, while not verbal expressions, clearly qualify as "nonverbal conduct of a person . . . intended by the person as a substitute for verbal expression." *See* Tex. R. Evid. 801(a)(2). Had trial counsel objected to Lowe's statements either on hearsay or Confrontation Clause grounds, the trial court would have erred in overruling the objection. Thus, trial counsel's failure to object constituted deficient performance. *See Martinez*, 330 S.W.3d at 901.

### C. Cargill was Prejudiced by Trial Counsel's Failure to Object to the Hearsay Statements

Trial counsel's failure to object to the hearsay statements offered by Lowe prejudiced Cargill's constitutional rights. Lowe still would have been able to testify to the more general aggravating issues such as the identity theft and seeing bruises on Jamie when he was a child. However, the more specific stories regarding Cargill's alleged abuse of Luke and Zach were far more damaging to

145

Cargill's case. Lowe's account of Luke saying that he believed Cargill would hurt him because he broke a thermometer painted a vivid image of Cargill as someone who would abuse her children for seemingly insignificant acts. The impact of Lowe's testimony was amplified by Lowe's repeating, "My mama is going to kill me."

Moreover, Lowe's hearsay testimony regarding Zach successfully painted him as a meek and helpless subject of Cargill's angry and abusive tendencies. Trial counsel was give multiple opportunities to prevent the jury from hearing Lowe's account of Zach, pale and sick on her couch, telling Lowe that he was afraid to go home with his own mother. By simply objecting to Lowe's hearsay accounts, counsel could have relegated her testimony to general observations that she made over the years that she knew Cargill. Instead, the State was allowed to present compelling aggravating evidence without challenge from the defense. Counsel's failure to challenge the State's presentation in these areas constituted ineffective assistance and prejudiced Cargill's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. For these reasons, Cargill's sentence should be reversed.

## CLAIM ELEVEN

### CARGILL'S DEATH SENTENCE WAS ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL ISSUE

Texas employs a unique sentencing scheme which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code

146

159

Crim. Proc. Art. 37.071 § 2(b)(1).[53] The American Bar Association ("ABA") has long recognized the problems with this first special issue. *See Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim that jurors are not well-suited to predict the probability of a defendant committing criminal acts of violence in the future). Most recently, the ABA released The Texas Capital Punishment Assessment Report which called on Texas to "abandon altogether the use of the 'future dangerousness' special issue" as it and other aspects of the Texas sentencing scheme "place limits on a juror's ability to give full consideration to any evidence that might serve as a basis for a sentence less than death." ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at viii, xxxix (September 2013) ("ABA Texas Assessment Report").

Among the ABA's concerns with the Texas scheme is that the key terms of the first special issue are undefined. *See* ABA Texas Assessment Report at 308. Additionally, the ABA notes that juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of mitigation, thus placing the first special issue "at the center of the jury's punishment decision." ABA Texas Assessment Report at 307.

The concerns raised by the ABA are consistent with violations of Cargill's Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine. The first special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the

---

[53] If jurors answer this question, referred to as Special Issue One, with a "Yes," jurors are asked to answer another Special Issue. If the jurors answer "No" to this question, the defendant is automatically sentenced to a term of life without the possibility of parole.

147

death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Cargill's death sentence was unlawfully and unconstitutionally imposed in violation of her applicable state and federal Constitutional rights and United States Supreme Court and state case law, and must therefore be reversed.

## A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the Class of Death-Eligible Defendants

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the first special issue. As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case." ABA Texas Assessment Report at viii.

The Supreme Court has long held that juror discretion must be channeled in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find that nearly every murder met the stated criteria. 446 U.S. 420, 428-29 (1980). In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty

148

is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the first special issue is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered. Tex. Code Crim. Proc. Art. 37.071 § 2(b)-(e). Accordingly, it acts as a de facto determinant of death-eligibility and therefore must meaningfully narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the first special issue. Rather, the terms are left to be interpreted according to their ordinary meaning. See *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007). Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event." *Granviel v. State*, 552 S.W.2d 107, 117 n. 6 (Tex. Crim. App. 1976); see also *Jurek v. State*, 522 S.W.2d 934, 945 (Tex. Crim. App. 1975) (Odom, J., dissenting) *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262 (1976) ("The statute does not require a particular degree of probability but only directs that some probability need be found.").

Neither is the degree of violence specified. "Criminal acts of violence" could reasonably range from capital murder all the way down to simple assault. See Christopher Slobogin, *Capital Punishment and Dangerousness*, in MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence"). This proved to be problematic for Cargill's jurors. During their punishment phase deliberations, the foreman sent out a note stating, "We have a disagreement on what criminal violence constitutes. A few juror want this defined." (5 CR 978.) The note requested examples in addition to a definition. Despite the jurors' apparent confusion over what, in fact, the first

149

162

special issue was asking of them, the Court simply referred them back to the Court's charge and instructed them to continue deliberations. (69 RR at 118.) Essentially, Cargill's jury was asked to determine whether there is any likelihood that Cargill might commit *any* act of violence in the future that poses a continuing threat to society. Psychiatrists, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person that was just convicted of a violent crime. *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional. That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another."). Even when predictions are based on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of committing future acts of criminal violence is phrased in terms of non-zero probabilities. *See, e.g.*, Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012, at 272 ("[Mental Health Professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the first special issue fails to narrow the class of death-eligible defendants. Moreover, the fact that any capital defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason. In Cargill's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that might serve as a basis for a sentence less than death. *See Tennard v. Dretke*, 542

150

U.S. 274, 278 ("It is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing the sentence.").

As a result, Cargill's death sentence was unlawfully and unconstitutionally imposed in violation of her applicable state and federal Constitutional rights, and therefore must be reversed.

## CLAIM TWELVE

### CARGILL'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

During the punishment phase deliberations of Cargill's trial, the jury foreman sent out a note indicating that the jury was unable to agree on the first special issue and inquiring as to what the jury's options were at that point. The Court responded, consistent with the Texas "10-12 Rule," that the jury should continue to deliberate. After further deliberations, the jury ultimately sentenced Cargill to death.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society [hereinafter "first special issue"]; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased [hereinafter "party complicity special issue"]; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole [hereinafter "mitigating circumstances special issue"]. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)-(2), (e)(1). The court must sentence a defendant to death if the jury unanimously answers "Yes" to the first two special issues and "No" to the third special issue.

151

Furthermore, the jury must be instructed as to these unanimity requirements. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2).

By contrast, if the jury answers "No" to either of the first two special issues or a "Yes" to the third special issue, then the court must sentence the defendant to life imprisonment without parole. Tex. Code Crim. Proc. art. 37.071, § 2(g). These answers need not be unanimous; instead, the jury may find *against* the first special issue or party complicity or *in favor of* mitigating circumstances so long as ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2).

In addition to these circumstances, the court also must sentence the defendant to life imprisonment without parole if the jury is unable to answer any of the special issues consistent with these guidelines. Tex. Code Crim. Proc. art. 37.071, § 2(g). Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues." Tex. Code Crim. Proc., § 2(a)(1).[54] Jurors thus remain free to speculate—or to be persuaded to make assumptions by their peers equally ignorant as to the law's requirements—that a failure to answer a special issue will produce a mistrial. As Texas's capital sentencing scheme misinforms the jury by bringing outside, impermissible considerations to bear on the verdict, Texas's statute

---

[54] Technically, this part of section 2(a)(1) addresses itself to the "issues submitted under Subsection (c) or (e)." Tex. Code Crim. Proc. art. 37.071, § 2(a)(1). While the mitigating circumstances special issue is submitted to the jury pursuant to subsection (e), no special issue is submitted to the jury pursuant to subsection (c); instead, that subsection concerns the burden of proof borne by the State with respect to the future dangerousness and party complicity special issues, viz., the "issue[s] *submitted under Subsection (b)*." *Id.* at art. 37.071, § 2(c) (emphasis added). Thus, by a plain reading of the statute there is no prohibition to disclose to the jury the effect of a failure to agree on the first two special issues.

152

deprived Cargill of a fair sentencing trial and thereby violated her rights under the Eighth and Fourteenth Amendments.

## A. The Cargill Jury was Initially Unable to Agree on the First Special Issue

Following eight days of punishment phase testimony, the Cargill jury retired for deliberations. After an unspecified period of time deliberating, the jury foreman sent out a note to the Court stating that the jury had reached an impasse on the first special issue—whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The foreman asked, "What are our options or what happens if we can't decide?" (5 CR at 978.) The Court indicated its intention to give the standard response to such a question, informing the jury that it cannot give any further instructions and that the jury should continue to deliberate. (69 RR at 115.) At that point defense counsel re-urged its pre-trial motion challenging the constitutionality of the 10-12 Rule. Moreover, counsel requested the following instruction from the Court:

> Under the law applicable to this case, you are instructed that if the jury is not able to answer a Special Issue, then the jury foreman shall refrain from answering that Special Issue and the Court will assess a life sentence without parole in the event that a Special Issue isn't answered by the jury foreman.

(69 RR at 116.) The State argued that while it understands what counsel is requesting, such an instruction does not reflect the current state of the law. (Id. at 117.) The Court then proceeded to overrule defense counsel's objection and instruct the jury to continue deliberating. (Id.) Ultimately, after nine hours of deliberations, the jury sentenced Cargill to death. (See Ex. 24 [Cargill Gets Death Sentence].)

153

166

## B. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances

Two Supreme Court cases—*Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)—stand for the proposition that a capital sentencing scheme cannot unduly burden a sentencer before he finds the presence of a mitigating circumstance.

In *Mills*, the Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. The Maryland scheme consisted of a verdict form in three sections: In Section I, the jury was asked whether it found unanimously one or more aggravating factors (out of ten aggravating factors listed), *Mills*, 486 U.S. at 385-86; in Section II, the jury was asked whether it found unanimously one or more mitigating factors, *id.* at 386-88; in Section III, the jury was asked to balance the aggravating factor(s) it found against the mitigating factor(s) it found, *id.* at 388-89. To proceed to Section II, the jury had to find unanimously one or more aggravating factors; if not, a life sentence would result. *Id.* at 386-88. To proceed to Section III upon completing Section II, the jury had to find unanimously one or more mitigating factors; if not, a death sentence would result. *Id.* at 389. Because a reasonable juror could have interpreted the instruction and accompanying verdict form as requiring unanimous agreement respecting each mitigating circumstance, the *Mills* Court adjudged this scheme unconstitutional. *Id.* at 384 ("Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."). Indeed, the Maryland scheme bore the additional risk that, even if all twelve jurors believed *some* mitigating circumstance

154

existed, the jury would be prevented from giving effect to any such circumstance unless they unanimously agreed on *which* circumstance(s) existed.

In *McKoy*, the Court likewise confronted a sentencing scheme that unduly burdened the jury's ability to reach a life sentence. The North Carolina sentencing scheme—more so than the Maryland one at issue in *Mills*—explicitly required the jury to find unanimously the presence of a mitigating factor. *Id.* at 435. This unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," thus did the statute violate the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

### C. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

Inconsistent with *Mills* and *McKoy*, Texas's 10-12 Rule permits a minority of a capital jury to impermissibly sway the verdict toward a sentence of death. It is perfectly within the realm of possibility that each of Cargill's twelve jurors would have, at some point in the penalty phase deliberations, voted for a life sentence, but that a death sentence would have resulted by operation of the 10-12 Rule. Consider the following hypothetical: Jurors 1 through 5 initially would answer "No" to the future dangerousness special issue but, fearing a mistrial, they change their votes to "Yes," while Jurors 6 through 10 initially would answer "Yes" to the mitigating circumstances special issue but, also fearing a mistrial, they change their votes to "No." At each stage of the deliberations, both minorities-of-five are well short of the ten votes needed to reach a life sentence, yet together they constitute ten votes in favor of a life sentence.

One might suppose that jurors would surmise the actual outcome in the event that they fail to agree to an extent necessary to conclude their deliberations—

155

that is, twelve votes for death or ten or more votes for life—but this supposition is belied by ample evidence collected by the Capital Jury Project in its interviews with capital jurors. As summarized in a 2003 article by that Project's principal investigator, 66% of interviewed Texas capital jurors incorrectly thought that they had to be convinced beyond a reasonable doubt on findings of mitigation; 73% incorrectly assumed that any findings on mitigation had to be unanimous; and 68% incorrectly believed that death was required if the defendant was determined to be dangerous in the future—the highest level of misunderstanding among the fourteen jurisdictions surveyed by the Capital Jury Project. William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 68, 71, 72-73 (2003). That Cargill's jurors would presume a mistrial upon their failure to agree at sentencing is not merely thinkable, it is *probable*. The Texas sentencing scheme, by hiding from the jury the consequences for falling short of ten and twelve, gives rise to the very risk which animated the Court in *Mills* and *McKoy*. The 10-12 Rule, then, serves as an impediment to even a majority of jurors who desire a life sentence for the defendant, and it thereby tramples upon the protections of the Eight and Fourteenth Amendments. And as the 10-12 Rule is an integral part to Texas's capital sentencing scheme, the scheme itself cannot withstand constitutional scrutiny.

### D. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating Supreme Court precedent in *Mills* and *McKoy* by giving improper weight to a minority voice among the jurors, Texas's 10-12 Rule functions as an impermissible outside influence which acts upon the jury as they deliberate. The rule misleads jurors as to the result of their failure to reach a statutorily-prescribed agreement and coerces them to favor a death sentence on the basis of considerations independent of a case's merits.

156

A feature of American jurisprudence—one broadly understood by the public—is that when a jury is unable to agree a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Because this option is both costly and cumbersome, the law expects that jurors will enter into their deliberations able to be swayed in their opinions. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and, consistent with their convictions, attempt to avoid an impasse.

In a capital case, the shadow of a mistrial understandably looms larger. Jurors cannot help but be aware of those cases' more involved procedures, improved safeguards, and greater expense. They experience first-hand the care taken by the State and the defense to select from the venire twelve jurors suitable for the high stakes of a capital trial. They are told to expect—and they usually sit through—a long trial with copious amounts of evidence and lengthy testimony from lay and expert witnesses alike. They are led to believe that distinguished and doubtlessly high-priced experts from a wide range of disciplines are not only available to testify but relevant to the trial's outcome.

In this setting a reasonable juror would be loath to force a mistrial, especially at that stage of the proceedings when the defendant's culpability already has been unanimously agreed to. But while the guilt/innocence phase of a capital trial tracks the public's understanding of the criminal law—*viz.*, acquittals and convictions must be unanimous—the penalty phase does not. Moreover, after being informed by the court that ten (not twelve) votes are necessary to answer the special issues in a way that favors a life sentence, it would be passingly strange for a juror to conclude that fewer than ten such votes would achieve the very same result. Texas's sentencing scheme not only denies jurors information about the effect of their vote but, by omission, invites them to assume that the consequence

157

for failure to reach agreement pursuant to the 10-12 Rule is a costly mistrial, regardless of any one juror's belief that a life sentence is appropriate. For such a juror *not* to labor under this misapprehension demands a counter-intuition both unreasonable and nowhere else presumed in the law. Thus, rather than operate as an incentive to reach a verdict in a capital case, the 10-12 Rule functions as an outside influence against a juror's vote for mercy.

### E. Conclusion

For the reasons stated above, the Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Accordingly, Cargill's death sentence was impermissibly imposed and should be vacated.

## CLAIM THIRTEEN

## CARGILL'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

Within Texas's criminal justice system, prosecutors exercise considerable discretion. Partly as a consequence of this discretion, a small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the past thirty-seven years. In addition to this geographic disparity—a disparity that cannot be explained merely by reference to county populations—Texas's system of administering the death penalty also reflects disparities based on race and ethnicity. Thus, whereas sentences of death are perforce reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one. As Cargill received her capital sentence by operation of this arbitrary system, she has been denied her rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Cargill's sentence therefore violates her applicable rights under the

158

Texas and United States Constitutions, just as it also violates Texas statutory law and United States Supreme Court and Texas case law. Accordingly, Cargill's sentence should be reversed.

## A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

Over forty years ago, the Supreme Court briefly suspended imposition of the death penalty throughout the United States. See Furman v. Georgia, 408 U.S. 238, 239 (1972) (per curiam). Four years later, the Court validated newly-enacted capital punishment statutes which included safeguards against the "arbitrariness and caprice" that had animated the Court in Furman. Gregg v. Georgia, 428 U.S. 153, 189 (1976) (plurality opinion) ("Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). While capital juries would enjoy some discretion in reaching their determinations regarding sentencing, their discretion under the new statutes would be "'controlled by clear and objective standards so as to produce non-discriminatory application.'" Id. at 196 (quoting Coley v. State, 204 S.E.2d 612, 615 (Ga. 1974)). Accordingly, the plurality in Gregg supposed, juries' decisions no longer would suffer from a lack of guidance and narrowing considerations as to who should receive the death penalty, and this, in turn, would do away with the arbitrariness which Furman found constitutionally intolerable. Id. at 309 (Stewart, J., concurring) (likening imposition of a death sentence to "being struck by lightning"); see also Jurek v. State, 522 S.W.2d 934, 940 (Tex. Crim. App. 1975) ("If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of Furman will be met."), aff'd sub nom. Jurek v. Texas, 428 U.S. 262 (1976).

159

In the intervening decades, the Supreme Court has continued to examine capital sentencing schemes to determine whether they include suitable safeguards to prevent the arbitrary assignment of death sentences. *See, e.g., California v. Brown*, 479 U.S. 538, 541 (1987); *Mills v. Maryland*, 486 U.S. 367, 374 (1988). At the same time, the Court has rejected mandatory sentencing determinations in capital cases because "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citations omitted); *see also Penry v. Lynaugh*, 492 U.S. 302, 805 (1989) (*Penry I*) ("*Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982),] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger*, [481 U.S. 393 (1987)]."). Far from being contradictory, the simultaneous pursuit of these objectives ensures that death is a penalty neither wanton nor freakish. And while certain procedural reforms—bifurcated capital trials, a narrowing of death-eligible crimes, appellate review for sentencing proportionality—continue to pass constitutional muster, others have proven themselves inadequate to the task of "minimiz[ing] the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Compare *Jurek*, 428 U.S. at 275 (approving Texas's guided-discretion statute), *with Penry I*, 492 U.S. at 328 (disapproving same); *compare Gregg*, 428 U.S. at 189 (approving Georgia's guided-discretion statute), *with Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (plurality opinion) (disapproving same).

In a nutshell, then, capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson*, 428 U.S. at 303. When these schemes

160

lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or emotion." *Godfrey*, 446 U.S. at 433.

## B. Texas's Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas's death penalty statute in *Jurek v. Texas* in 1976, having concluded that the state's bifurcation of the guilt/innocence and penalty phases and narrowing of death-eligible crimes "provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek*, 428 U.S. at 276. This judgment has not withstood the scrutiny of later cases. *See, e.g., Penry I*, 492 U.S. at 302 (invalidating Texas's statute for failing to instruct juries that they may consider mitigating evidence); *Penry v. Johnson*, 532 U.S. 782, 782 (2011) (*Penry II*) (invalidating Texas's supplemental instruction on mitigation for failing to provide the jury with a sufficient mechanism to consider mitigating evidence). Were a court to review the current operation of Texas's capital punishment system, it would find the same "struck by lightning", phenomenon which so troubled the Court in *Furman*.

In 2012, 1,089 murders were committed in Texas. Tex. Dep't Pub. Safety, *Index Crime Analysis 2011*, http://www.txdps.state.tx.us/crimereports/11/citCh3.pdf (last visited July 18, 2014). And yet, only nine death sentences were assessed by Texas juries in that same year.[55] Tex. Dep't Crim. Just., *Offenders on Death Row*, https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last

---

[55] Similarly disparate statistics are expected for 2013 and 2014. As of this filing, however, crime statistics for 2013 have not yet been published.

161

visited Aug. 12, 2014).[56] The number of death sentences assessed throughout the state has declined significantly in the past three decades. *See* Tex. Dep't Crim. Just., *Offenders on Death Row, id.* . Within these statistics, however, one finds at work factors that have no place in the "evenhanded, rational, and consistent imposition of death." *Jurek,* 428 U.S. at 276.

### 1. Geography

Since 1976, 1,069 defendants have been sentenced to death in Texas. Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County,* http://www.tdcj.state.tx.us/death_row/dr_county_conviction_offenders.html (last visited Aug. 12, 2014). Collectively, less than half of Texas's 254 counties account for these 1,069 sentences. *Id.* (listing 119 Texas counties). Four counties—Harris, Dallas, Bexar, and Tarrant—account for over 50% of these defendants, as well as for 48% of those who have been executed. Tex. Dep't Crim. Justice, *County of Conviction for Executed Offenders,* https://www.tdcj.state.tx.us/death_row/dr_county_conviction_executed.html (last visited Aug. 12, 2014) (249 out of 515). In the past thirty-seven years, 216 of Texas's 254 counties (85%) have sentenced someone to death three times or less, or not at all. Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County,* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited Aug. 12, 2014)

---

[56] No death row inmate was both convicted and executed in 2012. *See* Tex. Dep't Crim. Just., *Executed Offenders,* https://www.tdcj.state.tx.us/death_row/dr_executed_offenders.html (last visited Apr. 30, 2014). In addition, no death row inmate was both convicted and removed from death row in 2012. *See* Tex. Dep't Crim. Just., *Offenders No Longer on Death Row,* https://www.tdcj.state.tx.us/death_row/dr_offenders_no_longer_on_dr.html (last visited Aug. 12, 2014).

162

Texas is not alone in this phenomenon. Multiple studies conducted throughout the country have identified intra-state geographic discrepancies in the imposition of the death penalty.[57] *See, e.g.,* Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging,* 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010) (discussing studies in Arizona, Missouri, Pennsylvania, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty,* http://works.bepress.com/ adam_gershowitz/5 (2009). In one study, the researchers found that, over a four-year period in Missouri, 76% of cases charged as either first-degree murder, second-degree murder, or involuntary manslaughter met that State's statutory definition to be eligible for the death penalty. Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases,* 51 ARIZ. L. REV. 305, 309-11 (2009). However, only 5% of those cases occasioned a death penalty trial. *Id.* at 309. As a result, prosecutors throughout the state made the decision not to seek death in 95% of death-eligible cases. *Id.* This discretion was not spread evenly, however, as prosecutors in the City of St. Louis and Jackson County (where Kansas City is located) charged capital cases far less frequently (6.5%) than prosecutors in the rest of the state (20%).[58] *Id.* at 344.

---

[57] These observations are, of course, distinct from the *inter*-state geographic discrepancies in the imposition of the death penalty. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme,* 6 WM. & MARY BILL RTS. J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that—not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty—significant discrepancies exist among the death penalty jurisdictions.").

[58] A commission created to examine the fairness of New Jersey's capital punishment system likewise noted its concerns regarding "the existence of

163

In *Jurek* and in *Gregg*, the Supreme Court considered whether impermissible arbitrariness in capital sentencing resulted from prosecutorial discretion to choose those cases in which a death sentence would be sought. *Gregg*, 428 U.S. at 199; *Jurek*, 428 U.S. at 274. The Court determined that this decision-making served to remove defendants from the risk of death and did not violate the U.S. Constitution, provided the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely reflect that of juries and be rooted in the seriousness of the offense:

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

The experience of the last thirty-eight years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. It strains credulity to believe that Texas's four most populous counties—where 50% of Texas's post-1976 death-row cases originated—have had as many heinous crimes within their geographical limits as have Texas's 250 remaining counties. Far more likely, factors such as ideology, experience litigating capital cases, and resource availability exert significant influence on prosecutors' decisions to seek the death

---

variability among counties in the application of the death penalty." N.J. Death Penalty Study Comm., *New Jersey Death Penalty Commission Report* 43 (2007), *available at* http://www.njleg.state.nj.us/committees/dpsc_final.pdf.

164

penalty. *See* Gershowitz, *supra* at 11-15 (noting several instances in which prosecutors have declined to pursue the death penalty based on resource limitations).

The influence of these factors within Texas's capital punishment system has undermined the Supreme Court's expectations, voiced in *Jurek*, that this system would be an "evenhanded, rational, and consistent" one. *Jurek*, 428 U.S. at 276. Thirteen years after *Jurek*, the Court began to recognize the error in its assumption that Texas's system would, in practice, answer the several concerns expressed by a majority of the justices in *Furman*. *Compare Jurek*, 428 U.S. at 272 (expressing confidence that the Texas Court of Criminal Appeals would "interpret [the statutory special issue] so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"), *with Penry I*, 492 U.S. at 318 (finding inadequate and therefore unconstitutional the statutory special issues). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the belief that prosecutorial discretion will produce a consistent application of the law.

## 2. Race

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. *See, e.g.*, David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims).

One study specific to Texas examined the influence of race in Harris County capital cases from 1992 to 1999. Scott Phillips, *Racial Disparities in the Capital*

178

*of Capital Punishment,* 45 HOUS. L. REV. 807 (2008). Using statistical techniques to control for potential confounders[59], the study showed that "black defendants who committed crimes *less* likely to lead to a death trial tended to face a capital trial *more* frequently than their white and Hispanic counterparts." AM. BAR ASS'N, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT (2013) (citing Phillips, 45 HOUS. L. REV. at 830). A defendant also faced increased odds of receiving a death sentence if he was black than if he was white or Hispanic. Phillips, 45 HOUS. L. REV. at 834. The study also confirmed that, in Harris County within the eight-year period, those convicted of killing a white victim were more likely to receive a death sentence than those convicted of killing a black victim. *Id.*

A subsequent study conducted largely the same analysis for the period beginning January 1, 2001, and ending February 15, 2008. Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era,* 50 HOUS. L. REV. 131, 134 (2012). While the race of the defendant no longer appeared to influence the prosecution's charging decisions and the juries' sentencing decisions, the race of the victim still proved to be a controlling factor. *Id.* at 148. Specifically, this study found that "the death penalty was imposed on behalf of white victims at more than twice the rate one would expect if the system were blind to race, and . . . on behalf of white female victims at more than five times the rate one would expect if the system were blind to race and gender." *Id.* at 150.

In a third study—one that used a controlled experiment to examine the subtle influence of race on juror decision-making—researchers at the University of California at Berkeley found that members of a random sample of 276 adults were

---

[59] Potential confounders include "the social characteristics of the defendant, the social characteristics of the victim, and the legal dimensions of the case." Phillips, 45 HOUS. L. REV. at 822-27.

more inclined, after reviewing a file summary of a triple-murder case and being told that the maximum punishment was death, to find a defendant guilty based on the evidence provided if the defendant had a name traditionally associated with minorities (e.g., Darnel, Lamar, Terrell) than if he had a more race-neutral name (e.g., Andrew, Frank, Peter). Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* 5-6 (June 24, 2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1428943. By contrast, other members of that same random sample were no more likely, after reviewing that same file and being told that the maximum punishment was life without possibility of parole, to find a defendant guilty if his name happened to be one traditionally associated with minorities. *Id.*

Although the precise causal mechanism at work only could be guessed at, the researchers nevertheless postulated that "a more severe penalty raises the juror's estimated 'cost' of a wrongful conviction." *Id.* (citing N. Kerr, *Severity of Prescribed Penalty and Mock Jurors' Verdicts*, 36 J. PERSONALITY & SOC. PSYCH. 1431 (1978)). Or, perhaps, "for participants with Black defendants, wrongful conviction was a lesser concern, and instead the death penalty reinforced the brutality of the crime." *Id.* at 6. Still more perverse, "capital punishment may feel more appropriate for Black defendants, given that they are overrepresented on death row, and [] research has indicat[ed] that convicted capital defendants who look more stereotypically Black are more likely to be given a death sentence." *Id.* (citing Jennifer L. Eberhardt, et al., *Looking Deathworthy*, 17 PSYCH. SCI. 383 (2006)).

Whatever the participants' motivation, the conclusion compelled by this study and the other studies mentioned is inescapable: Race continues to influence the imposition of the death penalty, regardless of whether that influence is conscious or unconscious. When a law is applied in such a way that it becomes

167

more directed at a "particular class of persons"—particularly when that class of persons is distinguished by race—the application of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

## C. Conclusion

For the foregoing reasons, Texas's death penalty scheme is unconstitutional. Therefore, Cargill's sentence of death should be vacated.

## CLAIM FOURTEEN

## CARGILL'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), *aff'd, Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). The *Lockett* Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605. Texas's statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating, in violation of the Eighth and Fourteenth Amendments. Cargill's sentence therefore violates her applicable rights under the Texas and United States Constitutions, as

168

well as state statutory law and United State Supreme Court case law and state case law. Accordingly, Cargill's sentence should be vacated.

## A. The Texas Statute and Cargill's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute requires a trial court to submit at least two issues to the jury: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). With respect to the mitigating circumstances special issue, the court must instruct the jury that, if it answers that a circumstance warrants a sentence of life imprisonment without parole rather than a sentence of death, the defendant will receive a life sentence and will not be ineligible for parole. *Id.* at § 2(e)(2)(A)-(B). Furthermore, the court must instruct the jury to answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3).

In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness.*" Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) (emphasis added). No definition of "moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself.

As directed by the statute, the trial court in Cargill's case gave the statutorily required instructions during the punishment phase of trial and before the jury retired to deliberate. (*See* 5 CR at 965-75.) In particular, the court's charge included the following:

169

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(*Id.* at 974.) Further tracking Article 37.071, the charge included the following paragraph: "Further, the jury is instructed to consider mitigating evidence to be evidence that a juror might regard *as reducing the Defendant's moral blameworthiness.*" (*Id.* at 968 (emphasis added).)

### B. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence

The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of that mitigating evidence which the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating. As said the Court in *Tennard v. Dretke*: "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 542 U.S. 274, 285 (2004) (internal quotations omitted). *See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's

170

culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," *viz.*, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4. Even still, it could "hardly be disputed" that the evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4. *See also Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").

At the punishment phase, Cargill presented at least some evidence that bore no relationship to her legal or moral blameworthiness for the capital crime. Specifically, Jerdene Boyd, a fellow inmate at Smith County Jail, testified that she and Cargill were in the same pod together and that they got along well. (68 RR at 23.) She testified that Cargill would do Boyd's hair sometimes and would share her food with Boyd. (*Id.*) This evidence, though unrelated to Cargill's legal or moral blameworthiness for the crime, bolstered the argument that Cargill nevertheless was a worthwhile person undeserving of a death sentence. Such

171

evidence is equally meaningful for jurors as background and character evidence when deciding whether to impose a sentence of death. *See Penry I*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to "consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) (emphasis added). (*See also* CR at 968.) Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to Cargill's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent. Were any of Cargill's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Cargill's moral blameworthiness for the crime—that juror necessarily and untenably would violate the court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (*Penry II*). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Cargill's trial would have been different had a constitutionally adequate instruction been given. *See Id.* at 799.

## C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Cargill's trial, the jury was prohibited from giving effect—meaningful or otherwise—to mitigating evidence falling outside the boundaries specified in their instructions, and this

172

prohibition thereby unconstitutionally limited the jury's ability to give their "reasoned moral response." *See also Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

Although the Supreme Court has upheld Texas's capital punishment statute, it did so "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry I*, 492 U.S. at 318. Since then, the Court has repeatedly expressed its concerns "regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007). In this case, application of the Texas capital punishment statute impaired Cargill's right to have *all* mitigating evidence considered by the jurors as they assessed whether he deserved a life or death sentence. *Penry I*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Therefore, Cargill's death sentence should be reversed.

## CLAIM FIFTEEN

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESERVE THE RECORD FOR APPEAL

Cargill's conviction and sentence of death was unlawfully and unconstitutionally imposed in violation of her applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and

173

186

state case law, because trial counsel failed to preserve the record for appeal by acquiescing to a multitude of off-the-record conferences.

## A. Given the Importance of Preserving Issues for Appeal and the Clear Mandate of the ABA Guidelines to Do So, Failure to Preserve the Trial Record Constitutes Ineffective Assistance of Counsel

Under Texas Rule of Appellate Procedure 13.1, a court reporter is required to record all bench conferences that occur after the trial proceedings are underway. *See, e.g., Tanguma v. State*, 47 S.W.3d 663, 670 (Tex. App.—Corpus Christi 2001). However, if the defendant fails to make a pretrial motion to record bench conferences, the issue is not preserved on appeal should the court reporter fail to do so. *Valle v. State*, 109 S.W.3d 500, 508-09 (Tex. Crim. App. 2003) (holding that violations of Rule 13 are not preserved for appeal unless defense counsel objects to each individual unrecorded bench conference at trial).

The clarity and integrity of the trial record is vital to preserving the possibility of meaningful appellate review. *See, e.g.,* Michael Catalano, Making and Preserving the Record – Objections, 6 Am. Jur. Trials 605 (1967); *see also Moosavi v. State*, 711 S.W.2d 53, 54 (Tex. Crim. App. 1986) (noting that "error must be properly preserved during trial so that a complete record of the error can be reviewed on appeal"); *Mathews v. State*, 635 S.W.2d 532, 537 (Tex. Crim. App. 1982) (noting that "the record must be complete on the issue urged [on appeal]"). It is the duty of defense counsel to "keep the trial record clear, correct, and complete, so that at the end of the trial there will be an accurate history of the proceedings." Catalano, 6 Am. Jur. Trials at 605. This duty is of paramount importance in a capital murder trial, as the imposition of the death penalty is subject to automatic appeal. Tex. Crim. Pro. art. 37.071 § 2(h).

The ABA Guidelines highlight the importance of preserving the record, stating that counsel must "ensure that a full record is made of all legal proceedings

174

. . . ." ABA Guidelines, Guideline 10.8(B)(2). The commentary provides further guidance, noting that:

> One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial. For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review.

*Id.* (commentary). Based on these guidelines, a failure to preserve the record in a capital trial should be considered deficient performance.

The CCA has never directly addressed the issue of ineffective assistance of counsel for failing to ensure the preservation of a complete and clear record. However, there are a number of indications that failure to do so satisfies the deficient performance prong of *Strickland*. First, in considering these claims, a number of lower appellate courts in Texas have moved directly to the *Strickland* prejudice prong, implicitly finding that failure to ensure a complete record may constitute deficient performance. *See, e.g., Howard v. State*, 239 S.W.3d 359, 367 (Tex. App.—San Antonio 2007) (noting that "competent trial counsel should ensure all rulings [occurring during bench conferences] appear in the record"); *Medina v. State*, 2004 WL 764444, *6 (Tex. App.—Texarkana 2004) (unpublished) ("assuming, *arguendo*, that trial counsel erred" by failing to ensure that the court reporter recorded all bench conferences).

The Fifth Circuit has done the same in similar cases. *See, e.g., Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998). No Texas, state, or federal court has ever rejected the claim that defense counsel's failure to ensure a complete record may constitute deficient performance. Given the importance of preserving a complete and clear record for appeal, and the ABA Guidelines' explicit

175

requirements on this point, failure to ensure that off-the-record discussions are memorialized constitutes deficient performance under *Strickland*.

**B. Even if Failure to Preserve the Trial Record Will Not Always Automatically Satisfy the Deficient Performance Prong of *Strickland*, the Deficient Conduct of Cargll's Counsel in This Case Warrants a Finding of Deficient Performance**

Before the start of Cargill's capital trial, defense counsel failed to request that the court reporter record all proceedings including, but not limited to, bench conferences, discussions in chambers that concerned the case, and all objections and rulings therein—despite the fact that this failure waived any appellate claims originating from those discussions. *See Valle*, 109 S.W.3d at 508-09. This failure was compounded by counsel's repeated acquiescence to off-the-record bench conferences once proceedings began. During Cargill's trial, the court repeatedly held substantive discussions off the record and counsel repeatedly failed to go back on the record to re-create what was said or ordered by the court during those discussions.

According to the transcripts, seventy discussions were held off the record during voir dire, pre-trial proceedings, the guilt phase, and the punishment phase.[60] Cargill's counsel continually failed to object to this practice, and often times even requested the off-the-record conference themselves, simultaneously allowing significant gaps in the trial transcript and failing to preserve the issue for appeal.

---

[60] (8 RR at 78, 106; 9 RR at 216, 219, 222, 233; 12 RR at 167; 13 RR at 119; 14 RR at 17; 15 RR at 110, 136; 16 RR at 76; 17 RR at 21, 44; 19 RR at 158; 20 RR at 120; 24 RR at 117; 25 RR at 8, 51, 82; 26 RR at 171, 179; 27 RR at 7, 27; 28 RR at 19; 29 RR at 120, 136, 174, 247; 32 RR at 46, 129, 132, 193; 34 RR at 210, 295; 35 RR at 62, 68; 36 RR at 121, 123; 37 RR at 29; 38 RR at 104, 146, 204; 39 RR at 71; 40 RR at 4; 42 RR at 173, 194; 43 RR at 10; 44 RR at 20; 45 RR at 43, 182; 46 RR at 75, 120; 47 RR at 227; 48 RR at 56, 134; 49 RR at 84; 50 RR at 43; 53 RR at 5, 6; 57 RR at 3, 12, 14, 28; 58 RR at 38, 263 (twice); 60 RR at 69; 63 RR at 164; and 65 RR at 7.)

176

189

*See Valle*, 109 S.W.3d at 508-09 (holding that violations of Rule 13 are not preserved for appeal unless defense counsel objects to each individual unrecorded bench conference at trial).

In sum, trial counsel's failure to request that bench conferences be recorded in order to preserve the record must be considered deficient performance, as it effectively waived Cargill's ability to raise appellate claims regarding the issues discussed off the record.

C. **This Inquiry Must Take Into Account the Inherent Difficulties of Establishing Prejudice When a "Substantial and Crucial Portion" of the Transcript is Missing**

In the absence of a clear and complete record, it is difficult to determine what took place during trial. As such, arguments about possible prejudice suffer since they will frequently be viewed as speculative. Recognizing this, the Fifth Circuit has held that specific prejudice need not be shown if one can establish that a substantial portion of the trial transcript is absent. In *United States v. Selva*, 559 F.2d 1303, 1305-06 (5th Cir. 1977), the court held that an appellant need not show prejudice on direct appeal if: (1) a "substantial and crucial portion" of the trial transcript is missing and (2) he is represented on appeal by counsel other than his trial lawyer. The court reasoned that, under those circumstances, "counsel cannot reasonably be expected to show specific prejudice" because "even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded." *Id.* at 1306. Although the Fifth Circuit ruling is not binding on a state court, the reasoning in *Selva* nevertheless applies here.

In Cargill's case, there are few contextual clues for determining the subject matter of the majority of the seventy unrecorded discussions. Defense counsel's deficient performance in failing to preserve a complete record leads to a most

troubling result: insulation from meaningful appellate review. Therefore a reversal of Cargill's conviction and sentence is merited, as both deficient performance and prejudice are satisfied.

## V.

## PRAYER FOR RELIEF

WHEREFORE, Kimberly Dianne Cargill prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of her claims;

2. Vacate her conviction and death sentence;

3. Grant any other relief that law or justice may require.

Respectfully submitted,

DATED:     August 19, 2014

By _____
Janet Gilger-VanderZanden
Post-Conviction Attorney

By _____
Derek VerHagen
Post-Conviction Attorney

178

191

STATE OF TEXAS    §

COUNTY OF SMITH    §

VERIFICATION

BEFORE ME, the undersigned authority, on this day personally appeared Janet Gilger-VanderZanden who upon being duly sworn by me testified as follows:

1. I am a member of the State Bar of Texas.

2. I am the duly authorized attorney for Kimberly Cargill, having the authority to prepare and to verify Ms. Cargill's Application for Post-Conviction Writ of Habeas Corpus.

3. I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

_____
Janet Gilger-VanderZanden

SUBSCRIBED AND SWORN TO BEFORE ME on this 19th day of August, 2014.

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 20, 2018

Notary without Bond

_____
Notary Public, State of Texas

179

192

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Initial Application for Writ of Habeas Corpus by hand to:

Linda Rhymes
Criminal Post-Trial
Smith County District Clerk
100 N. Broadway, Suite 3180
Tyler, Texas 75702
(Original and one copy, via hand delivery)

Honorable Jack Skeen
Judge, 241st District Court
Smith County Courthouse
100 N. Broadway, Room 220
Tyler, Texas 75702
(One copy via hand delivery)

Smith County District Attorney
ATTN: Mike West
100 N. Broadway, Suite 400
Tyler, Texas 75702
(One Copy via hand delivery)

Kimberly Cargill
TDCJ # 999572
Mountain View Unit
2305 Ransom Road
Gatesville, Texas 76528
(One copy, via mail)

This certification is executed on August 19, 2014 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Janet Gilger-VanderZanden

193



# Lois Rogers

Smith County Courthouse
100 N. Broadway, Room 204
Tyler, Texas 75702

# Smith County
# District Clerk

(903) 590-1660
Fax (903) 590-1661

I, Lois Rogers, Clerk of the 241st District Court of Smith County, Texas, do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5(b).

Given under my hand and seal at my office in Tyler, Smith County, Texas this 6/2/2016.

Lois Rogers, Smith County District Clerk

By: /s/ *Blair Lewis*
Blair Lewis